**UNITED STATES BANKRUPTCY COURT**  **FOR PUBLICATION**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re:                                              Chapter 15

OI BRASIL HOLDINGS COÖPERATIEF U.A.,                Case No. 17-11888 (SHL)

    Debtor in a Foreign Proceeding.
-------------------------------------------------------------x
In re:                                              Chapter 15

OI BRASIL HOLDINGS COÖPERATIEF U.A.,                Case No. 16-11794 (SHL)

    Debtor in a Foreign Proceeding.
-------------------------------------------------------------x
In re:                                              Chapter 15

OI S.A., *et al.*,                                  Case No. 16-11791 (SHL)

    Debtors in a Foreign Proceeding.    (Jointly Administered)
-------------------------------------------------------------x


## POST-TRIAL MEMORANDUM OF DECISION


**A P P E A R A N C E S :**

**JONES DAY**
*Counsel for Jasper R. Berkenbosch, Solely in His Capacity*
*as Insolvency Trustee of Oi Brasil Holdings Coöperatief U.A.*
250 Vesey Street
New York, New York 10281
By: Corinne Ball, Esq.
   Stephen Pearson, Esq.
   Lauri W. Sawyer, Esq.
   Bryan M. Kotliar, Esq.
   Anna Kordas, Esq.


-and-


51 Louisiana Avenue, N.W.
Washington, D.C. 20001
By: Geoffrey Irwin, Esq.

**DECHERT LLP**
*Counsel for the International Bondholder Committee*
1095 Avenue of the Americas
New York, New York 10036-6797
By:    Allan S. Brilliant, Esq.
       Shmuel Vasser, Esq.
       Benjamin E. Rosenberg, Esq.

**WHITE & CASE LLP**
*Counsel for Oi S.A. and Antonio Reinaldo Rabelo Filho as*
*Petitioner and Foreign Representative of the RJ Proceeding*
*of Each of Oi S.A., Telemar Norte Leste S.A., Oi Brasil Holdings*
*Coöperatief U.A., and Oi Móvel S.A.*
1221 Avenue of the Americas
New York, New York 10020-1095
By:    J. Christopher Shore, Esq.
       John K. Cunningham, Esq.
       Mark P. Franke, Esq.

-and-

Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
By:    Richard S. Kebrdle, Esq.
       Jason N. Zakia, Esq.
       Laura L. Femino, Esq.

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
*Counsel for the Steering Committee of the Ad Hoc Group of Bondholders*
One Liberty Plaza
New York, New York 10006
By:    Richard J. Cooper, Esq.
       Luke A. Barefoot, Esq.
       Samuel Hershey, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the *Verified Petition and Motion seeking an Order (I) Recognizing the*

*Dutch Bankruptcy Proceeding as the Foreign Main Proceeding for Oi Brasil Holdings*

*Coöperatief U.A.* ("Coop" or the "Debtor"*); (II) Recognizing the Insolvency Trustee as the*

*Foreign Representative; (III) Modifying the Prior Recognition Order; (IV) Modifying the Prior*

*Joint Administration Order and (V) Granting Certain Related Relief*, dated July 7, 2017 (as later

supplemented and modified, the "Dutch Petition") [ECF Nos. 2, 23].[1]  The Dutch Petition was

filed by Jasper R. Berkenbosch, solely in his capacity as Insolvency Trustee of Debtor Coop (the

"Insolvency Trustee").

The Dutch Petition presents the Court with a complex factual and procedural history.

Coop is a Dutch entity that is part of a family of Brazilian telecommunications companies (the

"Oi Group") that initiated bankruptcy proceedings in Brazil in the summer of 2016.  In July

2016, several of these Oi Group entities—including Coop—sought and received recognition in

this Court of the Brazilian bankruptcy proceedings as a foreign main proceeding under Chapter

15 of the United States Bankruptcy Code.  As a basis for that recognition, the Court found

Coop's center of main interests ("COMI") to be in Brazil given Coop's status as a special

purpose financing vehicle for the Oi Group.

Around the same time, a number of Coop's creditors began to take action against Coop in

the Netherlands, which culminated in a Dutch bankruptcy proceeding for Coop.  After months of

litigation in the Dutch court system, the highest national court in the Netherlands upheld the

jurisdiction and propriety of Coop's bankruptcy proceedings under Dutch law.  In July 2017, the

Insolvency Trustee appointed in the Netherlands filed the Dutch Petition now before this Court.

Contending that Coop's COMI is in the Netherlands, the Dutch Petition seeks to have the Court

recognize Coop's Dutch bankruptcy proceedings as a foreign main proceeding under Chapter 15

and also to overturn the prior recognition by this Court of Coop's Brazilian bankruptcy

---

[1]    Unless otherwise specified, references to the Case Management/Electronic Case Filing ("ECF") docket are to Case No.17-11888.  There is an extensive evidentiary record in this proceeding.  Trial testimony is cited as "Trial Tr. [page:line], [date] ([witness])."  Testimony provided by written declaration is cited as "[Witness] Decl. ¶ __." Testimony on cross-examination provided by written declaration is cited as "[Witness] Cross ¶ __."  Exhibits are cited as "TX __" for the Insolvency Trustee's exhibits, "IBCX __" for the IBC's exhibits, "SCX __" for the Steering Committee's exhibits, and "OX __" for Oi's exhibits.

proceedings.  The Insolvency Trustee's Dutch Petition is supported by Aurelius Capital

Management, LP ("Aurelius") and other like-minded creditors who make up the International

Bondholder Committee (the "IBC," and together with the Insolvency Trustee, the "Movants").

The relief requested by the Movants is opposed by the debtors that previously received

recognition of the Brazilian bankruptcy proceedings in this Court.  These debtors are joined by a

separate group of Oi Group creditors (the "Steering Committee," and, together with the debtors

in the prior case, the "Objectors").

        To address the numerous issues presented by the parties, this Decision is divided into

sections.  The first section sets forth a detailed statement of facts based on the evidence presented

in the case, including at trial.  The remaining sections are the Court's conclusions of law based

on these facts and applicable law.  They open with a brief primer on Chapter 15 of the

Bankruptcy Code, focusing on recognition and the crucial concept of a debtor's COMI.  The

Court next turns to the parties' competing views of the applicable legal standard for evaluating

the Dutch Petition and Coop's COMI.  On the one hand, the Movants urge the Court to conduct a

*de novo* review of Coop's COMI under Section 1517(a) as of the date the Dutch Petition was

filed.  On the other hand, the Objectors advocate reviewing this case under Section 1517(d),

which looks at whether a prior COMI determination should be terminated or modified because it

was incorrect in the first instance or based on events after recognition.  For the reasons explained

below, the Court finds that Section 1517(d) provides the appropriate standard.

        After addressing the applicable legal standard, the Court considers whether the doctrines

of judicial estoppel and comity apply in this case.  More specifically, the Court evaluates

whether this Court should conduct its own determination of COMI under Chapter 15 or whether

it should defer to prior rulings made by the Dutch courts.  The Court ultimately concludes that

judicial estoppel and comity should not apply here for a variety of reasons, including, but not limited to, the differences between the legal question now before this Court and the one decided by the Dutch courts.

Finally, the Court evaluates the two prongs of Section 1517(d) for terminating or modifying a prior recognition. The first of these prongs directs the Court to determine whether the grounds for granting recognition were lacking. This requires the Court to examine the record before the Court at the time it recognized Coop's COMI as Brazil. After determining that the Court should not modify or terminate recognition under the first prong in Section 1517(d), the Court turns to the second prong in Section 1517(d). This second prong examines whether the grounds of recognition have ceased to exist. It requires the Court to examine whether events after the prior recognition have changed Coop's COMI from Brazil to the Netherlands. In concluding that this second prong has not been met, the Court considers the economic reality of the special purpose nature of Coop, the expectations of creditors, the limitations on the Dutch Insolvency Trustee presented by the proceedings in Brazil, and allegations of impropriety against creditor Aurelius.

After a trial and extensive submissions by the parties, the Court denies the Dutch Petition for the reasons set forth below. This decision constitutes the Court's findings of fact and conclusions of law.[2]

---

[2]    Certain information relevant to the Court's determination in this case is sensitive commercial information or subject to confidentiality restrictions under Dutch law. *See* Confidentiality Stipulation and Protective Order [ECF No. 38]; Stipulation Regarding Confidential Dutch Court Proceeding Information [ECF No. 67]; *see also* Rule 9018 of the Federal Rules of Bankruptcy Procedure (permitting protection of, among other things, confidential commercial information). Such confidential information has been redacted from this Decision. Redactions have been kept to a minimum, however, given the interest of transparency in these proceedings. An unredacted version of this Decision has been filed under seal and provided to counsel to the parties that participated in the trial.

**FINDINGS OF FACT**

A. **The Oi Group's Background and Structure**

Incorporated under the laws of Brazil, Oi S.A. ("Oi") is the parent company of a large telecommunications conglomerate. Proposed Joint Pre-Trial Order, Ex. A Statement of Stipulated Facts (the "Stip. Facts") ¶ 1 [ECF No. 87]; Declaration of Antonio Reinaldo Rabelo Filho ("Rabelo Decl.") ¶ 6 [ECF No. 59]. The Oi Group has 140,000 direct and indirect employees in Brazil, including 45,125 full-time employees, as of December 31, 2015. Rabelo Decl. ¶ 5. The Oi Group reports significant operations and market share in a range of telecommunications-related services in Brazil, including (i) operation of 651,000 public telephones, more than one million public Wi-Fi hotspots in locations such as airports and shopping malls, and 330,000 kilometers of fiber optic cables; (ii) a 34.5% market share of fixed-line services including network usage, television and data transmission; and (iii) an 18.6% national market share in mobile telecommunications with 48.1 million mobile subscribers as of December 31, 2015, and network coverage of approximately 93.0% of the urban population of Brazil. Rabelo Decl.¶ 5. Moreover, as part of its mobile business, Oi and/or its affiliates are parties to various roaming and similar contractual arrangements with other global telecommunications companies outside of Brazil. Stip. Facts ¶ 4; Declaration of Ojas N. Shah ("Shah Decl.") ¶ 11 [Case No. 16-11791, ECF No. 4]. Specifically, Oi Móvel S.A. ("Oi Móvel") is a party to roaming agreements with approximately 352 operators in over 140 countries, including in the U.S. TX 63 ¶ 33; TX 284 ¶¶ 18, 21; Trial Tr. 289:22–290:6, Sept. 18, 2017 (Rabelo).

Coop is a subsidiary of Oi. Stip. Facts ¶ 1. Oi has other direct and indirect subsidiaries, including (i) Telemar Norte Leste S.A. ("Telemar"), a wholly-owned subsidiary of Oi that operates a legacy landline telecommunications business; (ii) Oi Móvel, a wholly-owned

subsidiary of Telemar that operates the Oi Group's personal mobile and cable television services;
and (iii) Portugal Telecom International Finance B.V. ("PTIF"), a wholly-owned financing
subsidiary of Oi.  Stip. Facts ¶¶ 1, 3; Rabelo Decl.¶ 6.

### B.   Coop's Background and Structure

Coop was incorporated on April 20, 2011 as a Dutch financing entity with excluded
liability (*coöperatie met uitgesloten aansprakelijkheid*).  Stip. Facts ¶ 5; Shah Decl. ¶ 30; Trial
Tr. 226:11–226:14, Sept. 18, 2017 (Rabelo).  Coop maintains its registered address at
Strawinskylaan 3127, 1077 ZX, Amsterdam, Netherlands, which is the shared office of a trust
company servicing several corporate entities.  Stip. Facts ¶ 6; Trial Tr. 343:18–344:5, Sept. 18,
2017 (Rabelo); Trial Tr. 678:20–679:4, Sept. 25, 2017 (Berkenbosch).  Coop's operations are
very limited.  Coop has no subsidiaries (Stip. Facts ¶ 8); it has never held any equity investments
(Trial Tr. 682:2–14, Sept. 25, 2017 (Berkenbosch)); it has no operations and no business
independent of the Oi Group (Trial Tr. 682:15–18, Sept. 25, 2017 (Berkenbosch)); and it has
never held money for any entity other than a member of the Oi Group (Trial Tr. 352:10–12, Sept.
18, 2017 (Rabelo)).  Coop files financial statements with the Dutch Chamber of Commerce
(Revised Direct Testimony of Jasper R. Berkenbosch ("Berkenbosch Decl.") ¶ 10 [ECF No.
106]), pays taxes in the Netherlands (Trial Tr. 210:16–25, Sept. 18, 2017 (Rabelo)), and files tax
returns with Dutch tax authorities in the Netherlands and as part of the Oi Group's consolidated
tax filings in Brazil (Berkenbosch Decl. ¶ 10; Rabelo Decl.¶ 13).  Coop has retained various
professionals and advisors in the Netherlands in support of its legal and financial obligations.
Stip. Facts. ¶ 9.[3]

---

[3]    These include (i) RESOR N.V. (legal counsel); (ii) Baker Tilly Berk N.V. (auditors); (iii) KPMG (Meijburg
& Co Belastingadviseurs) (tax advisors); and (iv) Vistra B.V. (registered agent).  Stip. Facts ¶ 9.

Oi is and always has been Coop's sole member (i.e., shareholder).  Stip. Facts ¶ 7.

Accordingly, Oi has always held the sole authority to elect Coop's directors.  SCX 1 § 9.3.  The

Coop Board of Directors (the "Coop Board") consisted of two members from the date of Coop's

incorporation until April 19, 2017 (the date of the Dutch "conversion" decision, discussed

below).  Stip. Facts ¶ 10.  Prior to early March 2016, those two members included a Brazilian-

based representative and, to satisfy the Dutch legal requirements for sufficient Dutch presence,

Trust International Management B.V. ("T.I.M."), a Dutch corporate entity.  Trial Tr. 183:21–

187:8, Sept. 18, 2017 (Rabelo).  In early March 2016, Arthur José Lavatori Correa replaced

T.I.M. as the second director, moving to the Netherlands to fill the role.  Stip. Facts ¶ 12; Trial

Tr. 187:9–20, Sept. 18, 2017 (Rabelo).  Prior to serving on the Coop Board, Mr. Correa resided

in Brazil.  Stip. Facts ¶ 13.  From the time of the Dutch "conversion" decision on April 19, 2017

until the present, the Coop Board has consisted of only one Brazilian legal entity, Bryophyta Sp

Participacoes S/A.  Stip. Facts ¶ 11.

From early March 2016 until late April 2017, Mr. Correa also served as Coop's sole

employee.  Stip. Facts ¶ 14.  Mr. Correa's employment contract directed that he work at least 40

hours a week either in the Coop office or "such other place as [Coop] may instruct" (Trial Tr.

197:19–198:21, Sept. 18, 2017 (Rabelo); TX 73 ¶ 4.1), and there is no evidence that he ever

worked in the Coop office, but instead completed all work either at home or in internet cafes.

Trial Tr. 345:22–346:7, Sept. 18, 2017 (Rabelo).  Coop has never employed anyone else other

than Mr. Correa.  Stip. Facts ¶ 15; Trial Tr. 345:9–13, Sept. 18, 2017 (Rabelo); Trial Tr. 679:20–

679:4 (Berkenbosch).

### C.  **Coop's Activities**

Oi established Coop in the Netherlands as a tax-advantaged financing entity.  Shah Decl.

¶¶ 30–31; Rabelo 30(b)(6) Dep. Tr. 108:25–110:2; *see* SCX § 10

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████  Through its

existence, Coop has essentially performed only two functions: (i) borrowing, or issuing or

assuming notes; and (ii) on-lending to the Oi Group.  Trial Tr. 224:17–23; 351:20–352:4, Sept.

18, 2017 (Rabelo); Rabelo Decl. ¶¶ 8, 13; Shah Decl. ¶¶ 30, 35.  Although its Articles of

Association granted Coop the authority to take on a wider range of operations,[4] there is no

evidence that it ever did so.  In fact, Coop is prohibited under the provisions of one of its note

indentures from engaging in any activities other than those related to borrowing and on-lending

to Oi Group affiliates.[5]  TX 15 § 4.17.

---

[4]    The Articles of Association provide Coop with the authority, among other things:

to provide in the material needs of its Members and in this respect:
(a) to directly or indirectly invest in, manage and dispose of interests in businesses and companies and to otherwise manage, put out and invest funds and receivables;
(b) to finance the Members as well as companies and legal entities affiliated with the Cooperative or a Member;
(c) to collect and receive risk-bearing capital from the Members;
(d) to borrow, to lend and to raise funds, including the issue of bonds, promissory notes or other securities or evidence of indebtedness as well as to enter in agreements in connection with aforementioned activities;
(e) to incorporate, to participate in any way whatsoever in, to manage, to supervise businesses and companies;
(f) to finance businesses and companies;
(g) to render advice and services to businesses and companies with which the Cooperative or a Member forms a group and to third parties;
(h) to grant guarantees, to bind the Cooperative and to pledge its assets for obligations of businesses and companies with which it forms a group and on behalf of third parties;
(i) to trade in currencies, securities and items of a property in general;
(j) to perform any and all activities of an industrial, financial or commercial nature,
and to do all that is connected therewith or may be conducive thereto, all to be interpreted in the broadest sense.

SCX 1 § 3.

[5]    The note indenture provides that, so long as any of the securities are outstanding, Coop as issuer shall not:

(a)    engage in any business or enter into, or be party to, any transaction or agreement, except (i) the issuance, sale redemption, repurchase, or defeasance of the Securities (including any Additional Securities) and any other Indebtedness of the Issuer for the financing of the Company and its subsidiaries not otherwise prohibited by this Indenture and activities incidentally related thereto (including on-lending of funds to the Company and its subsidiaries), (ii) entering into affiliate debt transactions, including loan transactions, with regards to proceeds from the Initial

1. **Coop Notes**

Coop is presently the issuer of two series of notes: €628,112,000 of 5.625% U.S. Notes

due 2021 (the "2021 Notes"), and $1,451,413,000 of 5.75% U.S. Notes due 2022 (the "2022

Notes" and, together with the 2021 Notes, the "Coop Notes").  Stip. Facts ¶ 17.  The proceeds

from the issuance of the 2021 Notes were transferred directly to Coop's Itáu Nassau bank

account in the Bahamas.  Rabelo Decl. ¶ 22.  Coop never received the 2022 Notes proceeds

because it was not the original issuer, as explained below.

The 2022 Notes are governed by an indenture agreement dated February 10, 2012, and a

first supplemental indenture dated July 27, 2012 (the "2022 Notes Supplemental Indenture" and,

together with the prior indenture, the "2022 Notes Indenture").  Stip. Facts ¶ 18.  The 2021 Notes

are governed by an indenture agreement dated June 22, 2015 (the "2021 Notes Indenture" and,

together with the 2022 Notes Indenture, the "Coop Notes Indentures").  Stip. Facts ¶¶ 19, 21.

Both series of Coop Notes are guaranteed by Oi.  Stip. Facts ¶ 22.  While the 2021 Notes

were issued by Coop, the 2022 Notes were originally issued by Oi's corporate predecessor,

Brasil Telecom S.A.  Stip. Facts ¶ 20.  The 2022 Notes Indenture includes a provision that

permits any wholly-owned subsidiary of the Oi Group to be substituted as issuer at Oi's sole

---

Securities (including any Additional Securities) and any other Indebtedness not otherwise prohibited
by this Indenture, (iii) entering into hedging agreements not for speculative purposes, (iv) as
required by law, (v) in order to maintain its existence as a corporation, and (vi) in connection with
any transaction not otherwise prohibited under this Indenture;

(b)      acquire or own any subsidiary or other assets or properties, except (A) an interest in
hedging agreements relating to its or its Affiliates' Indebtedness and instruments evidencing
interests in the foregoing, (B) cash and cash equivalents, (C) any assets related to affiliate debt
transactions, and (D) each series of the Securities and other Indebtedness not otherwise prohibited
under this Indenture;

(c)      incur any Indebtedness other than (A) the Securities, and (B) any other Indebtedness that
(x) ranks equally with the Securities or (y) is subordinated to the Securities; and

(d)      incur or suffer to exist any Lien upon any properties or assets whatsoever, except Liens
imposed by law.

TX 15 § 4.17.

discretion and without noteholder consent, so long as Oi provides the noteholders with

indemnification for certain potential disadvantageous tax consequences.  TX 17 § 10.01.  Coop

was eventually substituted as issuer of the 2022 Notes pursuant to the execution of the 2022

Notes Supplemental Indenture.  Stip. Facts ¶ 21.[6]  Oi provided a guarantee on the 2022 Notes in

conjunction with this substitution.  Stip. Facts ¶ 21.

Both Coop Notes Indentures are governed by New York law, designate New York as the

forum for any disputes related to the Coop Notes, and require that Coop maintain an office or

agency in New York City for the purpose of service of process.  Stip. Facts ¶ 23–24.  The Bank

of New York Mellon is the indenture trustee for both series of Coop Notes.  Stip. Facts ¶ 25.

The offering memoranda for both series of Coop Notes speak of the Oi Group as a single

integrated operation (TX 16 at i; TX 19 at i), and the offering memorandum for the 2021 Notes

extensively describes Coop's conduit role and its complete dependence on the Brazilian Oi

Group entities:

> [Coop], a wholly-owned subsidiary of Oi organized under the laws of the
> Netherlands, has no operations other than the issuing and making payments on the
> Notes and other indebtedness ranking equally with the Notes, and using the
> proceeds therefrom as permitted by the documents governing these issuances,
> including lending the net proceeds of the Notes and other indebtedness incurred by
> [Coop] to Oi and subsidiaries of Oi. Accordingly, the ability of [Coop] to pay
> principal, interest and other amounts due on the Notes and other indebtedness will
> depend upon the financial condition and results of operations of Oi and its
> subsidiaries that are creditors of [Coop]. In the event of an adverse change in the
> financial condition or results of operations of Oi and its subsidiaries that are
> creditors of [Coop], these entities may be unable to service their indebtedness to
> [Coop], which would result in the failure of [Coop] to have sufficient funds to repay
> all amounts due on or with respect to the Notes.

TX 16 at 18.

---

[6]    The 2021 Notes Indenture includes a matching issuer substitution option.  Stip. Facts ¶ 21; TX 15 § 10.01.

The definition of "Events of Default" in the 2021 Notes Indenture includes restructuring or liquidation ("whether judicial or extrajudicial") or "any event . . . under the laws of *Brazil*, *the Netherlands* or any political subdivision thereof [that] has substantially the same effect." TX 15 § 6.01(9) (emphasis added). In contrast, and consistent with Oi's corporate predecessor serving as the original issuer, the definition of "Events of Default" in the 2022 Notes Indenture reads similarly, but excludes reference to the Netherlands. *See* TX 17 § 6.01(8) ("any event . . . under the laws of Brazil or any political subdivision thereof [that] has substantially the same effect."). In discussing default and insolvency risk, the offering memoranda for both series of Coop Notes explicitly warn of the possibility of a Brazilian bankruptcy:

> [i]f we are unable to pay our indebtedness, including our obligations under the notes, then we may become subject to bankruptcy proceedings in Brazil. Brazilian bankruptcy laws are significantly different from, and may be less favorable to creditors than, those of the United States.

TX 19 at 26; *see also* TX 16 at 21.

In June 2015, in conjunction with the issuance of the 2021 Notes, the Coop Board approved a resolution which contained the following language:

> [Coop's] centre of main interests (as referred to in Regulation (EC) No. 1346/2000 of the Council of 29 May 2000 on Insolvency Proceedings (as may be amended from time to time up to the date hereof) (the "EU Insolvency Regulation")) is located in the Netherlands and the Cooperative has not or will not have an "establishment" (as defined in the EU Insolvency Regulation) in any other member state of the European Union.

TX 150 Annex ¶ 6. That resolution also stated that it could be relied upon by Clifford Chance LLP, counsel to the underwriting banks and investment firms participating in the initial offering of the 2021 Notes. TX 150 Annex ¶ 6; TX 304 ¶¶ 1.1–1.4, 3.10. Clifford Chance subsequently issued an opinion letter for the benefit of its clients which contained the same clause regarding Coop's "centre of main interest" under EU law. TX 304 ¶ 3.18; Trial Tr. 257:17–261:24, Sept. 18, 2017 (Rabelo).

12

### 2. **PTIF Loan**

While PTIF has a similar role to Coop as a special purpose financing vehicle in the Oi
Group, it has a different origin story. PTIF was formed under the laws of the Netherlands as a
private entity with limited liability. Stip. Facts ¶ 2. Between 2013 and 2014, Oi closed on the
acquisition of Portugal Telecom SGPS, S.A. ("PT"), a Portuguese telecommunications company
that was the then-parent of PTIF. Rabelo Decl. ¶ 18; Berkenbosch Decl. ¶ 17. This purchase
included PTIF and the obligations for certain of PTIF's outstanding debts. Rabelo Decl. ¶ 18;
Berkenbosch Decl. ¶ 17. In late 2014, Oi sold PT, while retaining PTIF as a wholly-owned
subsidiary of Oi. Stip. Facts ¶ 2; Berkenbosch Decl. ¶ 17.

Following Oi's sale of PT, PTIF received the proceeds from the sale of PT as repayment
for its intercompany loans to its former parent. Rabelo Decl. ¶ 19; Berkenbosch Decl. ¶ 17. As a
result of PTIF's corporate structure and Dutch financial and banking regulations, PTIF was
required to re-lend the PT sale proceeds to another member of the Oi Group. Rabelo Decl. ¶ 19.
Accordingly, PTIF transferred the proceeds—in the amount of €4,648,887,000—to Coop (the
"PTIF Loan") pursuant to a loan agreement between PTIF and Coop dated June 2, 2015 (the
"PTIF Loan Agreement"). TX 5; Berkenbosch Decl. ¶ 18; Rabelo Decl. ¶¶ 19–20. Those funds
were deposited and held in Coop's Itaú Nassau bank account in the Bahamas until they were on-
lent to Oi in 2016. Rabelo Decl. ¶ 20; Trial Tr. 329:2–331:7, Sept. 18, 2017 (Rabelo). The PTIF
Loan Agreement was amended in mid-March 2016 to divide and extend the maturity of the loan
across several dates. *See* TX 6 § 1.1 and Annex A.

### 3. **Oi Loans**

Since its formation, Coop has lent money to Oi and Oi Móvel under four loan agreements
(the "Coop Loan Agreements"). TX 7–14; Berkenbosch Decl. ¶ 29; Trial Tr. 218:10–219:2,
Sept. 18, 2017 (Rabelo). In late August 2012, Coop and Oi executed the first loan agreement in

the amount of €1.5 billion.  TX 7.  In mid-June 2015, Coop and Oi executed a second agreement,

which provided for Coop to loan Oi €400 million.  TX 8.  The second agreement was amended

later that same month to increase the borrowing limit to €2 billion.  TX 9.  The second agreement

was then amended twice more in January and March of 2016 to increase the amount of

indebtedness to a total of over €2.6 billion and extend the maturity dates of certain tranches,

respectively.  TX 10, 11.  In late February 2016, Coop and Oi executed a third loan agreement

that provided for Coop to loan Oi approximately €245 million.  TX 12.  This third agreement

was amended in mid-March 2016 to (i) change the governing law from Dutch to Brazilian law;

and (ii) remove a clause that provided Coop with the right to request immediate payment of the

outstanding debt under the agreement 181 calendar days after the date of disbursement.  TX 13.

In early March 2016, Coop and Oi Móvel executed a final loan agreement in the amount of €1.56

billion.  TX 14.

    From June 2015 through the end of April 2016, a total of approximately €4,448,736,523

was transferred from Coop to Oi and Oi Móvel pursuant to the second, third, and fourth loan

agreements.  *See* Berkenbosch Decl. ¶¶ 33, 34 (totaling the loan amounts and detailing the

individual transfers).  As of early August 2016, the aggregate principal amount outstanding

under the four intercompany loans from Coop to Oi and Oi Móvel totaled approximately

€5,518,656,925.  Stip. Facts ¶ 30.

    On June 18, 2015, the Coop Board passed two resolutions approving two amendments to

the credit facilities for the loans between (i) Coop and Oi; and (ii) Coop and PTIF, respectively.

Both resolutions included the following language, similar to that used in the resolution passed in

conjunction with the issuance of the 2021 Notes and Clifford Chance's related opinion letter:

> [Coop's] centre of main interests (as referred to in Regulation (EC) No. 1346/2000
> of the Council of 29 May 2000 on Insolvency Proceedings (as may be amended

from time to time up to the date hereof) (the "EU Insolvency Regulation")) is located in the Netherlands and the Cooperative has not or will not have an "establishment" (as defined in the EU Insolvency Regulation) in any other member state of the European Union.

TX 148 ¶ 6; TX 149 ¶ 6.

### 4.  Summary of Coop's Assets and Liabilities

Coop's most valuable assets include the intercompany claims against Oi and Oi Móvel based on the loans described above, so-called "Pauliana" causes of action (described below) seeking the return of these same funds from Oi and Oi Móvel, a relatively small claim against Dutch tax authorities for a value-added tax (or VAT) refund, and other potential claims and causes of action.  Stip. Facts ¶ 28–29, 69; Trial Tr. 703:16–704:23, 762:17-20, Sept. 25, 2017 (Berkenbosch).

As of July 7, 2017—the date this case was filed—Coop had no bank accounts in Brazil, and its cash assets consisted of: (i) a court-supervised account in the Netherlands with a current total balance of approximately €416,905; (ii) a bank account at Citibank in New York with approximately $10,000 relating to a retainer payment for White & Case; and (iii) a bank account at Citibank in New York with approximately $50,000 held in trust by Jones Day.  Stip. Facts ¶¶ 26–27.

As of August 9, 2017, Coop's debts totaled approximately €5.7 billion, consisting principally of approximately €1.9 billion outstanding under the Coop Notes, approximately €3.8 billion owed to PTIF under the PTIF Loan Agreement, and approximately €50,000 to other creditors located in the Netherlands.  Stip. Facts ¶ 16.

### D.  Oi's Financial Distress and the Brazilian RJ Proceeding

As early as 2015, Oi began suffering financial distress as a result of increased interest rates, "chilled foreign investment in Brazil" stemming from various national corruption scandals,

increased competitive pressures, rapidly declining demand for fixed-line services ("the primary operational focus of Oi and Telemar"), and expensive government-mandated investment in negative-growth rural-area operations.  TX 63 at 3–4; Berkenbosch Decl. ¶ 27.  Oi's financial concerns increased in 2016, reflected by a 168% year-over-year increase in operational losses for the January 2016 to June 2016 period, and an 1126% year-over-year increase in total loss for the same period.  Berkenbosch Decl. ¶ 28.  The market price for Oi's common stock declined by approximately 90% between January 2014 and August 9, 2015.  Dutch Petition ¶ 32.  Credit rating agencies began downgrading the financial ratings of Oi and its affiliates around the same time, and continued warning of a "high risk of impending debt restructuring initiatives resulting in potential losses to creditors" in late 2015 and 2016.  Dutch Petition ¶ 33.

By early June 2016, Oi retained "advisors to help address capital structure and liquidity concerns."  TX 151 at 6.  Around that time, Oi prepared a PowerPoint presentation for bondholders with the title "Project Ocean," which displayed the logos of the legal, financial, and restructuring advisory firms White & Case, BMA, and PJT Partners.  TX 151.  The presentation detailed the Oi Group's financial distress and proposed a note exchange to address its liquidity and leverage issues.  TX 151.  Later that month, the Oi Group publicly disclosed its negotiations with the Steering Committee, including Oi's proposed out-of-court restructuring plan and a counter-proposal from the Steering Committee.  Stip. Facts ¶ 31.

On June 20, 2016, Oi, Oi Móvel, Coop, PTIF, Telemar, Copart 4 Participações S.A. and Copart 5 Participações S.A. (collectively, the "Brazilian RJ Debtors") commenced a jointly administered reorganization proceeding (the "Brazilian RJ Proceeding") in the *7a Vara Empresarial do Rio de Janeiro* (Seventh Business Court of Rio de Janeiro) (the "Brazilian RJ Court").  Stip. Facts ¶ 33.  The Coop Board contemporaneously approved the commencement of

the Brazilian RJ Proceeding for Coop.  Stip. Facts ¶ 32; TX 4 ¶ 5.  The same day that the

Brazilian RJ Proceeding was filed, Ojas N. Shah was appointed as the foreign representative for

the Brazilian RJ Proceeding with respect to four entities—Oi, Coop, Oi Móvel, and Telemar—

pursuant to resolutions and powers of attorney signed by authorized representatives of each

entity.  Stip. Facts ¶ 39.  Later that month, the Brazilian RJ Court granted the request for the

judicial reorganization of the Brazilian RJ Debtors.  Stip. Facts ¶ 34.  In early September 2016,

the Brazilian RJ Debtors submitted a proposed restructuring plan (the "Brazilian RJ Plan") in

the Brazilian RJ Proceeding.  Stip. Facts ¶ 35.  In mid-March 2017, the Oi Group released the

proposed economic terms of a revised plan of reorganization.  Stip. Facts ¶ 36.  The revised plan

had not yet been filed at the time of the trial on the Dutch Petition.  Stip. Facts ¶ 37.  Creditors of

Coop and PTIF have actively participated in the Brazilian RJ Proceeding, including two

Aurelius-managed funds—Syzygy Capital Management, Ltd. ("Syzygy") and Capricorn Capital

Ltd. ("Capricorn")—that have filed pleadings with and requested certain relief from the Brazilian

courts.  Trial Tr. 591:22–592:12, Sept. 25, 2017 (Gropper).

### E.  The Prior Recognition Proceeding

On June 21, 2016, one day after the Brazilian RJ Proceeding was filed, Mr. Shah filed

voluntary petitions in this Court under Chapter 15 of the Bankruptcy Code on behalf of four

entities: Oi, Coop, Oi Móvel, and Telemar (the "Chapter 15 Debtors").  Stip. Facts ¶ 40.  On the

same day, Mr. Shah filed a joint verified petition and motion (the "Brazilian Petition") seeking

recognition of the Brazilian RJ Proceeding for each of the Chapter 15 Debtors (Stip. Facts ¶ 41;

TX 63) [Case No. 16-11791, ECF No. 3], as well as the Shah Declaration (TX 64) [Case No. 16-

11791, ECF No. 4].  On June 21, 2016, this Court entered an order jointly consolidating the

bankruptcy cases for the Chapter 15 Debtors under the Case Number 16-11791.  [Case Number

16-11791, ECF No. 11].

The Shah Declaration informed the Court of Coop's nature as an SPV:

> Coop is a special-purpose vehicle (an "SPV") with no ability to generate a return
> on cash proceeds itself, any proceeds from debt issuances at Coop must be on-lent
> to (eventually) an operating Oi Group entity capable of earning a profit for Coop's
> creditors . . . . [and] Coop is also the obligor on any intragroup loans received by it
> from Oi Group affiliates in its capacity as an intragroup financing company in the
> Oi Group.

Shah Decl. ¶ 34. The Shah Declaration also stated that "[w]hen issuing long-term debt and as is

customary for corporate enterprises, the Oi Group makes use of special purpose financing

companies, intercompany guarantees, and intercompany transfers to reduce its cost of capital."

Shah Decl. ¶ 18.

In addition, the Shah Declaration informed the Court of Coop's ties to the Netherlands. It

stated: "Coop was incorporated . . . in 2011 under the laws of the Netherlands" (Shah Decl. ¶ 30;

Brazilian Petition ¶ 26); "Coop maintains its registered office in the Netherlands" (Shah Decl. ¶

31; Brazilian Petition ¶ 27); "Coop enters routine filings with the Dutch Chamber of

Commerce . . . files tax returns with the Dutch tax authorities, employs Baker Tilly International

as auditor, and completes other ministerial activities required by Dutch law" (Shah Decl. ¶ 31;

Brazilian Petition ¶ 27); "Coop hired independent Dutch counsel to ensure the protection of its

interests in a joint defense with its Oi Group affiliates" (Shah Decl. ¶ 32; Brazilian Petition ¶ 28);

"Coop . . . is governed by two directors, one of whom resides in the Netherlands" (Shah Decl. ¶

31; Brazilian Petition ¶ 27); and "Coop's board of directors . . . hold [its] meetings in the

Netherlands" (Shah Decl. ¶ 32; Brazilian Petition ¶ 28).

On June 22, 2016, the Court held a hearing on the Chapter 15 Debtors' motion for

provisional relief under Section 1519 of the Bankruptcy Code, in which they requested

protection of their U.S. property under the automatic stay pursuant to Section 362 of the

Bankruptcy Code. [Case No. 16-11791, ECF No. 28]. The Court found a "risk of irreparable

harm if the automatic stay" was not put into effect immediately, and was presented with no

objections or claims that the stay would prejudice any parties.  Hr'g. Tr. 9:8–25, June 22, 2016

[Case No 16-11791, ECF No. 28].  Accordingly, the Court granted the relief.  *See Order*

*Granting Provisional Relief* [Case No 16-11791, ECF No. 22].

On July 21, 2016, a hearing was held by the Court on the Chapter 15 Debtors' request to

recognize the Brazilian RJ Proceeding as a foreign main proceeding under Chapter 15 for each of

the Chapter 15 Debtors, including, but not limited to, Coop (the "Prior Recognition Hearing").

[Case No. 16-11791, ECF No. 41].  At the conclusion of the Prior Recognition Hearing, the

Court granted the request, ruling as follows:

> I conclude the Brazilian RJ proceeding is . . . a foreign ma[in] proceeding with
> respect to each of the debtors.  For three of the debtors, I note that the bankruptcy
> code establishes a presumption that a debtor's [] registered office is the center of
> main interest that is the COMI, and that's true for three of these entities.
>
> And I note that the integrated OI group enterprise is managed, directed, and
> monitored as a strategic whole in Brazil while major group decisions are affected
> at the OI group headquarters, the OI group headquarters is the corporate nerve
> center here.
>
> . . . .
>
> And in fact, I also find that Brazil is the appropriate center of main interest for the
> remaining entity, which is an SPV.  Case law including the OAS case notes that the
> COMI of an SPV turns at a location of the corporate nerve center and the
> expectation of creditors. And here, I find that the COMI analysis for the SPV here
> is essentially the same as it was in OAS and I reach the same conclusion that Brazil
> is the appropriate place.

Hr'g Tr. 21:10–15, July 21, 2016 (citing *In re OAS S.A.*, 533 B.R. 83, 92 (Bankr. S.D.N.Y.

2015)).  On July 22, 2016, the Court entered the *Order Granting Recognition of Foreign Main*

*Proceeding and Certain Related Relief* [Case No. 16-11791, ECF No. 38] (the "Prior

Recognition Order", and, together with all pleadings, hearings, and other activity in Case No. 16-

11791, the "Prior Recognition Proceeding").  Stip. Facts ¶ 43.

On July 18, 2017, White & Case filed a notice titled *Disclosure Pursuant to 11 U.S.C. §
1518 Regarding Substitution of Foreign Representative* [Case No. 16-11791, ECF No. 79]
(the "Rabelo Statement"). Stip. Facts ¶ 44. The Rabelo Statement declares that Mr. Shah's
appointment as Coop's foreign representative was terminated pursuant to resolutions and powers
of attorney executed on July 18, 2017, and that Mr. Antonio Reinaldo Rabelo Filho was
simultaneously appointed by the Coop Board to act as Coop's foreign representative in place of
Mr. Shah. Stip. Facts ¶ 45. Mr. Rabelo was previously employed as a tax director at Oi, but left
direct employment with Oi in May 2017. Stip. Facts ¶¶ 46–47.

### F. **Aurelius, the IBC, and the Dutch Bankruptcy Proceeding**

Aurelius participated in the Prior Recognition Proceeding as an interested party and
appeared at both the hearing on June 22, 2016, and the hearing on July 21, 2016. *See Motion for
Admission to Practice, Pro Hac Vice* [Case No. 16-11791, ECF No. 44]. Aurelius did not object
to the recognition of Brazil as the COMI for any of the Chapter 15 Debtors, including Coop. It
also did not file any pleadings beyond its motion for admission. But Aurelius requested that
certain language be included in the order granting provisional relief under Section 1519; the
language provided that the interim stay would not apply to actions and property outside the
United States and, in particular, the Netherlands. Hr'g Tr. 7:24–8:15 June 22, 2017. The Court's
order granting Section 1519 relief included the language Aurelius requested. *See Order
Granting Provisional Relief* ¶ 1. Aurelius sought and received the inclusion of similar language
in the proposed recognition order, resulting in a stipulation that, among other things, the stay
under Section 1520 would apply only to actions and property within the United States. *See* Hr'g
Tr. 9:23–10:15 July 21, 2017.

Notwithstanding its lack of objection to recognition of the Brazilian RJ Proceeding as the
foreign main proceeding for Coop, "[i]t was always [Aurelius'] understanding and expectation

that Coop would be reorganized in the Netherlands pursuant to the laws of the Netherlands." Trial Tr. 636:19–637:25, Sept. 25, 2017 (Gropper).  This was true even at the time of the Prior Recognition Hearing.  *See id.*  Indeed, the same day that the Prior Recognition Order was entered, Aurelius distributed a memo "invit[ing] dialog with holders of more than $50MM face amount of PTIF/[Coop] notes who are heavily weighted toward those notes – meaning that they hold a much larger percentage of the outstanding PTIF/[Coop] notes than of the outstanding Telemar notes."  OX 73 at 4.  This memo argued that initial restructuring negotiations between the Oi Group and some of its creditors had undervalued the PTIF and Coop Notes, and directed interested parties to contact Aurelius.  *Id.* at 3; Trial Tr. 603:24–604:22, Sept. 25, 2017 (Gropper).  As of the date of this memo, Aurelius held only ███████ of Coop Notes on a notional basis.  IBCX 20 at 2.[7]

Aurelius began taking legal action against Coop in the Netherlands weeks before the events in New York.  In the spring of 2016, Aurelius began pursuing actions in the Dutch courts to enjoin the on-lending and transfer of funds from Coop to Oi under their loan agreements. Shah Decl. ¶¶ 56–57.  These actions were ultimately unsuccessful.  Shah Decl. ¶¶ 57–58; SCX 3. In addition, on June 27, 2016, shortly after the filing of the Brazilian Petition, but before the Prior Recognition Hearing, the Aurelius-managed fund Syzygy filed an involuntary bankruptcy petition against Coop in the Netherlands.  Stip. Facts ¶¶ 49–51.  This was followed by the filing

---

[7]    As of July 1, 2017, the IBC held $2.6 billion of Oi Group debt, comprising approximately $574 million of notes issued by Coop, $1.9 billion of notes issued by PTIF, and $165 million of bonds guaranteed by Telemar. IBCX 45 n.2.

As of July 19, 2017, the Steering Committee held $1.23 billion of Oi Group debt, comprising approximately $242 million of notes issued by Coop, $88 million in notes issued by PTIF, $864 million of notes issued by Oi and guaranteed by Telemar, and $37 million in notes issued by Oi without a guarantee.  Steering Committee Objection ¶ 18 n.38 [ECF No. 55].

of three additional involuntary petitions against Coop in the Netherlands in July 2016 by three different groups of creditors.  Stip. Facts ¶¶ 49–51.

In the Prior Recognition Proceeding, the Court was informed of these involuntary petitions through a second declaration from Mr. Shah filed a little more than a week before the Prior Recognition Hearing.  [Case No. 16-11791, ECF No. 32 ¶ 21]; *see also* Hr'g Tr. 8:16–25, July 21, 2017.  In a subsequent declaration filed approximately one month after the Prior Recognition Order was entered, Mr. Shah informed this Court that following the involuntary filings against Coop in the Netherlands, Coop had filed its own petition for a suspension of payments proceeding in the Netherlands (as discussed further below).  Third Decl. Notifying Court of a Change of Status ¶ 5 [Case No. 16-11791, ECF No. 48].

Dutch bankruptcy proceedings are governed by two legal regimes, the EU regime established by the European Insolvency Regulation (the "EU Regulation") enacting the European Union Convention on Insolvency, and the Dutch national regime established by the Dutch Bankruptcy Act (the "DBA").  Berkenbosch Decl. ¶ 115; Declaration of Paul Michael Veder ("Veder Decl.") ¶¶ 12–15 [ECF No. 105–1].  When opening an insolvency proceeding, such as the one involving Coop, a Dutch court is obligated to *sua sponte* determine and declare which regime provides the basis for its jurisdiction.  Berkenbosch Decl. ¶ 116; Veder Decl. ¶ 14.  There are three bases for jurisdiction under the EU Regulation and DBA.  First, under the EU regime, a Dutch court can open a "main" proceeding if the debtor's COMI under the EU Regulation is found to be within the Netherlands.  *Id*.  Second, the court can open a "secondary" or "territorial" proceeding if it finds that the debtor has its COMI under the EU Regulation in a different EU member state, but has an "establishment" in the Netherlands.  *Id*.  Third, if the Dutch court finds a debtor's COMI under the EU Regulation to be outside the EU, it may instead have jurisdiction

22

under the DBA so long as the debtor either (1) has "domicile (*woonplaats*)" in the Netherlands; or (2) maintains an "office (*kantoor*)" in the Netherlands.  Berkenbosch Decl. ¶ 117; Veder Decl. ¶ 34.  For the purpose of the DBA, a legal entity has domicile in the same state as its statutory seat.  *Id*.

The primary difference in finding jurisdiction under the EU Regulation rather than the DBA is the automatic recognition granted to the proceeding by other EU member states.  Trial Tr. 394:22–396:22, Sept. 19, 2017 (Veder); Berkenbosch Decl. ¶ 125.  By contrast, Dutch insolvency proceedings under the DBA generally can receive recognition in other European nations only on a nation-by-nation basis using each nation's idiosyncratic legal protocols, although some member states—such as Germany—do still provide automatic recognition to Dutch insolvency proceedings under the DBA.  Trial Tr. 395:9–396:10, 400:14–401:21, Sept. 19, 2017 (Veder).

Notably, even if COMI under the EU Regulation is found to be in the EU, the Dutch courts offer the same forms of relief for cases opened under the DBA.  Berkenbosch Decl. ¶ 120.  In both cases, Dutch law contemplates two forms of insolvency proceedings for companies: "suspension of payments (*surseance van betaling*) and bankruptcy (*faillissement*)."  Veder Decl. ¶ 37.  Initiation of a suspension of payments ("SoP") instates a general moratorium on all actions by unsecured ordinary creditors and restricts debtors from performing acts of "administration or disposal" with regard to the estate "without cooperation, authorization or consent of the administrator."  Berkenbosch Decl. ¶ 130.  In contrast, in a bankruptcy proceeding, an insolvency trustee becomes exclusively authorized to manage the estate.  Berkenbosch Decl. ¶ 146.

While bankruptcy proceedings can be initiated upon the request of either a debtor or creditor, a SoP can only be granted at the request of the debtor.  Veder Decl. ¶ 37.  Accordingly, a Dutch court makes an initial determination regarding a SoP petition without holding a hearing or receiving input from creditors, shareholders, or other stakeholders.  Berkenbosch Decl. ¶ 132; Veder Decl. ¶ 38.  Upon request for a SoP proceeding, the Dutch court is obligated to grant a preliminary SoP if various initial criteria are met.  Veder Decl. ¶ 38.  Specifically, a SoP petition must contain evidence demonstrating that the debtor anticipates being unable to continue paying its debts as they fall due, and must include such documents as a balance sheet and a list of known creditors with their contact details.  Veder Decl. ¶ 38.  The SoP petition and any enclosed documents (e.g., a proposed composition plan) are subsequently made publically available. Berkenbosch Decl. ¶ 132.  After granting the provisional SoP, a Dutch court will generally also grant a definitive SoP unless (1) a qualified majority of the unsecured ordinary creditors object; (2) there is a well-founded suspicion that the debtor will prejudice the interests of creditors; or (3) there is no prospect of the debtor being able to satisfy its creditors within a certain period of time.  Berkenbosch Decl. ¶ 133.

Right after the filing of the first Dutch involuntary petition by Syzygy, Oi prepared a PowerPoint presentation dated June 30, 2016 and titled "*Projeto Oceano*."  TX 152.  The appendix of the PowerPoint addresses plans for the potential filing of insolvency proceedings across several jurisdictions, including timelines and descriptions of how those filings could interact.  In discussion of a potential Dutch filing, the presentation reads as follows:

> [The Brazilian RJ Proceeding] will not be recognized in the Netherlands therefore if creditors take action in the Netherlands, [Coop] will have to file for an additional insolvency proceeding, Suspension of Payments, to ensure they are protected in the Netherlands.  Please note the current intention is that this will be used as a defensive measure only. An illustrative timeline is on the next slide.

24

TX 152 at Bates OiSA-0000579.

In fact, on July 26, 2016, the Coop Board petitioned for appointment of a silent administrator for Coop in the Netherlands. Stip. Facts ¶ 52. Silent administration is primarily used to gather information about an entity while preparing it for an insolvency proceeding. Berkenbosch Decl. ¶ 49. On July 28, 2016, the Dutch District Court appointed Mr. Jasper Berkenbosch to the administrator post. Stip. Facts ¶ 53. Mr. Berkenbosch used the period of his appointment to "familiarize [him]self with Coop and the other Brazilian RJ Debtors by, among other methods, communicating with the Coop Board and its Dutch legal counsel." Berkenbosch Decl. ¶ 49.

On August 9, 2016, the Coop Board petitioned for a provisional SoP on an *ex parte* basis by filing a petition (the "SoP Petition") with the Dutch District Court. Stip. Facts ¶ 54. At 9:30AM the same morning, the Dutch District Court entered its order granting the SoP Petition (the "SoP Commencement Order") and commencing Coop's SoP proceeding (the "SoP Proceeding"). Trial Tr. 801:19–802:6, Sept. 25, 2017 (Berkenbosch); Stip. Facts ¶ 56. Coop filed the SoP Proceeding to facilitate its reorganization rather than its liquidation. TX 67 ¶ 5. In fact, the SoP Petition included a draft "composition plan" that proposed to incorporate the recoveries offered to creditors under the Brazilian RJ Plan. Stip. Facts ¶ 55; TX 26 Annex 13. A composition plan is the Dutch restructuring alternative to a liquidation and requires adoption by creditors and confirmation by a Dutch court. Trial Tr. 699:16–24, Sept. 25, 2017 (Berkenbosch). Pursuant to the SoP Commencement Order, the Dutch District Court appointed Mr. Berkenbosch as Coop's administrator (in such capacity, the "SoP Administrator") and Mr. W.F. Korthals Altes as the supervisory judge (the "Dutch Supervisory Judge"). Stip. Facts ¶ 57.

Shortly after Mr. Berkenbosch's appointment as SoP Administrator, Aurelius initiated a campaign of frequent and aggressive contact with Mr. Berkenbosch to convince him to move for the withdrawal of the SoP Proceeding and conversion to a Dutch bankruptcy, including by repeatedly critiquing his performance as SoP Administrator and reminding him of his fiduciary duties.  Trial Tr. 617:10–18, 618:13–20, 619:3–23, 620:14–621:11, Sept. 25, 2017 (Gropper); OX 4, 7, 9, 16, 27 (counsel letter on behalf of the IBC); Trial Tr. 816:11–19, Sept. 25, 2017 (Berkenbosch); SCX 6.  Representatives of Aurelius actually apologized twice for the contents of these communications after Mr. Berkenbosch took actions several weeks later that were in line with Aurelius' demands.  Berkenbosch Decl. ¶ 56 n.87; Trial Tr. 621:22–24, 640:13–641:20, 659:11–660:22, Sept 25, 2017 (Gropper); *id.* 767:15–769:4 (Berkenbosch).

Consistent with Aurelius' requests, Mr. Berkenbosch, in his capacity as SoP Administrator, and certain members of the IBC filed requests in early December 2016 to convert Coop's SoP Proceeding to a Dutch bankruptcy proceeding (collectively, the "Coop Conversion Requests").  Stip. Facts ¶ 58; TX 309.

The hearing on the Coop Conversion Requests took place before the Dutch District Court in early January 2017 (the "Conversion Hearing").  Stip. Facts ¶ 60.  Whether requested by a debtor or a creditor, hearings held to determine whether to convert a SoP proceeding and/or open a bankruptcy proceeding generally occur in chambers (in *raadkamer*).  Veder Written Direct ¶¶ 39–40; Berkenbosch Decl. ¶ 140.  In cases stemming from creditor requests, the district court will summon the petitioner and debtor, and may call the administrator and other creditors or relevant parties *sua sponte* or if the creditors have filed parallel bankruptcy requests.  *Id.*; Berkenbosch Decl. ¶ 140.  Either the Dutch court or the administrator may notify creditors that they will be provided an opportunity to participate.  Berkenbosch Decl. ¶ 140.  In Coop's case,

the Conversion Hearing was attended by Mr. Berkenbosch with counsel from Jones Day, the

PTIF administrator,[8] counsel for Coop, and counsel for various creditors, including members of

the IBC, certain Italian noteholders, and GoldenTree Asset Management LP, a member of the

Steering Committee.  Berkenbosch Decl. ¶ 73; Van Agteren 30(b)(6) Dep. Tr. 83:8–84:10.

     In early February 2017, the Dutch District Court denied the Coop Conversion Requests

(the "Conversion Denial Decision").  Stip. Facts ¶ 61.  A little more than a week later, four

creditors of Coop, including the Aurelius-managed fund Syzygy, appealed the Conversion

Denial Decision to the Dutch Court of Appeals.  Stip. Facts ¶ 63; Veder Decl. ¶ 57.  Three of

these creditors, including Syzygy, are members of the IBC.  IBCX 45 n.2; Trial Tr. 769:17–24,

Sept. 25, 2017 (Berkenbosch).  Mr. Berkenbosch did not appeal.  Stip. Facts ¶ 62.  Coop filed a

response to the appeal on March 22, 2017.  TX. 421.  ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

     A hearing on the appeal took place in late March 2017 (the "Dutch Court of Appeals

Hearing").  Stip. Facts ¶ 64.  Counsel to the Coop Board attended ███████████████

████████████████████████████  On April 19, 2017 (the "Conversion

Date"), the Dutch Court of Appeals issued a decision overturning the Conversion Denial

Decision, converting Coop's SoP Proceeding to a Dutch bankruptcy proceeding (the "Dutch

Bankruptcy Proceeding"), and appointing Mr. Berkenbosch as Coop's Insolvency Trustee.  Stip.

Facts ¶ 65.

---

[8]     PTIF was also undergoing a Dutch insolvency proceeding at this time, and had received a provisional SoP
on October 3, 2016.  TX 3 § 3.1(iv).

At the beginning of May 2017, Coop appealed the Dutch Court of Appeals' legal

conclusions to the Dutch Supreme Court. Stip. Facts ¶ 66. The hearing on that appeal took place

in the middle of June 2017. Stip. Facts ¶ 67. In its written pleadings, Coop challenged the Dutch

Court of Appeals decision in part on procedural grounds, arguing that "the Court of Appeals

ought to have summoned all the creditors in order to be heard and not allowed interested parties

other than creditors to be heard." TX 3 § 3.4.1. The Dutch Supreme Court rejected this claim,

interpreting Dutch law to oblige the court to summon only "the petitioner, the debtor and the

administrator" and allowing the court to also "summon[] and hear[] other interested parties, such

as (other) creditors or companies associated with the debtor" at its discretion. TX 3 § 3.4.2; *see

also* Berkenbosch Decl. ¶ 190. ███████████████████████████████████

████████████████████████████████████████████████████████████

███  On July 7, 2017, the Dutch Supreme Court affirmed the Dutch Court of Appeals decision.

Stip. Facts ¶ 68.

### G.  **The Authority and Activities of the Dutch Insolvency Trustee**

Under Dutch law, as under the U.S. Bankruptcy Code, commencement of a bankruptcy

proceeding transfers certain powers away from the pre-insolvency debtor and its management

team. Most significantly, "the debtor – and its board of directors – is no longer authorized to

manage and dispose of the assets composing the insolvent estate." Berkenbosch Decl. ¶ 156.

Rather, only the insolvency trustee is empowered to "preserve, collect and liquidate all of the

debtor's assets for distribution to creditors through the bankruptcy proceeding." Berkenbosch

Decl. ¶ 157; Supplemental Declaration of Paul Michael Veder ("Veder Sup. Decl.") ¶ 12. The

insolvency trustee gains exclusive authority to commence proceedings or bring and defend

against any legal action on behalf of the estate. Berkenbosch Decl. ¶ 156; Veder Sup. Decl. ¶ 12.

Additionally, "any powers of attorney made by a debtor or its board of directors are automatically terminated by operation of law." Berkenbosch Decl. ¶ 157.

The debtor and not the insolvency trustee, however, remains the "legal owner" of the assets of the bankruptcy estate. Veder Sup. Decl. ¶ 11. The insolvency trustee is only appointed to administer the bankruptcy estate, not the "*legal person* of the debtor," and the debtor and its "corporate bodies (*organen*)" retain existence during the bankruptcy. Veder Decl. ¶¶ 60–61 (emphasis in original); Berkenbosch Decl. ¶ 158. "The debtor's management board and supervisory board remain in place, as do any internal corporate groups (such as a works council that looks after the interests of employees)." Veder Decl. ¶ 62.

"[T]he insolvency trustee is not entitled to dismiss or appoint management board members." Berkenbosch Decl. ¶ 158. The board of directors retains authority to call a general meeting of shareholders. Berkenbosch Decl. ¶ 158. The shareholders (or members) retain their equity holdings and their exclusive ability to amend the debtor's articles of association. Veder Decl. ¶¶ 62–63. More practically, while a debtor or its directors "may in principle still enter into agreements with third parties—loan agreements, for example—such agreements do not automatically bind the estate; the estate would only be liable in respect of such an agreement to the extent that the estate benefitted therefrom." Veder Sup. Decl. ¶ 12 [ECF No. 105–2].

The debtor also remains a distinct legal entity for the purposes of participation in the bankruptcy proceedings themselves, and may retain its own counsel, legal, financial or otherwise. Berkenbosch Decl. ¶ 158; Veder Sup. Decl. ¶ 19. The debtor may submit to the supervisory judge "article 69" petitions under Dutch law to challenge actions of the insolvency trustee. Berkenbosch Decl. ¶ 159; Veder Decl. ¶ 64. The debtor can even request that the supervisory judge dismiss or replace the insolvency trustee. Veder Decl. ¶ 64. Likewise, any

creditor or creditor committee is empowered to challenge the acts of an insolvency trustee with the supervisory judge and request an order directing the insolvency trustee to "commit or omit a certain act." Berkenbosch Decl. ¶ 166. The debtor also has a right to challenge creditor claims during the "verification" process or request amendments to the report of the creditors' meeting. Veder Decl. ¶¶ 64–66.

Most significantly, the board remains "solely entitled to offer a composition plan under Dutch law to the unsecured ordinary creditors on behalf of the debtor." Berkenbosch Decl. ¶ 161. This is because under Dutch law, "the composition plan is considered a contract between the debtor and its creditors." Veder Decl. ¶ 66. The insolvency trustee offers advice on the composition plan to the creditors, but cannot vote on the plan with the creditors. Veder Sup. Decl. ¶ 14. A plan is adopted "if more than 50 percent of the total amount of ordinary unsecured creditors present at the meeting where the plan is voted on, which together represent at least half of the total amount of ordinary unsecured claims outstanding, accept the plan." Berkenbosch Decl. ¶ 161. Notably, the board is not allowed to unilaterally bind the Dutch estate by voting in support of a plan of reorganization in a foreign proceeding that affects the estate assets. *See* TX 3 § 3.8.2.

Mr. Berkenbosch has taken several actions on behalf of the Coop Dutch bankruptcy estate in his roles as SoP Administrator and Insolvency Trustee. First, Mr. Berkenbosch has issued several communications to Coop creditors in the form of public reports and notices on the status of Coop's insolvency proceedings and the proposed composition plan as required under Dutch law. Berkenbosch Decl. ¶ 59; TX 29–34; TX 162 Arts. 73a and 227. Some of the reports were published online and are accessible on the Central Insolvency Register in the Netherlands (TX 38 ¶ 1.3; TX 40 ¶ 1.3; Berkenbosch Decl. ¶ 112), as well as on a website Mr. Berkenbosch

has maintained in his capacity as SoP Administrator and Insolvency Trustee.  Berkenbosch Decl. ¶ 59.

Mr. Berkenbosch has engaged in multiple written, electronic, and in-person communications with Oi and the Coop Board.  TX 30 ¶ 1.1, TX 82–87; Trial Tr. 701:23–702:9, Sept. 25, 2017 (Berkenbosch); Berkenbosch Decl. ¶¶ 63, 65–70.  Among other things, Mr. Berkenbosch has held videoconferences and in-person meetings with the Coop Board and Oi executives, as well as their Dutch, Brazilian and U.S. counsel, in Brazil, Portugal, London and the Netherlands.  TX 30 ¶ 1.1; Berkenbosch Decl. ¶¶ 63, 66, 70.  Mr. Berkenbosch has also sent Oi and the Coop Board a number of letters expressing his concerns and requests regarding the restructuring proceeding in Brazil.  *See, e.g.,* TX 82–87; Berkenbosch Decl. ¶¶ 63, 65, 68–70.

Mr. Berkenbosch has also responded to and satisfied requests for payment of Coop's day-to-day debts and expenses.  *See* Declaration of Corinne Ball ("Ball Decl.") Ex. S [ECF No. 73] (November 30, 2016 email to J. Berkenbosch from Coop Board member requesting authorization of salary payment); *id.* Ex. T (January 25, 2017 email from J. Berkenbosch to RESOR and Coop Board member granting authorization for payment to the Coop Board's Dutch counsel).

Separate and apart from the Dutch insolvency proceedings, Mr. Berkenbosch has initiated actions in the Dutch courts on behalf of the Coop Dutch bankruptcy estate.  In late May 2017, the Insolvency Trustee commenced a Dutch Pauliana action on behalf of the Dutch bankruptcy estate of Coop against Oi and Oi Móvel (the "Pauliana Proceeding").  Stip. Facts ¶ 69.  Mr. Berkenbosch reports the goal of this action to be the "unwinding [of] the 2016 loans from Coop to Oi Móvel."  Berkenbosch Decl. ¶ 25.[9]  On August 2, 2017, the Amsterdam District Court in

---

[9]    Pauliana actions are similar to fraudulent conveyance claims under U.S. law.  Trial Tr. 655:11–17, Sept. 25, 2017 (Gropper); Berkenbosch Decl. ¶ 24; Trial Tr. 703:16–704:8, Sept. 25, 2017 (Berkenbosch).

which the Pauliana Proceeding was filed rejected Coop's request to join as a separate, interested

party:

> The bankrupt debtor remains authorized to act as claimant or defendant insofar as
> it concerns claims that do not involve the estate. However, the claims in the main
> action and in the interim action concern claims "that have rights or obligations that
> belong to the insolvent estate as their subject" (article 25 Dutch Insolvency Act).  It
> does not fit within the system of the law.

Berkenbosch Decl. ¶ 160.  The Insolvency Trustee has also pursued a claim on behalf of Coop's

estate against the Dutch tax authorities for a VAT (value added tax) refund of approximately

€160,846.  Berkenbosch Decl. ¶ 26; Dutch Petition ¶ 30.

Mr. Berkenbosch has also taken action in the Brazilian RJ Proceeding.  Following the

conversion order issued by the Dutch courts, the Brazilian RJ Court issued an order in mid-May

2017 (the "Brazilian Injunction Order") to prohibit Mr. Berkenbosch from taking actions which

would disrupt the Brazilian RJ Proceeding.  The injunction of the Brazilian RJ Court ordered:

> under penalty of R$ 300,000.00 per event of non-compliance, that the Dutch Jas,
> Messrs. Jasper Berkenbosch and J.L.Groenewgen fully respect the decisions of the
> Brazilian law and, among other things, abstain from performing any act aimed at:
> (a) imposing or preventing an action or omission by the directors of [Coop] or PTIF
> or any representative[;] (b) performing or cooperating in the performance of any
> act that tends to encumber, assign, transfer or in any way alienate the assets of
> [Coop] and PTIF, in any jurisdiction, authorising the payment of everyday
> expenses, all under penalty of personal responsibility; and (c) using the cash of
> [Coop] and PTIF to pay attorneys fees, Brazilian or foreign who acted and act on
> behalf of the conversion into bankruptcy of the Dutch companies.

TX 53 at Bates OI-TRUSTEE-000001303; *see also* Declaration of Sérgio Ricardo Savi Ferreira

("Ferreira Decl.") ¶¶ 6–9 [ECF No. 105–3]; Declaration of Giuliano Colombo ("Colombo

Decl.") ¶ 34 [ECF No. 105–7]; Declaration of Sheila Christina Neder Cerezetti ("Cerezetti

Decl.") ¶ 56 [ECF No. 81].  The Insolvency Trustee has appealed this decision multiple times,

earning at least partial relief in June 2017 as to assets located outside of Brazil.[10]  In addition,

Mr. Berkenbosch has obtained orders in the Brazilian RJ Proceeding requiring the Brazilian RJ

Debtors to provide separate creditor lists (TX 471), and to allow creditors to have a non-

consolidated vote on the proposed consolidation (TX 485; Trial Tr. 785:12–19, 786:14–17,

828:12–829:4, Sept. 25, 2017 (Berkenbosch)).

In early July 2017, the Insolvency Trustee received approval from the Dutch Supervisory

Judge to commence the current Chapter 15 proceeding on behalf of Coop.  Berkenbosch Decl. ¶

99.  On July 7, 2017, the Insolvency Trustee filed the Dutch Petition.  Stip. Facts ¶ 70.  On July

31, 2017, the Insolvency Trustee filed a supplement to the Dutch Petition [ECF No. 23].  Stip.

Facts ¶ 71.  To fund his various actions on behalf of the Coop Dutch bankruptcy estate, the

Insolvency Trustee borrowed $5 million from the IBC under a credit facility entered into on July

4, 2017.  Rabelo Decl. ¶ 9; TX 58.  Before accepting that financing, Mr. Berkenbosch contacted

a number of other potential lenders, including Oi, the PTIF insolvency trustee, the Steering

Committee, and other "third-party litigation funders."  Berkenbosch Decl. ¶ 100; Trial

Tr. 700:17–701:12, Sept. 25, 2017 (Berkenbosch); TX 119 at 1, 6–7.

### H.  The Current Proceedings

The Court held a trial on the Dutch Petition on September 18, 19, 25 and 26, 2017.  *See*

*Notice of Filing of Evidentiary Hearing Transcripts* [ECF No. 124].  During the four days of

trial, the Court heard testimony from four witnesses: Mr. Rabelo, Mr. Berkenbosch, Mr. Dan

---

[10]    S*ee* TX 54 at 6 ("[T]here is no evidence that foreign sovereignty was violated . . . . [T]he appealed decision, in explaining the trustee's impediments in any jurisdiction, obviously refers to the goods and assets located in Brazil, with respect to the sovereignty of the States."); TX 134 at 1 ("I grant partial suspensive effect on the assets requested so that the appealed decision expressly shows that the decisions made by the Brazilian courts impact the goods and assets located in domestic territory and those located abroad that are owned by the companies in the process of reorganization, except the cases in which foreign jurisdiction concludes otherwise in that regard, exclusively for the assets located in the territory subject to foreign jurisdiction, due to the principle of sovereignty of each State, and consequently, its Jurisdiction."); *see also* Cerezetti Decl. ¶¶ 57–61.

Gropper (an Aurelius managing director), and Professor Paul Michael Veder (an expert on Dutch

insolvency law offered by Oi).  By agreement of the parties and pursuant to the Court's

instruction, direct testimony of those witnesses was presented in written form and each appeared

at trial for cross-examination and re-direct examination.  Also by agreement of the parties and

pursuant to the Court's direction, the Court accepted deposition designations in lieu of live

testimony for three Brazilian law experts and three fact witnesses: Giuliano Colombo (Brazilian

law expert for the Steering Committee), Professor Sheila Cerezetti (Brazilian law expert for Mr.

Berkenbosch), Sergio Ricardo Savi Ferreira (Brazilian law expert for Oi),[11] Erick Alberti

(financial advisor to the Steering Committee), Patrick Dyson (partner at an individual fund in the

Steering Committee), Van Agteren (attorney and 30(b)(6) witness for the Steering Committee).

In addition to the witness testimony, the Court heard argument of counsel, admitted exhibits into

evidence, and accepted a stipulation from the parties with agreed-upon facts.  After the trial, the

parties submitted proposed findings of fact and conclusions of law.  *See Movants' Proposed FoF*

and *Movants' Proposed CoL* [ECF No. 120]*; Objectors' Proposed FoF* and *CoL* [ECF No. 121].

## CONCLUSIONS OF LAW

### A.  Chapter 15 and COMI Generally

Chapter 15 of the Bankruptcy Code was enacted by Congress as part of the Bankruptcy

Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23.

Chapter 15 implemented the Model Law on Cross-Border Insolvency (the "Model Law"),

promulgated by the United Nations Commission on International Trade Law ("UNCITRAL").

*See* H.R. REP. No. 109-31, at 105-07 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88; *In re Bear*

*Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. (In Provisional*

---

[11]     Mr. Colombo, Professor Cerezetti, and Mr. Ferreira also submitted written direct testimony.

*Liquidation)*, 374 B.R. 122, 126 (Bankr. S.D.N.Y. 2007).  The stated purpose of Chapter 15 "is

to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms

for dealing with cases of cross-border insolvency," with the related goals of promoting

cooperation between U.S. and foreign courts, greater legal certainty for trade and investment, fair

and efficient administration of cross-border insolvencies that protects the interests of all creditors

and other interested entities, including the debtor, protection and maximization of a debtor's

assets, and the rescue of financially troubled businesses.  11 U.S.C. § 1501(a).

When interpreting Chapter 15, the statute directs that "the court shall consider its

international origin, and the need to promote an application of this chapter that is consistent with

the application of similar statutes adopted by foreign jurisdictions."  11 US.C. § 1508.  "As each

section of Chapter 15 is based on a corresponding article in the Model Law, if a textual provision

of Chapter 15 is unclear or ambiguous, the Court may then consider the Model Law and foreign

interpretations of it as part of its 'interpretive task.'"  *In re OAS*, 533 B.R. at 92 (quoting

*O'Sullivan v. Loy (In re Loy)*, 432 B.R. 551, 560 (E.D. Va. 2010)).  Legislative history also

recommends consulting the Guide to Enactment of the UNCITRAL Model Law on Cross-Border

Insolvency, U.N. Gen. Ass., UNCITRAL 30th Sess., U.N. Doc. A/CN.9/442 (1997) (the

"Guide"), promulgated by UNCITRAL, "for guidance as to the meaning and purpose of [Chapter

15's] provisions."  H.R. Rep. No. 109-31, pt. 1, at 106 n.101 (2005); *see also Morning Mist

Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 136 (2d Cir. 2013).  While the

statutory text of Chapter 15 controls, international sources may be considered to the extent they

assist in "carry[ing] out the congressional purpose of achieving international uniformity in cross-

border insolvency proceedings."  *In re Fairfield Sentry*, 714 F.3d at 136.

A Chapter 15 case is commenced by the foreign representative of a debtor filing a petition for recognition of a foreign proceeding. *See* 11 U.S.C. §§ 1504, 1515(a). The petition must be accompanied by certain evidentiary documents that are presumed authentic in the absence of contrary evidence. *See* 11 U.S.C. §§ 1515(b), 1516(b); *In re Bear Stearns*, 374 B.R. at 128.

Section 1517 of the Bankruptcy Code identifies the requirements for recognition of a foreign proceeding. It provides that

> an order recognizing a foreign proceeding shall be entered if—
> (1) such foreign proceeding . . . is a foreign main proceeding or foreign nonmain proceeding within the meaning of [S]ection 1502;
> (2) the foreign representative applying for recognition is a person or body; and
> (3) the petition meets the requirements of [S]ection 1515.

11 U.S.C. § 1517(a). A recognition must be identified as either a main or a nonmain proceeding. *See In re Bear Stearns*, 374 B.R. at 126–27. "A simple recognition of a foreign proceeding without specifying more (i.e., non-declaration as to either 'main or nonmain') is insufficient as there are substantial eligibility distinctions and consequences." *Id.* at 127. For instance, upon the recognition of a foreign main proceeding, Section 1520 of the Bankruptcy Code provides certain "automatic, nondiscretionary relief," including imposition of an automatic stay with respect to the debtor and its property located within the United States. *In re Fairfield Sentry*, 714 F.3d at 133; 11 U.S.C. § 1520(a). A stay is also available on a discretionary basis upon the recognition of a foreign main or a foreign nonmain proceeding. 11 U.S.C. § 1521(a).

Recognition is mandatory if all three requirements of Section 1517(a) are met. *See* 11 U.S.C. § 1517(a) ("[R]ecognition of a foreign proceeding shall be entered. . ."); *see also In re Creative Fin., Ltd. (In Liquidation)*, 543 B.R. 498, 516 (Bankr. S.D.N.Y. 2016). "But recognition is not a 'rubber stamp exercise,'" and the burden rests on the foreign representative

to prove each of the requirements of Section 1517.  *In re Creative Fin.*, 543 B.R. at 514 (internal

citations omitted).  Additionally, recognition is subject to termination or modification "if it is

shown that the grounds for granting it were fully or partially lacking or have ceased to exist."  11

U.S.C. § 1517(d).  However, "in considering such action the court shall give due weight to

possible prejudice to parties that have relied upon the order granting recognition."  *Id.*

Section 1506 of the Bankruptcy Code includes an overriding public policy exception,

providing that a court may refuse to take an action under Chapter 15 if such action "would be

manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  The exception

is read narrowly, with legislative history stating that "the word 'manifestly' in international

usage restricts the public policy exception to *the most fundamental policies of the United States*."

*In re Fairfield Sentry*, 714 F.3d at 139 (emphasis in original) (quoting H.R. Rep. No. 109-31, pt.

1, at 109 (2005)).  Thus, "even the absence of certain procedural or constitutional rights will not

itself be a bar under [Section] 1506."  *In re OAS*, 533 B.R. at 104 (quoting *In re Vitro S.A.B. de

CV*, 701 F.3d 1031, 1069 (5th Cir. 2012)).  This Court has previously held that "Brazilian

bankruptcy law meets our fundamental standards of fairness and accords with the course of

civilized jurisprudence."  *In re OAS*, 533 B.R. at 103 (quoting *In re Rede Energia S.A.*, 515 B.R.

69, 98 (Bankr. S.D.N.Y. 2014)) (discussing Section 1506 in the context of, among other things, a

request for substantive consolidation of the debtors' assets and liabilities for plan purposes in a

Brazilian proceeding).  Indeed, "Brazil has a comprehensive bankruptcy law that in many ways

mirrors our own."  *Id.* at 103–04 (describing similarities between Brazilian and U.S. insolvency

law).

A foreign main proceeding is defined as "a foreign proceeding pending in the country

where the debtor has the center of its main interests," referred to as "COMI."  11 U.S.C. §

1502(4).  A foreign nonmain proceeding is "a foreign proceeding, other than a foreign main

proceeding, pending in a country where the debtor has an establishment."  11 U.S.C. § 1502(5).

An establishment means "any place of operations where the debtor carries out a nontransitory

economic activity."  11 U.S.C. § 1502(2).

The Bankruptcy Code neither defines COMI, nor prescribes the evidence that should be

considered in making a determination of where a debtor's COMI is located.  *See In re Creative*

*Fin.*, 543 B.R. at 517.  "Because COMI is not statutorily defined, courts are free to develop and

consider the particular factors that may be relevant, dependent upon the facts and circumstances

present."  *Id.* at 517.  Several factors applicable to a COMI determination were identified in the

case of *In re SPhinX, Ltd.*, which stated:

> [v]arious factors, singly or combined, could be relevant to such a determination:
> the location of the debtor's headquarters; the location of those who actually manage
> the debtor (which, conceivably could be the headquarters of a holding company);
> the location of the debtor's primary assets; the location of the majority of the
> debtor's creditors or of a majority of the creditors who would be affected by the
> case; and/or the jurisdiction whose law would apply to most disputes.

351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006).  Also subject to consideration is "a debtor's 'nerve

center,' including from where the debtor's activities are directed and controlled."  *In re Fairfield*

*Sentry,* 714 F.3d at 138 n.10.  The Second Circuit has cited the *SPhinX* factors as "a helpful

guide," but noted that "consideration of these specific factors is neither required nor dispositive"

and that "any relevant activities, including liquidation activities and administrative functions,

may be considered in the COMI analysis."  *Id*. at 137.  The Second Circuit has also noted that the

EU Regulation states that COMI "should correspond to the place where the debtor conducts the

administration of his interest on a regular basis and is therefore ascertainable by third parties."

*Id*. at 138 (quoting EU Regulation, Preamble ¶ 13).  This "underscores the importance of factors

that indicate regularity and ascertainability."  *Id*.  The Second Circuit recognized, however, that

"[t]he absence of a statutory definition for a term that is not self-defining signifies that the text is open-ended, and invites development by courts, depending on facts presented, without prescription or limitation." *Id.* at 138.

The Second Circuit has held that "a debtor's COMI is determined based on its activities at or around the time the Chapter 15 petition is filed . . . ." *In re Fairfield Sentry*, 714 F.3d at 137; *see also id.* at 133–34. Thus, a court making a COMI determination should not conduct an inquiry into a debtor's entire operational history. *See id.* at 134 (citing *In re Ran*, 607 F.3d 1017, 1025 (5th Cir. 2010)). But "[t]o offset a debtor's ability to manipulate its COMI, a court may consider the period between the commencement of the foreign insolvency proceeding and the filing of the Chapter 15 petition." *Id.* at 137; *see also In re Ran*, 607 F.3d at 1026.

Section 1516(c) provides that "[i]n the absence of evidence to the contrary, the debtor's registered office . . . is presumed to be" the debtor's COMI. 11 U.S.C. § 1516(c). But this presumption is rebuttable, and is only applied "[f]or speed and convenience in instances in which the COMI is obvious and undisputed." *In re Creative Fin.*, 543 B.R. at 514–15; *see also In re SPhinX,* 351 B.R. at 117 (citing legislative history). Moreover, the presumption "is especially inappropriate in a case where there is a substantial dispute." *In re Creative Fin.*, 543 B.R. at 517; *see also In re Bear Stearns*, 374 B.R. at 129 ("[T]he Guide explains that the presumption does 'not prevent, in accordance with applicable procedural law, calling for or assessing other evidence if the conclusion suggested by the presumption is called into *question by the court* or an interested party.'") (quoting Guide ¶ 122) (emphasis in original). Thus, the presumption "does not tie the hands of a court to examine the facts more closely in any instances where the court regards the issues to be sufficiently material to warrant further inquiry." *In re Creative Fin.*, 543

B.R. at 515 (quoting *In re Basis Yield Alpha Fund (Master)*, 381 B.R. 37, 52 (Bankr. S.D.N.Y. 2008)).

Additionally, the registered office "does not shift the risk of nonpersuasion, i.e., the burden of proof, away from the foreign representative seeking recognition as a main proceeding." *In re Bear Stearns*, 374 B.R. at 127 (quoting *In re Tri-Continental Exch. Ltd.*, 349 B.R. 627, 635 (Bankr. E.D. Cal. 2006)). "[I]f the foreign proceeding is in the country of the registered office, and if there is evidence that the center of main interests might be elsewhere, then the foreign representative must prove that the center of main interest is in the same country as the registered office." *Id.* at 128 (quoting *In re Tri-Continental Exch.*, 349 B.R. at 635); *see also id.* ("[The] presumption is not a preferred alternative where there is a separation between a corporation's jurisdiction of incorporation and its real seat.") (citing Jay Lawrence Westbrook, *Locating the Eye of the Financial Storm*, 32 BROOK. J. INT'L L. 3, 15 (2007)).

**B.   <u>The Applicable Standard in this Proceeding</u>**

Against this backdrop, the Court must determine the applicable legal standard for evaluating the Dutch Petition. The parties offer starkly different views. On the one hand, the Movants urge that the Court consider recognition of the Dutch Bankruptcy Proceeding under Section 1517(a) of the Bankruptcy Code *de novo*, evaluating the COMI of Coop as of the date that the Insolvency Trustee filed the Dutch Petition, essentially disregarding the Prior Recognition Order. *See* Movants' Proposed CoL ¶ 1–4 [ECF No. 120]. While acknowledging that Section 1517(d) grants the authority for "modification or termination" of an earlier recognition order, Movants contend that satisfaction of the standard set in Section 1517(a) mandates withdrawal of the earlier order and issuance of a new recognition. *See* Movants' Proposed CoL ¶ 5–13; Dutch Petition 95–99, 105; Trustee Reply ¶ 84–87 [ECF No. 72]. On the other hand, the Objectors suggest a higher hurdle. Given the existence of the Court's Prior

40

Recognition Order, they argue that Section 1517(d) applies to allow for "modification or termination," but contend that Movants must meet the exacting standard in Rule 60(b) of the Federal Rules of Civil Procedure to vacate the prior order and reach a different result on Coop's COMI. *See, e.g.*, Objectors' Proposed FoF and CoL ¶¶ 63–70.

As always, we start with the words of the statute. *In re Caldor Corp.*, 303 F.3d 161, 167 (2d Cir. 2002) ("The task of resolving a dispute over the meaning of a provision of the Bankruptcy Code 'begins where all such inquires must begin: with the language of the statute itself.'") (quoting *United States v. Ron Pair Enters.,* 489 U.S. 235, 241 (1989)).  While the Movants look to Section 1517(a) to lobby for a *de novo* COMI determination, it is Section 1517(d) that most directly applies to this situation.  That section specifically contemplates the question currently before this Court: a request to terminate or modify a prior recognition.  *See In re SPhinX*, 351 B.R. at 116 (noting that "recognition itself is subject to review and modification under Bankruptcy Code section 1517(d).").  It provides that "[t]he provisions of this subchapter do not prevent modification or termination of recognition if it is shown that the grounds for granting it were fully or partially lacking or have ceased to exist . . . ."  11 U.S.C. § 1517(d).  The statute thus breaks down the basis for modification or termination into two prongs.  The first prong looks backwards to see whether the basis for recognition previously presented to the Court was flawed in some way.  *See* 11 U.S.C. § 1517(d) (whether it is shown that the grounds for recognition were "fully or partially lacking").  The second prong looks forwards to whether something has changed since recognition.  *See id*. (whether the grounds for recognition "have ceased to exist").

Petitioner's advocacy of a *de novo* review under Section 1517(a) in this case fails because it reads subsection (d) out of the statute.  If the termination or modification of recognition is

41

governed by Section 1517(a), what is the purpose of Section 1517(d)?  What would be the point

in setting forth the two prongs in subsection (d) if not to provide guidance on the basis for

modification or termination of recognition?[12]  *See Knutzen v. Eben Ezer Lutheran Hous. Ctr.*,

815 F.2d 1343, 1348–49 (10th Cir. 1987) (a statute should be construed "so that one section will

not destroy another unless the provision is the result of obvious mistake or error.") (citations

omitted)).  By ignoring the existence of this language, Movants' position "is thus at odds with

one of the most basic interpretive canons, that '[a] statute should be construed so that effect is

given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant

. . . .'"  *Corley v. United States*, 556 U.S. 303, 314 (2009) (*quoting Hibbs v. Winn*, 542 U.S. 88,

101 (2004) (quoting 2A N. Singer, Statutes and Statutory Construction § 46.06, pp. 181–186 (6th

ed. rev. 2000)); *Clark v. Rameker*, 134 S. Ct. 2242 (2014) (citing *Corley*, 556 U.S. at 314).  Of

course, the so-called "antisuperfluous canon"—like other canons of statutory interpretation—is

not absolute.  For example, it cannot be used to override the unambiguous language of a statute.

*See Corley*, 556 U.S. at 324–25 (Alito, J., dissenting) ("such 'interpretative canon[s are] not a

license for the judiciary to rewrite language enacted by the legislature.'") (citations omitted).

But no violence is done to the language of Chapter 15 by viewing Section 1517(d) as the

controlling authority for a request to modify or terminate a prior order of recognition.

This conclusion is reinforced by the placement of subsections (a) and (d) within the same

statutory section.  It is hard to imagine why Congress would place these two provisions within

the same section of Chapter 15 unless it was intended that both subsections be given effect where

appropriate.  It is not the case that these provisions are separated by time or space within Chapter

---

[12]    The parties concede that there can only be one foreign main proceeding.  *See* Trustee Reply ¶ 85; Oi
Objection ¶ 33 [ECF No. 58]; Steering Committee Objection ¶ 58.  As acknowledged by the Insolvency Trustee,
"recognition of the Dutch Bankruptcy Proceeding as a foreign main proceeding necessarily entails termination of the
recognition of the Brazilian proceeding as a foreign main proceeding."  Trustee Reply ¶ 85.

15, having both been enacted simultaneously.  *See* Bankruptcy Abuse Prevention and Consumer

Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23, 139–140 (Apr. 20, 2005).  The

applicability of subsection (d) is further confirmed by the one relevant sentence of legislative

history, which plainly states that "[subsection (d)] states the grounds for modifying or

terminating recognition."  H.R. Rep. 109-31, pt. 1 (2005); *see also* Guide, Art. 17, § 4 (noting

that the prior articles did "not prevent modification or termination of recognition if it is shown

that the grounds for granting it were fully or partially lacking or have ceased to exist").

 But while the language of Section 1517(d) contemplates the Court's *ability* to alter a prior

recognition determination if one of the two prongs is satisfied, nothing in Section 1517(d)

*requires* it.  Section 1517(d) instead contains much more open-ended language.  It provides that

"[t]he provisions of subchapter [1517] do not prevent [the Court] from modif[ying] or

terminat[ing]" a prior recognition order.  11 U.S.C. § 1517(d).  The use of such permissive

phrasing suggests that the Court is left with discretion.  *See Rastelli v. Warden, Metro.*

*Correctional Center*, 782 F.2d 17, 23 (2d Cir. 1986); ("The use of a permissive verb—'may

review' instead of 'shall review'—suggests a discretionary rather than mandatory review

process."); *In re New Haven Projects Ltd. Liab. Co.*, 225 F.3d 283, 287 (2d Cir. 2000) ("This

Court has observed that '[t]he verb "may" generally denotes a grant of authority that is merely

permissive.'") (quoting *International Cablevision, Inc. v. Sykes,* 997 F.2d 998, 1005 (2d

Cir.1993)); *see also Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 346 (2005)

(the connotation that "may" implies discretion is particularly apt when it is used in contrast to the

word "shall").

 The discretion left to a court under Section 1517(d) is markedly different from other

provisions governing recognition under Chapter 15.  Of particular relevance here, the provision

relied upon by the Movants—Section 1517(a)—speaks in mandatory terms. It provides that "an order recognizing a foreign proceeding *shall* be entered" if the conditions for recognition are met. 11 U.S.C. § 1517(a) (emphasis added). Section 1515 of the Bankruptcy Code also uses mandatory language when specifying the information that must be included in a petition for recognition. *See* 11 U.S.C. § 1515(b) ("A petition for recognition *shall* be accompanied by . . . .") (emphasis added). When used in a statute, the word "shall" is ordinarily the language of a legislative command. *See Alabama v. Bozeman*, 533 U.S. 146, 153 (2001) (concluding that the absolutist language of a statute precluded the state's argument for an exception); *Escondido Mut. Water Co. v. LaJolla Indians*, 466 U.S. 765 (1984) ("Congress' apparent desire that the Secretary's conditions 'shall' be included in the license must therefore be given effect unless there are clear expressions of legislative intent to the contrary."); *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("The mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion."); *see also In re Suffolk Regional Off-Track Betting Corp.*, 542 B.R. 72, 84-85 (Bankr. E.D.N.Y. 2015) ("The use of the mandatory 'shall' language denotes a ministerial duty imposed by statute . . . .")

The lack of mandatory language in Section 1517(d)—coupled with the use of "shall" elsewhere in Chapter 15—demonstrates that this distinction is deliberate and, therefore, such discretion was intended for Section 1517(d). *See Weinstein v. Albright*, 261 F.3d 127, 137–38 (2d Cir. 2001) (when a statute uses both "may" and "shall," the normal inference is that each is used in its usual sense, the one being permissive and the other mandatory); *Lopez v. Davis*, 531 U.S. 230, 241 (2001) ("Congress' use of the permissive 'may' . . . contrasts with the legislators' use of a mandatory 'shall' in the very same section."); *United States ex rel. Siegel v. Thoman*, 156 U.S. 353, 359 (1895) ("In the law to be construed here it is evident that the word 'may' is

used in special contradistinction to the word 'shall . . . .'"); *cf. Gustafson v. Alloyd Co.*, 513 U.S.

561, 570–71 (1995) (an act of Congress "should not be read as a series of unrelated and isolated

provisions.") (internal quotations omitted).

Of course, the case law on the distinction between mandatory and permissive language in

statutes focuses largely on the difference between the terms "shall" and "may." This is not

surprising given the frequency with which these terms are used in American statutes and given

that these terms have well-established meaning in American jurisprudence. The Court is mindful

that Section 1517(d) does not use the term "may," despite the fact that "may" is used elsewhere

in Chapter 15. *See, e.g.*, 11 U.S.C. §§ 1505, 1507(a), 1509(b), 1511(a). But Congress does not

follow a uniform code to guide its statutory construction (*see* Robert A. Katzmann, Judging

Statutes 51–53 (2014)), and there are many possible variants of a permissive phrase. *See, e.g.,*

*Leland v. Moran*, 235 F. Supp. 2d 153, 169 (N.D.N.Y. 2002), *aff'd*, 80 F. App'x 133 (2d Cir.

2003) (holding that a statute providing that a "commissioner shall have the power to" take

certain actions to abate pollution "does not constrain the [commission's] discretion whether to

enforce or prosecute violations . . . but merely provides the [commission] with a grant of

authority."); *see id* at 163–164 (holding that where a building inspector "is authorized" to take

action under a statute, he has "discretion" to determine "whether and how to enforce the

provisions at issue . . . .").

The lack of case law on the exact phrasing of subsection (d) does not justify disregarding

its obvious discretionary meaning. *See In re Stringer*, 847 F.2d 549, 551 n.2 (9th Cir. 1988)

("We note in passing that lack of caselaw supporting the literal construction of a statute is not

usually a reason to ignore its plain meaning. Moreover, lack of interpretive caselaw may well

mean that other courts and litigants have not doubted the plain meaning of the statute."); *Am.*

*Nat'l Red Cross v. S.G.*, 505 U.S. 247, 263 (1992) (rejecting alternative interpretative theories of

a statute that "violate[] the ordinary sense of the language used."); *Caminetti v. U.S.*, 242 U.S.

470, 485 (1917) ("[I]f [the statutory language] is plain, . . . the sole function of the courts is to

enforce it according to its terms."); *In re Caldor Corp.*, 303 F.3d at 167–68 ("'[A]s long as the

statutory scheme is coherent and consistent, there generally is no need for a court to inquire

beyond the plain language of the statute.'") (quoting *Ron Pair Enters.,* 489 U.S. at 240–241).[13]

       It is nonetheless instructive to review a few similarly phrased provisions in the

Bankruptcy Code to see how such language is used.  *See Nat'l Credit Union Admin. v. First Nat.*

*Bank & Tr. Co.*, 522 U.S. 479, 501 (1998) (it is an "established canon of construction that similar

language within the same statutory section must be accorded a consistent meaning"); *Ratzlaf v.*

*United States*, 510 U.S. 135, 143 (1994) ("A term appearing in several places in a statutory text

is generally read the same way each time it appears."); *Anderson v. Fed. Deposit Ins. Corp.*, 918

F.2d 1139, 1143 n.4 (4th Cir. 1990) ("We believe the more appropriate rule of statutory

construction is the principle that a court should, if possible, construe statutes harmoniously."); *In*

*re Betacom of Phoenix, Inc.*, 225 B.R. 703, 707 (D. Ariz. 1998), *rev'd on other grounds*, 240

F.3d 823 (9th Cir. 2001) ("Congressional intent may be clarified by analogizing to similar

language in an unrelated statute, that applies to similar parties, subject matter or relationships.").

A review of these similar instances demonstrates a consistent use of the "nothing prevents"

---

[13]       Movants suggest that "[t]ermination of a recognition order under [Section] 1517(d) is discretionary in some
circumstances but is mandatory here because recognition of the Dutch Bankruptcy Proceeding as the foreign main
proceeding is mandatory under [Sections] 1517(a) & (b)."  Movants' Proposed CoL, ¶ 10; *id.* (suggesting this as the
"only interpretation" that harmonizes these provisions).  But there is nothing in the language of subsection (d) that
supports such a tortured reading, which requires that the same statutory language take on two different meanings.
*See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("Our first step in interpreting a statute is to determine
whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the
case.").  Instead, the proper interpretation is the most obvious one: subsections (a) and (b) govern a recognition
request and subsection (d) applies to a request to terminate or modify an order of recognition already entered.

formulation for situations where discretion may be exercised consistent with certain conditions, but where no action is mandated.

Starting closest to home, such phrasing is used in one other provision of Chapter 15. Section 1506 provides that "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. The case law on Section 1506 has focused on the significance of the phrase "manifestly contrary." *See In re Fairfield Sentry*, 714 F.3d at 139 (observing that the section "does not create an exception for any action under [C]hapter 15 that may conflict with public policy, but only an action that is manifestly contrary."); *In re Vitro*, 701 F.3d at 1069–70 (taking restrictive reading of Section 1506 to cover only "exceptional circumstances"). But more relevant for our purposes, the section is considered to be a discretionary exception, consistent with the section's use of the same kind of open ended approach employed by Section 1517(d). *See In re Creative Fin.*, 542 B.R. at 515 (characterizing Section 1506 as "permit[ting] a court to refuse recognition" on specified grounds).

This same kind of phrasing is also found in the most commonly cited source of bankruptcy court discretion, Section 105(a). That provision reads as follows:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. *No provision of this title* providing for the raising of an issue by a party in interest *shall be construed to preclude the court* from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a) (emphasis added). Rather than being read as a directive, Section 105(a) is understood as providing courts with discretion to accommodate the unique facts of a case consistent with the policies or directives set by the other applicable substantive provisions of the Bankruptcy Code. *See Sears, Roebuck & Co. v. Spivey*, 265 B.R. 357, 371 (E.D.N.Y. 2001)

("Section 105 of the Bankruptcy Code bestows on bankruptcy courts a specific equitable power to act in accordance with principles of justice and fairness."); c*f. In re Tennant*, 318 B.R. 860, 871 (B.A.P. 9th Cir. 2004) (approving a bankruptcy court's *sua sponte* dismissal of a case under Section 105(a) after the debtor failed to file its Statement of Financial Affairs within the 15 days required by Rule 1007(c)); *In re Durham*, 461 B.R. 139, 141 (Bankr. D. Mass. 2011) (noting that Section 109(g)(2) on Chapter 13 debtor eligibility "'does not explicitly prescribe for [sic] *sua sponte* dismissal or conversion,' [but Section] 105(a) 'accommodates such a result.'") (quoting *In re Kazis,* 256 B.R. 242, 244 (Bankr. D. Mass. 2000)).

Like Section 1517(d), Section 105(a) only contemplates exercise of the granted discretion when *appropriate*. Under Section 105(a), the standard for appropriate action is whether the exercise of discretion would contravene another section of the Bankruptcy Code. *See In re Headlee Mgmt. Corp.*, 519 B.R. 452, 459 (Bankr. S.D.N.Y. 2014) (Section 105(a) cannot be used to "override explicit mandates of other sections of the Bankruptcy Code.") (citing *Law v. Siegel*, 134 S.Ct. 1188, 1193 (2014)); *GAF Corp. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 26 B.R. 405, 415 (Bankr. S.D.N.Y. 1983) (Section 105 "does not permit the court to ignore, supersede, suspend or even misconstrue the statute itself or the rules.") (citing 2 Collier on Bankruptcy ¶ 105.02 (15th ed. 1982)). Thus, Section 105(a) is markedly similar to Section 1517(d), which cabins off a court's discretion for modifying or terminating recognition to instances where one of the two prongs set forth in the subsection have been met.

Another provision of the Bankruptcy Code—Section 524(f)—also employs the same kind of negative formulation to preserve discretion, but this time for a debtor rather than a court. Sections 524(c) and (d) govern the specific conditions that permit debtor-creditor repayment agreements (e.g. reaffirmation agreements) involving dischargeable debts. *See* 11 U.S.C. §§

48

524(c)–(d).  Section 524(f) states that "[n]othing contained in subsection (c) or (d) of this section

prevents a debtor from voluntarily repaying any debt."  11 U.S.C. § 524(f).  This exception

preserves a debtor's freedom to make payments on a dischargeable debt if the debtor determines

such a choice is warranted.  *See In re Journal Register Co.*, 407 B.R. 520, 533 (Bankr. S.D.N.Y.

2009).  Once again, the language does not mandate action but rather preserves the right to act

where appropriate.  In the case of Section 524(f), the standard for what is appropriate is a truly

voluntary election by the debtor, a condition which courts have construed strictly, consistent with

the broader goals of debtor protection manifested in the surrounding provisions.  *See In re

Nassoko*, 405 B.R. 515, 523–24 (Bankr. S.D.N.Y. 2009); *In re Cruz*, 254 B.R. 801, 815–16

(Bankr. S.D.N.Y. 2000).

Last but not least, the Court has surveyed instances of similar negative phrasing

elsewhere in the U.S. Code.  There are well over 100 instances using the language "does not

prevent," let alone other formulations.  They are far too numerous and disparate to be

summarized here.  But importantly, the Court has been unable to find any instances where such

phrasing appears to have been used to mandate action.  Like 1517(d), these statutes refer back to

strictures of a statutory scheme and illuminate instances where, within that scheme, discretion

may be exercised under appropriate circumstances.  *See, e.g.,* 31 U.S.C. § 5318 ("(1) In

general.—A financial institution . . . shall not establish, maintain, administer, or manage a

correspondent account in the United States for, or on behalf of, a foreign bank that does not have

a physical presence in any country.  (2) Prevention of indirect service to foreign shell banks. . . .

(3) *Exception.—Paragraphs (1) and (2) do not prohibit* a covered financial institution from

providing a correspondent account to a foreign bank, if the foreign bank— . . . .") (emphasis

added); 10 U.S.C. § 2204 ("To prevent overdrafts and deficiencies in the fiscal year for which

appropriations are made, appropriations made to the Department of Defense or to a military

department, and reimbursements thereto, are available for obligation and expenditure only under

scheduled rates of obligation, or changes thereto, that have been approved by the Secretary of

Defense. This section *does not prohibit* the Department of Defense from incurring a deficiency

that it has been authorized by law to incur.") (emphasis added).[14]

Consistent with this statutory analysis, the only court to have applied Section 1517(d) has

concluded that relief under this provision is discretionary.  *See In re Loy*, 448 B.R. 420, 438

(Bankr. E.D. Va. 2011) (stating that "revisiting a recognition determination is not mandatory, it

is within the Court's discretion to do so").  In *Loy*, the debtor sought to revoke the bankruptcy

court's prior recognition of an English bankruptcy proceeding as a foreign main proceeding.

The crux of the dispute in *Loy* was the debtor's contention that COMI was erroneously found to

exist in England when, in fact, the debtor resided in the United States.  Despite extensive efforts

to get to the bottom of this factual question, the court was unable to obtain a clear factual record

due to the debtor's lack of cooperation.  Given this difficulty, the court in *Loy* denied the

debtor's request, stating that "[t]he Court will not afford the Debtor the extraordinary remedy of

revocation of recognition without a complete factual record."  *Id*. at 436.  In reaching that

decision, the court applied the "plain meaning rule" to Section 1517(d).  *Id*. at 438.  It concluded

that "[t]he actual language dictates that the subchapter's provisions '*do not prevent* modification

or termination'" to mean that "revisiting a recognition determination is not mandatory" but rather

---

[14]      *See also* 42 U.S.C. § 1996a ("(2) This section *does not prohibit* such reasonable regulation and registration
by the Drug Enforcement Administration of those persons who cultivate, harvest, or distribute peyote as may be
consistent with the purposes of this section and section 1996 of this title.") (emphasis added); 49 U.S.C. § 49102
("(a) General.--The purpose of this chapter is to authorize the transfer of operating responsibility under long-term
lease of the 2 Metropolitan Washington Airport properties . . . to a properly constituted independent airport authority
created by Virginia and the District of Columbia . . . . (b) . . . . This chapter *does not prohibit* the Airports Authority
and Maryland from making an agreement to make Baltimore/Washington International Airport part of a regional
airports authority . . . .") (emphasis added).

"within the Court's discretion." *Id.* at 438 (emphasis in the original) (quoting 11 U.S.C. § 1517(d)).

For many of the same reasons set forth above, the Court also rejects the Objectors' contention that Rule 60(b) of the Federal Rules of Civil Procedure governs the request for relief in this case. The Objectors contend that Section 1517(d) does not provide a standard for obtaining relief from recognition and, therefore, such relief should be governed by the procedural rules that would normally apply where a party seeks to vacate a court order. This means, they say, that we should use Rule 60(b) here. But the Court disagrees. It is true that Rule 60(b) is the procedural rule that normally governs a request for relief from an order.[15] Fed. R. Civ. P. 60(b) (basis for relief includes mistake, inadvertence, surprise, excusable neglect, newly discovered evidence and fraud); *see United States v. Int'l Bd. of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001) (relief under Rule 60(b) is "properly granted only upon a showing of exceptional circumstances."). But it is not true that no standard exists in Chapter 15 for the situation before the Court. As explained above, subsection (d) provides the standard for a request to terminate or modify recognition—a discretionary standard that examines where there was a mistake in the initial grant of recognition or has been a subsequent change in circumstances. As such, there is no need for Rule 60(b) to fill a gap in the statutory standard.

Moreover, the stringent requirements of Rule 60(b) are a poor fit here. As numerous courts have recognized, the recognition process must be sufficiently flexible to achieve the goals of Chapter 15. In *In re Oversight & Control Comm'n of Avanzit, S.A.*, 385 B.R. 525 (Bankr. S.D.N.Y. 2008), for example, the court observed that "Chapter 15 recognizes that the status of

---

[15] Rule 60(b) is made applicable to bankruptcy proceedings by Rule 9024 of the Federal Rules of Bankruptcy Procedure.

the foreign proceeding can change, and the change can affect the right to recognition before or

after it is granted." *Id.* at 533; *see In re Loy*, 448 B.R. at 440 (citing the *Ananzit* case for the idea

that "recognition determinations are malleable, and, as facts warrant in a specific case, the court

may revisit recognition."). In the same vein, the court in *In re British Am. Ins. Co.*, 425 B.R. 884

(Bankr. D. Fla. 2010), allowed facts relating to the debtor's COMI to be admitted after the

recognition proceedings had commenced. The court observed that Section 1517(d) allowed

courts to adjust their rulings based on changed circumstances, which exhibited "a policy that the

recognition process remain flexible, taking into account the actual facts relevant to the court's

decision rather than setting an arbitrary determination point." *Id.* at 113; *see In re SPhinX*, 351

B.R. at 112 (noting that Chapter 15 maintains, and in some respects enhances, the "maximum

flexibility" of bankruptcy courts in handling ancillary cases in light of principles of international

comity and respect for the laws and judgments of other nations). Indeed, courts have gone so far

as to view a recognition order as less than a final order, seeing it as a reflection of the facts

presented to the court at the time. *See In re Ernst & Young, Inc.*, 383 B.R. 773, 781 (Bankr. D.

Colo. 2008) (court concluding that its recognition ruling was a summary determination rather a

decision that was "full and final").

### C. Judicial Estoppel Does Not Apply to these Proceedings

Before assessing the Dutch Petition under Section 1517(d), the Court must first address

Movants' claims that such an analysis is unnecessary because of the doctrine of judicial estoppel.

More specifically, the Movants contend that Coop is barred by judicial estoppel from arguing in

this proceeding that its COMI is in Brazil because of prior representations by Coop to the Dutch

courts. Importantly, Movants do not claim that Coop ever explicitly or affirmatively represented

to the Dutch courts that its COMI was in a particular location. *See* Trustee Reply ¶ 32 ("Coop's

*behavior* . . . presents a classic case for judicial estoppel") (emphasis added); *id.* ¶ 34

52

(acknowledging that the Objectors are correct in "not[ing] that Coop's petition never uses the

term COMI"). But the Movants nonetheless argue that estoppel should apply because the

information provided by Coop resulted in the Dutch courts finding that Coop's COMI under the

EU Regulation is in the Netherlands and Coop never contested that finding.

"The doctrine of judicial estoppel prevents a party from asserting a factual position in one

legal proceeding that is contrary to a position that is successfully advanced in another

proceeding." *BPP Illinois, LLC v. Royal Bank of Scotland Grp. PLC*, 859 F.3d 188, 192 (2d Cir.

2017) (quoting *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004)).

Judicial estoppel aims "to protect the integrity of the judicial process . . . by prohibiting parties

from deliberately changing positions according to the exigencies of the moment." *New

Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001) (quotations omitted). "[T]he exact criteria

for invoking judicial estoppel will vary based on specific factual contexts." *BPP Illinois*, 859

F.3d at 192 (quoting *Adelphia Recovery Trust v. Goldman, Sachs & Co.*, 748 F.3d 110, 116 (2d

Cir. 2014)). But judicial estoppel generally requires that "[A] a party's later position is 'clearly

inconsistent' with its earlier position; [B] the party's former position has been adopted in some

way by the court in the earlier proceeding; and [C] the party asserting the two positions would

derive an unfair advantage against the party seeking estoppel." *Id.* at 192 (quoting *In re

Adelphia Recovery Tr.*, 634 F.3d 678, 695–96 (2d Cir. 2011)). The third requirement is

sometimes couched in terms of "'unfair detriment [to] the opposing party' rather than advantage

to the party to be estopped." *In re Adelphia Recovery Tr.*, 634 F.3d at 696 (quoting *New

Hampshire,* 532 U.S. at 751) (alteration in original). But the Second Circuit limits application of

judicial estoppel to "situations where the risk of inconsistent results with its impact on judicial

integrity is certain." *Id.* "This requirement means that judicial estoppel may only apply where

the earlier tribunal accepted the accuracy of the litigant's statements." *Id.* (citing *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010)).

Under applicable law, silence in a prior proceeding is generally not treated as comparable to a statement for purposes of judicial estoppel. Classic applications of the doctrine involve affirmative declarations or postures that are directly at odds with a latter position. In *New Hampshire*, for example, the state of New Hampshire was estopped from contesting the location of its shared boundary with Maine only after previously entering a consent decree "expressly" determining the issue. *New Hampshire*, 532 U.S. at 746. Similarly, a shipping company in *Rapture Shipping* was estopped from denying the existence of a contract it had explicitly relied upon in earlier proceedings in front of a Dutch court. *See Rapture Shipping, Ltd. v. Allround Fuel Trading B.V.*, 350 F. Supp. 2d 369 (S.D.N.Y. 2004). Alternatively, the court in *AXA Marine & Aviation Ins.* rejected a judicial estoppel argument where an insurer's denial of coverage did not actually contradict an earlier statement in a related proceeding that coverage had not been declined "to date." *AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus. Inc.*, 84 F.3d 622, 628 (2d Cir. 1996).

Instead, silence in a prior proceeding provides a basis for judicial estoppel where it violates some affirmative duty to speak. Perhaps the most common example in bankruptcy court involves a debtor's failure to declare the existence of assets or potential assets. Such cases of judicial estoppel rest on the debtor's legal obligation to completely and accurately inform the court of its assets, and the damage caused to the bankruptcy system and individual creditors by a failure to do so. *See, e.g., BPP Illinois*, 859 F.3d at 192–194 (examining a debtor's duty to list all assets prior to confirmation of a plan and finding the debtor had violated the duty by not revealing a fraud claim it subsequently pursued); *In re Adelphia Recovery Tr.*, 634 F.3d at 697–

54

98 (finding that a statutory trust created to pursue claims on behalf of certain estate claimants had taken inconsistent positions by failing to reveal to the court and certain creditors the existence of potential fraudulent conveyance claims); *Galin v. United States*, 2008 WL 5378387, at \*10–11 (E.D.N.Y. Dec. 23, 2008) (holding divorcee judicially estopped in tax case from claiming equitable title to property after having asserted that she had no interest in any real property during an earlier pre-divorce personal bankruptcy).

Where such legal disclosure obligations are not violated, judicial estoppel based on a failure to act arises where the omission flaunts a party's fundamental procedural obligations so as to actively mislead a court. In *Guinness PLC v. Ward*, 955 F.2d 875, 898–900 (4th Cir. 1992), for example, Ward was estopped in a proceeding seeking enforcement of a foreign money judgment from raising the argument that the proceeding violated a prior settlement between the parties. The court observed that Ward had continued with his appeal of the underlying foreign action after the purported settlement without informing the British appellate courts of the settlement, thereby "inherently and explicitly informing [the British appellate courts] that no events had occurred which would render such appeals improper." *Id.* at 899. Thus, it was inappropriate to rely on the settlement in the U.S. court while Ward himself had acted inconsistently in the British proceedings. *Id.* at 899–900.

But courts generally have refused to apply judicial estoppel to silence where a party is not otherwise obligated to speak up or take action. For example, in *Bridgeway Corp. v. Citibank*, 45 F. Supp. 2d 276, 283–84 (S.D.N.Y. 1999), *aff'd,* 201 F.3d 134 (2d Cir. 2000), Citibank was not judicially estopped from arguing that a Liberian court judgment was unenforceable due to impartiality of the Liberian judicial system. The court held that such a stance was not "clearly inconsistent" with participating in and defending itself against suits in the Liberian courts

55

without making such arguments there, which plaintiff insisted "implicitly" embraced the

opposite position.  *Id.*  The court was not swayed by plaintiff's argument that Citibank had not

made such claims until it was faced with an unfavorable decision in Liberia.  *Id.; see also*

*Esparza v. Stephens*, 2017 WL 1197137, at *5 (E.D. Tex. Mar. 31, 2017) (judicial estoppel did

not bar Texas from opposing a habeas petition after not submitting written materials earlier in the

proceeding where it was not required to do so under the applicable rules); *Nettles v. Daphne*

*Utilities*, 2014 WL 3845072, at *3 n.2 (S.D. Ala. Aug. 5, 2014) (judicial estoppel did not bar a

party from objecting to a jury demand despite not addressing the issue in an earlier responsive

pleading when the rules did not require that the objection be raised earlier and the objection was

not inconsistent with later pleadings).

In the present case, Movants' estoppel argument seeks to bar Coop from asserting a

position on COMI under Chapter 15 based upon (1) the jurisdictional statements made by Coop

in its Dutch SoP Petition; and (2) Coop's failure to legally contest or appeal any of the Dutch

courts' findings regarding Coop's COMI.  Movants' Proposed CoL ¶¶ 81–83.  But Movants'

estoppel argument fails because the COMI finding under the EU Regulation in the Dutch

proceedings is not the same as a COMI finding under Chapter 15 of the Bankruptcy Code.

It is true that Chapter 15's use of the COMI concept stems indirectly from the EU

Regulation.  The Guide explains that the use of COMI "as the determinant that a foreign

proceeding is a 'main' proceeding was modeled on the use of that concept in the European Union

Convention on Insolvency Proceedings . . . that was already in the process of being adopted

when UNCITRAL drafted the Model Law."  *In re Bear Stearns*, 374 B.R. at 129 (citing Guide,

U.N. Gen. Ass., UNCITRAL 30th Sess., U.N. Doc. A/CN.9/442 (1997)).  Consequently,

"Congress instructed that '[i]n interpreting [Chapter 15], the court shall consider its international

origin, and the need to promote an application of this chapter that is consistent with the

application of similar statutes adopted by foreign jurisdictions.'" *In re Fairfield Sentry*, 714 F.3d

at 136 (quoting 11 U.S.C. § 1508) (alterations in the original); *see also In re Ocean Rig UDW*

*Inc.*, 570 B.R. 687, 703 n.6 (Bankr. S.D.N.Y. 2017).

As a result of their related histories, Chapter 15 and the EU Regulation share many

significant traits, especially with respect to the concept of COMI.  Both regimes require COMI

inquiries for each debtor entity rather than for collective corporate groups.  *See* Case 341/04,

*Bondi v. Bank of America, N.A. (Eurofood),* 2006 E.C.R. I–3813, p. 18–19, ¶ 30, 2006 WL

1142304 (E.C.J. May 2, 2006) ("[E]ach debtor constituting a distinct legal entity is subject to its

own court jurisdiction."); Veder Decl. ¶ 32 ("[A] court [in the EU] faced with a corporate group

insolvency needs to ascertain the COMI individually for each legal entity"); 11 U.S.C. § 1502(1)

("'[D]ebtor' means an entity that is the subject of a foreign proceeding.").  Both regimes include

an initial presumption that a legal entity's COMI is the location of the debtor's registered seat or

office.  *See* Veder Decl. ¶ 20 (citing 3(1) Insolvency Regulation (recast)); 11 U.S.C. § 1516(c).

U.S. and European courts have also emphasized the principle that COMI should be established

by "objective factors" which are "ascertainable by third parties."  Veder Decl. ¶ 30 (citation

omitted); *see In re Fairfield Sentry*, 714 F.3d at 136 ("The focus on regularity and

ascertainability should also inform our interpretation of the text.").

Despite all these similarities, however, the EU Regulation and Chapter 15 are far from

identical.  As the Second Circuit has flatly stated, "the EU Regulation does not operate as an

analog to Chapter 15." *In re Fairfield Sentry*, 714 F.3d at 136.  The COMI inquiries

underpinning both regimes are conceptually and procedurally different, and have evolved under

separate lines of case law written by judges operating with different purposes and concerns.

First and foremost, the EU Regulation is not an implementation of the UNCITRAL

Model Law.[16]  The EU Regulation's principal concern is coordination and recognition between

insolvency proceedings among the European member states.  Trial Tr. 487:13–488:8, Sept. 19,

2017 (Veder).  Because of this focus on coordinating insolvency proceedings within the EU, "a

main insolvency proceeding in one EU member state is automatically recognized by all other EU

member states."  *In re Fairfield Sentry*, 714 F.3d at 136 (citing EU Regulation art. 16).  Once a

COMI determination is made in one state, it is binding on other EU member state courts.  *See*

Trial Tr. 478:23–479:13, Sept. 19, 2017 (Veder); Berkenbosch Decl. ¶ 126.  Consequently, "the

EU has no need for a recognition petition such as provided under Chapter 15."  *In re Fairfield*

*Sentry*, 714 F.3d at 136.  When a court finds a debtor's COMI to be outside the EU, it looks to

the applicable national insolvency regime rather than the EU Regulation.  *See* Berkenbosch Decl.

¶ 115–17; Veder Decl. ¶ 12-15, 33-35.  In the Netherlands, it is the DBA that dictates the specific

procedures and forms of relief available to a debtor in the Dutch courts and governs how to treat

insolvency proceedings for a debtor with a Dutch "establishment" but a non-EU COMI.  *See*

Berkenbosch Decl. ¶ 115–17; Veder Decl. ¶ 12-15, 33-35.

---

[16]     The testimony from Prof. Veder is clear on this point:

Q. Could you explain to the Court, is the European Insolvency Regulation an effort to implement the UNCITRAL model law in European law?

A. Not at all.

Q. Could you please explain to the court why?

A. Okay. So the European Insolvency Regulation is a self-contained body that only applies within the EU that determines jurisdiction, choice of law, recognition issues within the European Union. The model law is something completely different.  It is exactly what it says, it's a model law that's been implemented in whatever state that adopts it. It's like the U.S. standards adoption of Chapter 15 based on the model law, the UK has done something similar, but the EU Insolvency Regulation is not an implementation of that model law.

Trial Tr. 487:13–488:8, Sept. 19, 2017 (Veder).

The EU Regulation is also a "poor analog" in regards to the timeframe considered in a COMI analysis. *In re Fairfield Sentry*, 714 F.3d at 136 n.9 (discussing *In re Millennium Global Emerging Credit Master Fund Ltd.,* 458 B.R. 63, 74 (Bankr. S.D.N.Y. 2011)).  The EU Regulation looks to the date of the filing of the foreign insolvency proceedings (Veder Decl. ¶ 31), whereas in the U.S. the inquiry centers on the date of the Chapter 15 recognition petition. *See In re Fairfield Sentry*, 714 F.3d at 136.

While both regimes include a registered office presumption, divergent case law has led to a different application of that presumption under the EU Regulation than under Chapter 15.  The European Court of Justice set the standard for applying and overcoming the presumption in the *Eurofood* and *Interedil*[17] cases.  *See* Movants' Proposed CoL ¶ 50; Veder Decl. ¶¶ 22–31.  Under these cases, the EU courts do not pursue a comprehensive exploration of the evidence, but rather uphold the presumption unless it is demonstrated that a debtor's management and assets sit *together* in a different state, and that such facts are ascertainable by third parties:

> Where a company's central administration is not in the same place as its registered office, the presence of company assets and the existence of contracts for the financial exploitation of those assets in a Member State other than that in which the registered office is situated cannot be regarded as sufficient factors to rebut the presumption unless a comprehensive assessment of all the relevant factors makes it possible to establish, in a manner that is ascertainable by third parties, that the company's actual centre of management and supervision and of the management of its interests is located in that other Member State.

Veder Decl. ¶ 30 (quoting *Interedil* ¶ 59).

This is far different than U.S. law.  In the U.S., the registered office presumption is applied merely "[f]or speed and convenience in instances in which the COMI is obvious and undisputed." *In re Creative Fin.*, 543 B.R. at 514-15; *see also In re SPhinX*, 351 B.R. at 117

---

[17]    Case C-396/09, Interedil Srl (*Interedil*) v. Fallimento Interedil Srl, 2011 E.C.R. I-9915.

(citing legislative history).  The presumption "does not shift the risk of nonpersuasion, i.e., the

burden of proof, away from the foreign representative seeking recognition as a main

proceeding." *In re Bear Stearns*, 374 B.R. at 127 (quoting *In re Tri-Continental Exch.*, 349 B.R.

at 635).  "In fact, Congress changed the relevant language of the Model law by substituting . . .

'evidence' . . . for the Model Law's 'proof' . . . to clarify this issue." *In re Bear Stearns High-

Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 335 (S.D.N.Y. 2008).

"[T]he Guide explains that the presumption does 'not prevent, in accordance with applicable

procedural law, calling for or assessing other evidence if the conclusion suggested by the

presumption is called into *question by the court* or an interested party.'" *In re Bear Stearns*, 374

B.R. at 129 (emphasis in original) (quoting Guide, ¶ 122).  Thus, the presumption "does not tie

the hands of a court to examine the facts more closely in any instances where the court regards

the issues to be sufficiently material to warrant further inquiry." *In re Creative Fin.*, 543 B.R. at

515 (quoting *In re Basis Yield*, 381 B.R. at 52).  The presumption "is especially inappropriate in

a case where there is a substantial dispute." *In re Creative Fin.*, 543 B.R. at 517.

      In sum, "whatever may be the proper interpretation of the EU Regulation, the Model Law

and Chapter 15 give limited weight to the presumption of jurisdiction of incorporation as the

COMI." *In re Bear Stearns*, 374 B.R. at 128 (quoting Westbrook, *Locating the Eye of the

Financial Storm*, 32 BROOK. J. INT'L L. at 15-16).  "[I]f the foreign proceeding is in the

country of the registered office, and if there is evidence that the center of main interests might be

elsewhere, then the foreign representative must prove that the center of main interest is in the

same country as the registered office." *In re Bear Stearns*, 374 B.R. at 128 (quoting *In re Tri-

Continental Exch.*, 349 B.R. at 635); *see also id.* ("[The] presumption is not a preferred

alternative where there is a separation between a corporation's jurisdiction of incorporation and

its real seat.") (citing Westbrook, *Locating the Eye of the Financial Storm*, 32 BROOK. J. INT'L

L. at 15).

The distinctions in the substantive use of the presumption are reflected in the procedures

used by Dutch and U.S. courts.  The Dutch court's procedures for issuing a determination on

European COMI are very different from what occurs in a Chapter 15 recognition proceeding.  In

the Netherlands, the DBA requires a COMI finding as the preliminary jurisdictional step in an

insolvency proceeding, which can be initiated by a debtor's *ex parte* filing of a suspension of

payments petition.  *See* Trial Tr. 802:7–15, Sept. 25, 2017 (Berkenbosch).  The Dutch courts do

not *sua sponte* seek further information beyond what is provided in the petition (Berkenbosch

Decl. ¶ 119), which can result in an extremely rapid COMI determination.  This case is a perfect

example.  Coop filed its SoP Petition on August 9, 2016 and received confirmation of its

provisional SoP *at 9:30AM that same morning*.  *See* Trial Tr. 801:19–802:6 Sept. 25, 2017

(Berkenbosch).  That confirmation found Coop's COMI to be in the Netherlands under the EU

Regulation.  TX 28 at 3–4 ("[T]his district court is competent to open these main proceedings as

in its opinion the centre of the debtor's main interests lies in the Netherlands . . . . The district

court: - grants [Coop] a provisional suspension of payments.").  This procedure is a far cry from

the U.S. requirement to hold a hearing on recognition—on notice of not less than 21 days—at

which time the court will hear any objections.  *See* Fed. R. Bankr. P. 2002(q)(1).  This can be an

involved and contested process in the U.S.  *See, e.g., In re Bear Stearns*, 389 B.R. 325 (denying

appeal of Chapter 15 recognition of Cayman Islands proceeding upon objections from foreign

secured creditors and a COMI hearing, despite appellant's registered office in the Cayman

Islands implicating the statutory COMI presumption); *In re Millennium Glob. Emerging Credit

Master Fund*, 458 B.R. 63, *aff'd,* 474 B.R. 88 (S.D.N.Y. 2012) (affirming bankruptcy court's

COMI finding and recognition of Bermuda proceedings as foreign main proceeding under

Chapter 15); *In re Gerova Fin. Grp., Ltd.*, 482 B.R. 86 (Bankr. S.D.N.Y. 2012) (despite secured

creditors' argument under Section 1506 and opposition to wind-up proceedings, the court

granted recognition of Bermuda proceedings as foreign main proceedings under Chapter 15 after

one day hearing).  Given the different legal standard and process for determining COMI under

the EU Regulation and Chapter 15, it is inappropriate to apply judicial estoppel in these

proceedings.  *See Brown v. Watters*, 599 F.3d 602, 615 (7th Cir. 2010) (noting that party does

not take inconsistent positions when statutory standards relied upon are different in material

respects).

In addition, each of the two factual bases relied upon by Movants suffers from other

defects.  The first argument relies on Coop's SoP Petition.  The Movants argue that the

"Jurisdiction" section of the SoP Petition shows that Coop presented facts to the Dutch District

Court that would necessarily lead it to conclude that Coop's COMI was located in the

Netherlands.  *See* TX 26 ¶ 8.1.  More specifically, the Insolvency Trustee asserts that when a

debtor's COMI is in the EU, it has a statutory duty to "submit sufficient information to enable

the judge to determine whether it has jurisdiction under the [EU Regulation] Regime."

Berkenbosch Decl. ¶ 119.  Movants contend that Coop provided no information in that section

that could rebut the presumption that the location of a company's registered office is the same as

its COMI, and, in fact, further buttressed that conclusion with additional details about Coop's

Dutch presence.  Trustee Reply ¶ 33; *see also* Berkenbosch Decl. ¶ 119.  In addition to the

"Jurisdiction" section, Movants also cite to a statement concerning Coop's purpose for filing the

SoP Petition:

> In order to ensure that the restructuring of the indebtedness as contemplated by the
> RJ Plan, to the extent it concerns [Coop], will be recognised and bind creditors in

relation to the assets and liabilities of [Coop] in the Netherlands (and in other European member states), [Coop] has submitted, together with this petition, a draft composition plan.

TX 26 ¶ 6.1.  Because recognition of a Dutch composition plan would only occur automatically across EU member states under the EU Regulation, the Movants argue this statement conclusively demonstrates Coop's awareness that its SoP Petition would lead to a finding of Dutch COMI.  *See* Trustee Reply ¶ 38.

But Movants have not established that Coop had an affirmative duty to provide more information than is contained in the SoP Petition or that its silence flaunted some fundamental procedural obligations so as to actively mislead a court.  Movants' position is undercut by the breadth of information contained in Coop's SoP Petition.  Coop did not make any representations about its COMI but it did present the relevant facts about its operations.  Those facts included not only information about Coop's registered office in the Netherlands but also information about Coop's role as a financing SPV for the Oi Group.  For example, the SoP Petition highlighted Coop's role as a "financing vehicle"[18] dependent on the Oi Group operations for repayment of Coop's debts,[19] described the Brazilian RJ Proceeding and the recognition granted to those

---

[18]    Coop is referred to as Finco throughout the SoP Petition.  The SoP Petition states that

[t]he business of Finco consists of (i) attracting financing from the international capital markets, primarily in the form of issuing listed notes (the Notes), (ii) receiving funds from PTIF via a credit agreement entered into between Finco and PTIF on 2 June 2015 (as amended from time to time, hereinafter the Finco Loan), and (iii) on-lending amounts that Finco has attracted via the Notes or from PTIF (via the Finco Loan). The Notes are unsecured but guaranteed by Oi. Finco has no real estate and no other operations of its own. Finco has one employee, Mr. Lavatori Correa, who is one of Finco's directors.

TX 26 ¶ 1.2.

[19]    The SoP Petition states that

[a]s a financing vehicle, Finco has no revenue-generating capacity or other assets (other than intra-group loans) of its own. Additionally, the Notes are guaranteed by Oi. Therefore, Finco's ability to repay its debts depends entirely on the success of the RJ Proceedings and, consequently, the continuity of the Oi Group's business and revenues. In view of these facts, Finco's financial and economic situation is inherently linked to that of the Oi Group

proceedings both in the U.S. and the U.K.,[20] and repeatedly emphasized that a Coop restructuring

and payment of Coop debts was entirely reliant on a successful Brazilian restructuring of the Oi

Group as a whole.[21]  It is these same facts that led to this Court's prior order recognizing Coop's

COMI in Brazil, notwithstanding the location of its registered office.  *See* Prior Recognition

Order at 2–5; Hr. Tr. 20:17–21:15, July 22, 2017.  Thus, it cannot be said that the Dutch courts

---

as a whole. Finco will be able to repay its debts only to the extent the Oi Group is able to do so, which is inconsistent with a bankruptcy liquidation of the Oi Group.

TX 26 ¶ 2.2.

[20]    The SoP Petition explains that

[t]he Brazilian Court assumed jurisdiction in relation to Finco based on the fact that Finco is merely a financing vehicle and not an operating company within the Oi Group, and the Oi Group's 'main place of business' is in Rio de Janerio, Brazil (p. 89501 of the RJ Acceptance Order)."  TX 26 ¶ 3.4.  "The U.S. Bankruptcy Court of the Southern District of New York (the U.S. Bankruptcy Court) recognised the RJ Proceedings, including in respect of Finco, on 22 July 2016. Consequently, creditors of Finco are also subject to a moratorium in the United States, where they can no longer enforce their claims.

TX 26 ¶ 3.5.

The SoP Petition further states that

Recognition proceedings have since been effected in various jurisdictions[,] including the United States (as previously noted). In the United States, an interim order recognising the RJ Proceedings with respect to, amongst others, Oi and Finco through [C]hapter 15 proceedings was granted on 22 June 2016. At a hearing on 21 July 2016, the U.S. Bankruptcy Court recognised the RJ Proceedings as a 'foreign main proceeding' with respect to each of the [C]hapter 15 debtors, including Finco. Similarly, on 23 June 2016 the RJ Proceedings were recognised in respect of Oi and two of its Brazilian subsidiaries as a 'foreign main proceeding' in Great Britain in accordance with the UNCITRAL Model Law on Cross-Border Insolvency as set out in Schedule 1 to the Cross-Border Insolvency Regulations 2006 (S.I. 2006 No 1030).

TX 26 ¶ 5.3.

[21]    The SoP Petition makes clear that "the outcome of the restructuring for the creditors of Finco is entirely dependent on the RJ Proceedings and RJ Plan. The assets and value of the Oi Group can only be realized for the benefit of the creditors of Finco through the RJ Proceedings."  TX 26 ¶ 5.6.  It states

[t]he background to this request is that any voting that takes place on the suspension of payment proceedings related to Finco prior to the voting on the RJ Plan in the RJ Proceedings is likely to disrupt the negotiation process in the RJ Proceedings. At the same time, the content of the Dutch Plan and the economic reality of any consideration for the creditors of Finco will need to be paid by the Brazilian operating entities of the Oi Group, which in turn is dependent on the success of the RJ Plan. This implies that any vote on the suspension of payments before the voting in the RJ Proceedings is not likely to have any practical effect . . . .

TX 26 ¶ 7.2.

were misled by Coop given its fulsome disclosure of the relevant facts about its corporate

existence and operations. *See Period Homes, Ltd. v. Wallick,* 275 Ga. 486, 488 (2002) (denying

estoppel claim in part because debtor did not mislead bankruptcy court about a post-petition

breach of contract claim when it failed to amend its asset schedule but still informed the Chapter

7 trustee of the claim's existence and amount of damages sought); *Sports Page, Inc. v. First*

*Union Mgmt., Inc.*, 438 N.W.2d 428, 431–32 (Minn. Ct. App. 1989) (affirming lower courts

rejection of a judicial estoppel argument based on debtor's failure to include a claim in its asset

schedules because debtor had otherwise informed the bankruptcy trustee of the claim's

existence).[22]

Admittedly, there is evidence that Coop was aware of the effect of the EU recognition "in

other European member states." TX 26 ¶ 6.1; *see* Trustee Reply ¶ 38. But as Professor Veder

testified, recognition of a Dutch composition plan by other EU member states is not limited to

the automatic mechanism provided for under the EU Regulation. Trial Tr. 394:22–396:22, Sept.

19, 2017 (Veder). Even for proceedings established under the DBA, member state national

regimes provide for their own recognition procedures, including automatic recognition in

Germany and UNCITRAL Model Law-style recognition in the UK. *See id.* But judicial

estoppel is not a tool to be used in such a nuanced situation, particularly given that Coop

presented a fulsome picture of Coop in its SoP Petition. Thus, Coop was simply not "blowing

---

[22]    It is also unclear whether a failure to object to the Dutch COMI findings committed any violence
to the Dutch insolvency proceedings. In fact, the Movants do not claim that Coop's position on its COMI
had any impact whatsoever on the Dutch Proceedings. The Insolvency Trustee himself conceded that
regardless of the location of a debtor's COMI and the source of the Dutch Court's jurisdiction, a Dutch
debtor has available the same forms of relief and insolvency procedures within the Netherlands.
Berkenbosch Decl. ¶ 120. Thus, the Dutch District Court was not misled by any implied representation
into opening or continuing any proceedings that it would otherwise have curtailed. *See, e.g., Guinness*, 955
F.2d at 899 (holding that plaintiff, by continuing with an appeal after purportedly reaching a settlement, and
not informing the appellate courts of the settlement, was "inherently and explicitly informing [the appellate
courts] that no events had occurred which would render such appeals improper").

hot and cold with the judicial process to such a degree as to violate the essential integrity of that

process." *Guinness*, 955 F.2d at 899 (quotations omitted).

The Movants' other estoppel argument relies upon Coop's failure to contest or appeal the

Dutch District Court's COMI finding. Movants' Proposed CoL ¶ 83. But Coop's Dutch law

expert testified that such actions are not possible, a conclusion that the Court credits. *Compare*

Trial Tr. 477:19–480:14, Sept. 19, 2017 (Veder), *with* Trial Tr. 836:19–838:7, Sept. 25, 2017

(Berkenbosch). But for this Court's purposes, it does not even matter. In its subsequent

submissions to the Dutch District Court ███████████████████, Coop ██████

expressed its disagreement with the Dutch COMI finding, laid out its concerns regarding the

impact of a successful conversion on the Oi Group's restructuring, and argued that the DBA

rather than the EU Regulation should govern the insolvency proceedings.[23] So even if each

Dutch court made its own independent finding regarding COMI and jurisdiction as the

---

[23] ████████████████████████████████████████████████
████ For example, Coop submitted the following to the Dutch District Court for the Conversion Hearing:

> Oi Coop does not agree with the Administrator's position that Oi Coop's COMI is in the
> Netherlands. Oi Coop's COMI is in Brazil, as was determined by the Brazilian Court even before
> the suspension of payments procedure began (see also p. 89498 of the ruling of the Brazilian Court
> of 29 June 2016, <u>Exhibit 9</u> with the Supplementary Petition), and recognized by the court in the
> United States in the Chapter 15 Procedure.

TX 449 ¶ 11.1.1; *see also id.* at ¶ 11.1.6 ("Because the COMI is in Brazil, the [EU Regulation] is not applicable.").



Insolvency Trustee states (Trial Tr. 835:12–836:18 Sept. 25, 2017 (Berkenbosch)), they appear to have done so with knowledge of Coop's opposition to a Dutch COMI.

### D.   This Court Does Not Abstain Under Comity from Determining Recognition Under Chapter 15

Movants' comity argument also fails.  The Insolvency Trustee argues that the Court should refrain from making its own determination on Coop's COMI, and instead simply grant comity to the Dutch court decisions that found COMI under the EU Regulation to be located in the Netherlands.  The Trustee writes that this Court should "accord[] the decisions of the Dutch Courts the same effect they are already entitled to throughout the European Union, where they are final and binding."  Trustee Reply ¶ 49.  But while comity is crucial to a proper functioning of Chapter 15, the Court disagrees that it should defer to the Dutch courts in assessing COMI under Chapter 15.

International comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws."  *Hilton v. Guyat*, 159 U.S. 113, 163–64 (1895).  The doctrine is "concerned with maintaining amicable working relationships between nations, a 'shorthand for good neighbourliness, common courtesy and mutual respect between those who labour in adjoining judicial vineyards.'"  *JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*, 412 F.3d 418, 423 (2d Cir. 2005) (quoting *British Airways Bd. v. Laker Airways Ltd.*, [1984] E.C.C. 36, 41 (Eng. C.A.)).  American courts have long recognized the importance of comity "[p]articularly in the bankruptcy context, . . . because '[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single

proceeding.'" *In re Atlas Shipping A/S*, 404 B.R. 726, 733 (Bankr. S.D.N.Y. 2009) (second

alteration in the original) (quoting *Victrix,* 825 F.2d 709, 713–14 (2d Cir. 1987)).

"The decision to grant comity is a matter within a court's discretion and the burden of

proof to establish its appropriateness is on the moving party." *Duff & Phelps, LLC v. Vitro

S.A.B. de C.V.*, 18 F. Supp. 3d 375, 382 (S.D.N.Y. 2014) (quoting *Maersk, Inc. v. Neewra, Inc.*,

2010 U.S. Dist. LEXIS 69863, at \*29 (S.D.N.Y. July 9, 2010)); *see also Fox v. Bank Madiri (In

re Perry H. Koplik & Sons, Inc.)*, 2007 Bankr. LEXIS 925, at \*9–10 (Bankr. S.D.N.Y. Mar. 31,

2007) ("[A] decision to grant comity to the determination of a foreign court is a matter within the

court's discretion, as to which the party seeking to invoke comity has the burden of establishing

that the foreign court's determination is appropriate.") (citing *Allstate Life Ins. Co. v. Linter Grp.

Ltd.*, 994 F.2d 996, 999 (2d Cir. 1993)).  The doctrine is a form of abstention; it "is not an

imperative obligation of courts but rather is a discretionary rule of 'practice, convenience, and

expediency.'" *JP Morgan*, 412 F.3d at 423 (quoting *Pravin Banker Assocs., Ltd. v. Banco

Popular del Peru*, 109 F.3d 850, 854 (2d Cir. 1997)); *see also Sec. Inv'r Prot. Corp. v. Bernard

L. Madoff Inv. Sec. LLC (In re Madoff)*, 2016 Bankr. LEXIS 4067, at \*32 (Bankr. S.D.N.Y. Nov.

21, 2016) ("Dismissing an action based on comity is a form of abstention . . . .") (citations

omitted).  "[C]ourts generally extend comity provided the foreign court had proper jurisdiction

and recognition of its judgment or proceeding does not prejudice the rights of United States

citizens or violate domestic public policy." *Rapture Shipping*, 350 F. Supp. 2d at 373 (citing

*Victrix,* 825 F.2d at 713).

"A central tenet of [C]hapter 15 is the importance of comity in cross-border insolvency

proceedings." *In re Rede Energia*, 515 B.R. at 89 (citing *In re Cozumel Caribe S.A. de C.V.,* 482

B.R. 96, 114–15 (Bankr. S.D.N.Y. 2012)); *In re Atlas Shipping*, 404 B.R. at 738 ("Chapter 15

Embodies Principles of Comity"); *In re Vitro*, 701 F.3d at 1043 ("[c]entral to Chapter 15 is

comity."). But "Chapter 15 does impose certain requirements and considerations that act as a

brake or limitation on comity." *Krys v. Farnum Place, LLC (In re Fairfield Sentry Ltd.)*, 768

F.3d 239, 245 (2d Cir. 2014) (quoting *In re Vitro*, 701 F.3d at 1054); *see also In re Rede

Energia*, 515 B.R. at 91. Where the Bankruptcy Code provides the standard for a court's

determination, comity does not enter the equation. *See In re Fairfield Sentry Ltd.*, 768 F.3d at

246 ("[W]hen a statute's language is plain, the sole function of the courts—at least where the

disposition required by the text is not absurd—is to enforce it according to its terms.") (quoting

*Sebelius v. Cloer*, 569 U.S. 369, 381 (2013)). For example, the Second Circuit in *Fairfield

Sentry* found the plain language of Section 1520(a)(2) required the bankruptcy court in a Chapter

15 case to conduct its own review of a transaction under Section 363 of the Bankruptcy Code,

notwithstanding that the transaction had been approved by the British Virgin Islands court where

the foreign main proceeding was pending. *See In re Fairfield Sentry Ltd.*, 768 F.3d at 246.

Thus, the Second Circuit explicitly rejected the notion that the bankruptcy court should defer to

the foreign court's determination based on the principle of international comity. *See id.* at 245–

46; s*ee also In re Vitro*, 701 F.3d at 1054 (holding that while "comity should be an important

factor in determining whether relief will be granted," the court was "compelled . . . to get into the

weeds of Chapter 15 to determine" the scope of a foreign representative's authority and the

nature of the relief the bankruptcy court could grant).

   In the case of recognition under Chapter 15, "[b]oth the plain language and legislative

history of Chapter 15 . . . requires [a bankruptcy court to make] a factual determination with

respect to recognition before principles of comity come into play." *In re Bear Stearns*, 389 B.R.

at 334. So while comity governs recognition of a foreign *judgment* (*see Rapture Shipping*, 350

F. Supp. 2d at 373), it does not govern the initial recognition of a foreign proceeding under

Chapter 15.  Recognition of a proceeding requires the application of "objective criteria," and it is

only post-recognition relief which "turns on subjective factors that embody principles of

comity."  *In re Atlas Shipping*, 404 B.R. at 738 (quoting *In re Bear Stearns*, 389 B.R. at 333

(citing 11 U.S.C. §§ 1507, 1517, 1521, 1525; Model Law Art. 7, 17, 21, 25)); s*ee also In re Ran*,

390 B.R. 257, 292 (Bankr. S.D. Tex. 2008) ("By arguing comity without satisfying the

conditions for recognition, [the foreign trustee] urges this Court to ignore the statutory

requirements of 11 U.S.C. § 1517 . . . . comity is not an element of recognition; it is rather, a

consideration once recognition is granted.").

    The objective criteria of the recognition procedure "reflects a policy determination by

UNCITRAL and Congress that this Court should not assist a representative of a foreign action

unless the debtor has a sufficient presence in the country in which the foreign action is taking

place."  *In re British Am. Ins. Co.*, 488 B.R. 205, 213 (Bankr. S.D. Fla. 2013) (citing *In re Bear

Stearns,* 389 B.R. at 333–34).  "If the debtor does not have its center of main interests or at least

an establishment in the country of the foreign proceedings, the bankruptcy court should not grant

recognition and is not authorized to use its power to effectuate the purposes of the foreign

proceeding."  *In re Bear Stearns,* 389 B.R. at 334 (citing House Report at 1:13; Guide ¶¶ 73, 75,

128).

    In fact, Chapter 15 makes no mention of comity in Section 1517 or any other section

setting forth the requirements for a grant of recognition.  Rather, Section 1509(b) provides that:

> *[i]f* the court grants recognition under section 1517 . . . the foreign representative
> may apply directly to a court in the United States for appropriate relief in that court;
> and a court in the United States shall grant *comity or cooperation* to the foreign
> representative.

11 U.S.C. § 1509(b) (emphasis added).  Likewise, Section 1507 allows courts to "provide

additional assistance to a foreign representative . . . consistent with the principles of comity" "*if*

recognition is granted . . . ."  11 U.S.C. § 1507(a)–(b) (emphasis added).  The statute also refers

to requests for relief from "court[s] in the United States other than the court which granted

recognition," as requests for "*comity or cooperation*."  11 U.S.C. § 1509(c) (emphasis added).

Similarly, if recognition has been denied under Chapter 15, "the court may issue any appropriate

order necessary to prevent the foreign representative from obtaining *comity or cooperation*" from

other U.S. courts.  11 U.S.C. § 1509(d) (emphasis added); *see In re Atlas Shipping*, 404 B.R. at

738–39 (conducting related analysis of references to comity throughout Chapter 15).

     An examination of Section 304 of the Bankruptcy Code—Chapter 15's statutory

predecessor—further underscores the requirement that a bankruptcy court conduct an

independent assessment of recognition.  "While much of the jurisprudence developed under

[S]ection 304 is preserved in the context of new [S]ection 1507, [S]ection 304 did not have a

recognition requirement as a first step…. Chapter 15, on the other hand, imposes a rigid

procedural structure for recognition of foreign proceedings as either main or nonmain . . . ."  *In

re Ran*, 390 B.R. at 290–91 (quoting *In re Bear Stearns*, 374 B.R. at 132) (first omission in the

original); *see also In re British Am. Ins. Co.*, 488 B.R. at 213 ("The general principles of comity

that governed acknowledgement of cross-border matters under former [S]ection 304 no longer

apply to recognition under [C]hapter 15.") (citing *Lavie v. Ran,* 406 B.R. 277, 282

(S.D.Tex.2009), *aff'd,* 607 F.3d 1017 (5th Cir.2010)).  "Requiring recognition as a condition to

nearly all court access and consequently as a condition to granting comity distinguishes Chapter

15 from its predecessor [S]ection 304."  *In re Bear Stearns*, 389 B.R. at 333.  "Prior to the

enactment of Chapter 15, access to the United States courts by a foreign representative was not

dependent on recognition; rather, all relief under [S]ection 304 was discretionary and based on

subjective, comity-influenced factors." *In re Ran*, 390 B.R. at 291 (citing *In re Bear Stearns*,

374 B.R. at 126; *In re Basis Yield*, 381 B.R. at 46; Westbrook, *Locating the Eye of the Financial*

*Storm*, 32 BROOK. J. INT'L L. at 1024; Daniel Glosband, *SPhinX Chapter 15 Opinion Misses*

*the Mark*, 25 AM. BANKR. INST. J. 44, 45 (Dec./Jan.2007)).    Chapter 15 changed this by

establishing an objective eligibility requirement for recognition to promote predictability and

reliability.  *See In re Bear Stearns*, 389 B.R. at 333.    This is in contrast to the standards for post-

recognition relief, which under Chapter 15 remained "flexible and pragmatic in order to foster

comity and cooperation in appropriate cases." *Id.*

    All these principles dictate that this Court make its own determination on recognition in

this case, rather than defer to the Dutch courts.    While the parties disagree as to whether the

Dutch Petition should be evaluated under Section 1517(a) or 1517(d), it is clear that Chapter 15

itself provides the standard for the U.S. courts to apply.    As explained above, Section 1517(a)

sets forth explicit requirements for recognition while Section 1517(d) provides a basis for the

"modification or termination" of a prior recognition hearing.  *See* 11 U.S.C.§ 1517(a); 11 U.S.C.

§ 1517(d).    Given that Chapter 15 provides the standard for the present dispute, abstention based

on comity is inappropriate.  *See In re Fairfield Sentry Ltd.*, 768 F.3d at 246.

    Even if comity could be appropriately considered, the Insolvency Trustee's argument

would fail for a different reason.    The principles of comity do not fit comfortably where the task

before the foreign court was different from that which faces this Court.    For the reasons

discussed earlier, a COMI finding for the purposes of an insolvency proceeding under the EU

Regulation is not the same as a COMI finding under Chapter 15.    Here, the Insolvency Trustee

has even gone beyond asking for comity and requested that this Court "accord[] the decisions of

the Dutch Courts the same effect they are already entitled to throughout the European Union . .

.," where such decisions are granted automated recognition.  Trustee Reply ¶ 49.  There is no

basis in statute or case law for such treatment.

Finally, the Insolvency Trustee's reliance on *In re Ocean Rig* as a basis for comity here is

misplaced.  The Insolvency Trustee refers to one statement from that case:

> [t]o the extent that a determination of center . . . of main interests is relevant to
> eligibility to file proceedings in other countries, and has been decided by the foreign
> court, it may well be appropriate for a U.S. bankruptcy court to give deference or
> comity to the determination of the foreign court in the jurisdiction in which the
> foreign proceeding is filed.

*In re Ocean Rig*, 570 B.R at 703 n.6; Trial Tr. 927:18–11, Sept. 26, 2017 (Ball).  But this

statement, made in a single footnote and unrepeated elsewhere, was clearly dicta.  Indeed, the

court in *Ocean Rig* explicitly stated that "since the Cayman Court has not decided the issue here,

no issue of deference or comity arises."  *Id*.  Moreover, these statements followed the

observation that it is appropriate to look to foreign interpretations of COMI "from other

international jurisdictions *that have adopted the Model Law*," which was not the case in the

Cayman Islands.  *Id*. (emphasis added).  Neither the Netherlands nor Brazil have adopted the

Model Law.  *See* Status UNCITRAL Model law on Cross-Border Insolvency (1997),

http://www.uncitral.org/uncitral/en/uncitral_texts/insolvency

/1997Model_status.html (last visited Nov. 13, 2017) (listing countries that have adopted the

Model Law and not including Brazil or the Netherlands).[24]

---

[24]     *See also* Ferreira Decl. ¶ 18 ("Brazilian insolvency legislation has not adopted the UNCITRAL Model Law
on Cross-Border Insolvency . . . ."); Trial Tr. 487:13–17, Sept. 19, 2017 (Veder) ("Q. Could you explain to the
Court, is the European Insolvency Regulation an effort to implement the UNCITRAL model law in European law?
A. Not at all.").

### E.  The Court Will Not Exercise its Discretion to Grant Relief
### Under the First Prong of Section 1517(d)

The Court now turns to the crux of this dispute: whether the Prior Recognition Order for the Brazilian RJ Proceeding should be terminated under Section 1517(d) of the Bankruptcy Code.  The Court starts by addressing the first prong under subsection (d), and concludes that the grounds for granting recognition to the Brazilian RJ Proceeding were not "fully or partially lacking."  11 U.S.C. § 1517(d).

Under this first prong, the Movants contend the Court was misled at the Prior Recognition Hearing because certain information was concealed from the Court such that the Court lacked a basis for its ruling.  More specifically, Mr. Berkenbosch alleges that the Court was not informed of certain important facts at the time of the Prior Recognition Hearing.  *See* Movants' Proposed CoL ¶¶ 46, 89, 104.[25]  The Court rejects the Movants' request to modify or terminate the Prior Recognition on this basis for two reasons: (1) the evidence relied upon by the Court in its Prior Recognition Order justified its finding that Coop's COMI was in Brazil; and (2) the evidence that Movants contend was omitted is not significant enough to grant relief under the first prong.

First, the record demonstrates that the Court was provided a broad picture of the relevant facts, and a sufficient basis for its Prior Recognition Order.  The Chapter 15 Debtors presented Coop's ties to Brazil as a special purpose financing vehicle for the Oi Group at the Prior Recognition Hearing.  The Oi Debtors informed the Court that "Coop is a special-purpose vehicle (an SPV) with no ability to generate a return on cash proceeds itself" (Shah Decl. ¶ 34),

---

[25]    Within the same submission, the Movants present two different versions of the facts that were not disclosed to the Court.  *Compare* Movants' Proposed FoF ¶ 89, *with* Movants' Proposed CoL ¶ 46.  It is unclear which of these two lists represent Movants' position.  But regardless of which list—or both—control, the Court's conclusion is the same.

that "any proceeds from debt issuances at Coop must be on-lent to (eventually) an operating Oi

Group entity capable of earning a profit for Coop's creditors" (*id.*), that Coop is "the obligor on

any intragroup loans received by it from Oi Group affiliates in its capacity as an intragroup

financing company in the Oi group" (*id.*), that "Coop exists exclusively to service the financing

needs of the economically integrated Oi Group" (*id.* ¶ 30), and that "Coop's assets consist solely

of receivables owed to it by its Brazilian Oi Group affiliates" (*id.* ¶ 33).

But the Chapter 15 Debtors also disclosed the key facts about Coop's ties to the

Netherlands.  For example, the Court was informed that "Coop was incorporated . . . in 2011

under the laws of the Netherlands" (Shah Decl. ¶ 30; Brazilian Petition ¶ 26); "Coop maintains

its registered office in the Netherlands" (Shah Decl. ¶ 31; Brazilian Petition ¶ 27); "Coop enters

routine filings with the Dutch Chamber of Commerce . . . files tax returns with the Dutch tax

authorities, employs Baker Tilly International as auditor, and completes other ministerial

activities required by Dutch law" (Shah Decl. ¶ 31; Brazilian Petition ¶ 27);[26] "Coop hired

independent Dutch counsel to ensure the protection of its interests in a joint defense with its Oi

Group affiliates" (Shah Decl. ¶32; Brazilian Petition ¶, 28); "Coop . . . is governed by two

directors, one of whom resides in the Netherlands" (Shah Decl. ¶ 31; Brazilian Petition ¶ 27);

and "Coop's board of directors . . . hold [their] meetings in the Netherlands" (Shah Decl. ¶ 32;

Brazilian Petition ¶ 28).[27]  Given all of the facts provided by the Chapter 15 Debtors in the Prior

Recognition Proceeding, the Court concludes that the grounds for recognition were not lacking.

---

[26]    Movants incorrectly suggest that Coop did not disclose its retention of Dutch professionals.  Movants' Proposed FoF ¶ 89.  This is clearly incorrect.

[27]    Some facts relating to Coop's Dutch ties were not disclosed, such as that Coop's books and records were in the Netherlands, that Coop had a bank account in the Netherlands, and the existence of Coop's tax claim against Dutch authorities.  Trustee Reply ¶ 4.  But none of those facts are significant given the broad disclosure provided to the Court.  For example, information about the tax claim was relatively unimportant given the size of the claim.  *See* Berkenbosch Decl. ¶ 26 (noting claim on behalf of Coop estate against Dutch tax authorities for VAT refund of

Second, none of the facts identified by Movants as undisclosed at the Prior

Recognition Hearing justify relief under the first prong of Section 1517(d).  In short, the absence

of these facts did not mislead the Court so as to result in an erroneous COMI determination.  A

few of the specific facts relied upon by Movants are worthy of discussion.

Movants rely most heavily upon Coop's prior statements about its COMI under the EU

Regulation.  Movants point out that the Court was not informed of: (1) the existence of "prior

resolutions of the Coop Board stating [that] COMI [under the EU Regulation] was in the

Netherlands"; and (2) the existence of an "opinion letter to [underwriters] of the 2021 Notes"

which discusses Coop's COMI under the EU Regulation.  Trustee Reply ¶ 78.  But for reasons

explained earlier, these statements regarding the location of Coop's COMI under the EU

Regulation are not dispositive for determining COMI under U.S. law.[28]  The Dutch District

Court found Coop's COMI under the EU Regulation to be in the Netherlands—without a hearing

and on the same day that the SoP Petition was filed—based on the presumption triggered by

Coop's corporate location.  It made this determination notwithstanding the other information

about Coop contained in the SoP Petition, such as Coop's status as a special purpose financing

vehicle for the Oi group.

At the Prior Recognition Hearing this Court was well aware that Coop's registered office

was in the Netherlands.  But the registered office presumption is not accorded the same weight

under U.S. law.  *See supra* at 23-25.  Given the different standard under U.S. law, therefore, this

---

approximately €160,846).  It is difficult to argue that the existence of the tax claim was crucial information when
even Coop's court-appointed Dutch fiduciary, Mr. Berkenbosch, was unaware of when it came into existence.  *See*
Trial Tr. 691:10–20, Sept. 25, 2017 (Berkenbosch).

[28]     There is another reason to afford less weight to the opinion letter: it was not public.  As information that
was not ascertainable by third parties, therefore, this document is of limited utility in determining COMI under
Chapter 15.  *In re Fairfield Sentry,* 714 F.3d at 138 (underscoring the importance of regularity and ascertainability in
determining COMI) (quoting EU Regulation, Preamble ¶ 13 stating that COMI "should correspond to the place
where the debtor conducts the administration of his interest on a regular basis and is therefore ascertainable by third
parties.").

Court considered the information about Coop's SPV status to be highly relevant in reaching a

different conclusion about Coop's COMI under Chapter 15 at the Prior Recognition Hearing.

*See* Hr'g Tr. 21:10–15, July 21, 2016 ("Case law including the OAS case notes that the COMI of

an SPV turns at a location of the corporate nerve center and the expectation of creditors. And

here, I find that the COMI analysis for the SPV here is essentially the same as it was in OAS and

I reach the same conclusion that Brazil is the appropriate place."); *see also In re OAS*, 533 B.R.

at 102 (noting that COMI of a financing SPV depended upon: (1) the location of the corporate

nerve center of the corporate group the SPV served; (2) the expectations of the SPV's creditors;

and (3) the function the SPV played within its corporate group).[29]

The Movants further contend that the Chapter 15 Debtors did not disclose to the Court

that Coop engaged in business beyond the issuance of notes, such as hedging and financing

activities. They even argue that Coop is not an SPV, claiming that it engages in other activities

beyond paying off debt that it accrued and then passed on to the Oi Group. But this is not borne

out by the evidence. The record does not show that Coop took actions other than those

consistent with its nature as a special purpose financing vehicle. While Coop's Articles of

Association list a number of other potential activities that the company could hypothetically

engage in (SCX 1, Art. 3), no evidence was presented that it has ever actually engaged in

activities beyond its role as an SPV. Movants make much of the notion that Coop "held" money

that it received before on-lending the funds to the Oi Group (*see* Trustee Reply ¶ 4), implying

that significant economic activity was involved in such "holding." But the record does not

support that conclusion. Nothing appears to have been done with this cash while being held in

---

[29]    The Court notes that its Prior Recognition Order and COMI determination were not discussed by the Dutch
courts in the SoP or Dutch Bankruptcy Proceeding, despite having been made before the SoP was issued in the
Netherlands. This just reinforces the distinct legal tasks before this Court under Chapter 15, which is an adoption of
the Model Law, and the Dutch courts under the EU Regulation, which is not an adoption of the Model Law.

the bank in the Bahamas.  Rabelo Decl. ¶¶ 20, 22.  The mere act of holding those funds is not

inconsistent with Coop's SPV nature; it is hard to imagine how an entity like Coop could obtain

funds and on-lend them without at some point "holding" the money.  Moreover, Movants have

not pointed to anything in the record establishing that Coop even made the decision about when

these funds were transferred.  Indeed, one would expect such a decision to be made directly or

indirectly by the Oi Group in Brazil.  For all these reasons, therefore, the record here does not

support Movants' claim that Coop acted outside the parameters of its role as a special purpose

financing vehicle.

The Movants also complain that the Chapter 15 Debtors in the prior case concealed

certain actions that Coop had taken or was planning to take, such as that: (1) Coop fraudulently

transferred the PT sale proceeds to Brazilian affiliates just days before commencing restructuring

activities (Trustee Reply ¶ 4); (2) Oi replaced the Dutch member of the Coop Board with an Oi

employee (Trustee Reply ¶ 78);[30] and (3) the newly reconstituted Coop Board approved loan

amendments that looked to Brazil and not the Netherlands (Trustee Reply ¶ 78).  The Movants

also note that Coop failed to disclose that it was planning to file the SoP in the Netherlands after

the Prior Recognition Order was entered.  Movants' Proposed CoL ¶ 46.  But none of these

actions would be sufficient to sway the COMI determination made at the Prior Recognition

Hearing.  It is not even clear how these actions would be relevant to the Court's determination

that Coop's COMI is in Brazil.  As to the first, the existence of prepetition transfers is not a

---

[30]    The Court notes that the first two of these facts were disclosed to the Court prior to the Prior Recognition Hearing.  *See* Motion for Provisional Relief [Case No. 16-11791, ECF No. 7, Ex. D] (Writ of Summons, dated March 16, 2016, attached to Section 1519 motion filed by Chapter 15 Debtors) (discussing financial problems of Oi Group and intercompany transfers of PTIF and Coop, as well as replacement of board members of PTIF and Coop with all new board members that were either employees of or counsel to Oi); Motion for Provisional Relief [Case No. 16-11791, ECF No. 7, Ex. F] (Writ of Summons, dated March 30, 2016, in Dutch proceeding brought by Capricorn against Coop) (discussing intercompany transfers of Coop and noting that Oi terminated Coop's only outside director and replaced that director with an employee of Oi, so that the board now consists of the CFO of Oi and another Oi employee).

78

factor normally identified as relevant to recognition under Section 1517.  *See In re Fairfield Sentry*, 714 F.3d at 133 (noting that a debtor's COMI is determined at the timing of filing of the Chapter 15 petition, except in circumstances of COMI manipulation).  In any event, there has been no cogent explanation why it would be so here, particularly when Coop was required as a special purpose financing vehicle to on-lend any funds it received—which would include the proceeds of the PT sale—to the Oi Group.  *See* Trial Tr. 676:13–23, Sept. 25, 2017 (Berkenbosch); TX 16 at 4 (2021 Notes Offering Memorandum) ("We expect to use the net cash proceeds of the PT Portugal Disposition for the repayment of indebtedness of our company or to carry out corporate transactions that aim to consolidate the telecommunications sector in Brazil, including the acquisition of interests in other mobile operators.").

There is also no convincing explanation of the relevance of the second action cited by the Movants—the replacing of the Dutch member of the Coop Board—particularly given that Mr. Correa's replacement of T.I.M. preserved the status quo of Coop having one director based in the Netherlands.  *See* Trial Tr. 184:7–12, Sept. 18, 2017 (Rabelo) (prior to T.I.M.'s replacement, Coop had one director in the Netherlands and one in Brazil); Trial Tr. 679:10–22, Sept. 25, 2017 (Berkenbosch) (upon appointment, Mr. Correa moved to the Netherlands); Shah Decl. ¶ 31 (informing the Court that Coop had one director in the Netherlands and one in Brazil).  As to the third action cited by the Movants regarding loan amendments, the amendments would not have changed this Court's COMI determination.  If anything, the amendments provide additional ties to Brazil.

The fourth action cited by the Movants regarding Coop's intentions to file the SoP Petition fairs no better.  Despite the Movants' assertions that the SoP was always planned by the Oi Group as part of a global restructuring strategy, the Court finds that the SoP Petition was filed

for defensive purposes in response to the involuntary petitions. *See infra* n. 55 and

accompanying text. In any event, the Chapter 15 Debtors promptly informed the Court of the

filing of the SoP Petition within two weeks of the event. *See* Third Decl. of Shah Notifying

Court of a Change of Status ¶ 5 [Case No. 16-11791, ECF No. 48].

The Movants also argue that the Chapter 15 Debtors withheld facts regarding PTIF, such

as PTIF being Coop's largest creditor and the PTIF Loan Agreement having a Netherlands forum

selection clause. But the Court finds that adequate information regarding PTIF was provided to

the Court in the earlier proceeding. *See* Brazilian Petition, at 3 n.5 (stating that PTIF is an

"affiliated Debtor[] . . . organized under the laws of the Netherlands"); *id.* ¶ 30 (stating that Oi

Coop is an obligor on intercompany claims of an affiliate); Motion for Provisional Relief [Case

No. 16-11791, ECF No. 7, Ex. D] (Writ of Summons, dated March 16, 2016, in Dutch

proceeding brought by the Aurelius-managed fund Capricorn against PTIF, Coop, and others,

alleging that (1) "PTIF and [Coop] are Dutch legal entities that are full subsidiaries of Oi" (¶

2.1.1); (2) PTIF and Coop "are both engaged in financing activities for the Oi Group" (¶ 2.1.3);

and (3) that in issuing the PTIF Loan, PTIF "basically transferred all its available funds to

[Coop]" (¶ 2.4.3) and became "[Coop]'s largest creditor" (¶ 2.4.2).). As for the Netherlands

forum selection clause in the PTIF Loan Agreement, it doesn't tell the whole story. The PTIF

Loan Agreement is actually "governed by and construed in accordance with the laws of Brazil"

(TX 5 § 6.5), and was executed not in Dutch, but "in both [the] English and Portuguese

languages," while setting out that "[i]n the event of any dispute or controversy, the Portuguese

version [would] prevail" (TX 5 § 6.4).

Finally, the Movants allege that the Chapter 15 Debtors misled this Court by suggesting

that the Brazilian public prosecutor in the Brazilian RJ Proceeding had issued an opinion

concluding that "for the purposes of the Brazilian Bankruptcy Law and the Model Law, 'there is

no question' that the COMI of each of the RJ Debtors, including the Dutch-incorporated entities

Coop and PTIF, is in Rio de Janeiro, Brazil." *See* Movants' CoL ¶¶ 46, 104–09 (quoting Decl.

of Shah Notifying Court of a Change of Status ¶ 7(iv) [Case No. 16-11791, ECF No. 32]).  The

Movants contrast this statement with the actual words of the public prosecutor that referred to the

"main place of business" of the Oi Group.  *See* Movants' CoL ¶¶ 106–07.  But this is much ado

about nothing as the Chapter 15 Debtors provided the Court with a copy of the prosecutor's

opinion itself.  *See* Request of the Office of the Public Prosecutor, attached as Ex. B. to Decl. of

Shah Notifying Court of a Change of Status [Case No. 16-11791, ECF No. 32-2].  The Court

could and did read this opinion in the prior case, and thus was fully informed of its content at the

time the Court entered the Prior Recognition Order.

Putting aside the basis for the Court's Prior Recognition Order, the Court has another

reservation about exercising its discretion to grant relief under the first prong of Section 1517(d):

the behavior of the Coop creditor Aurelius.  The evidence at trial demonstrates that Aurelius'

failure to object at the Prior Recognition Hearing was a strategic decision, not one based on a

lack of information or some fundamental misunderstanding of the facts.  Aurelius was armed

with the crucial information about Coop.[31]  But Aurelius nonetheless said nothing when the

Court inquired about the COMI of Coop.  It remained silent when the Court stated that the COMI

---

[31]     Aurelius' awareness of these crucial facts about Coop is also reflected in the significant litigation already
pending against Coop at the time of the Prior Recognition Hearing.  In March 2016, the Aurelius-managed fund
Capricorn filed an action in the Netherlands to avoid the PTIF loan and to hold PTIF, Coop, and various of their
directors liable for damages suffered by Capricorn as a result of the PTIF loan and the Coop loan.  *See* Motion for
Provisional Relief [Case No. 16-11791, ECF No. 7, Ex. D] (Writ of Summons, dated March 16, 2016, in main
proceeding brought by Capricorn against PTIF, Coop, and others).  That litigation shows that Aurelius was aware of
the transfer of cash from Coop to Oi affiliates and was concerned about such transfers.  *See id.*; *see also* Trial Tr.
575:10-22, Sept. 25, 2017 (Gropper).  That same month, Capricorn filed a summary proceeding seeking to enjoin
Coop from further transferring funds to any member of the Oi Group.  *See* Motion for Provisional Relief [Case No.
16-11791, ECF No. 7, Ex. F] (Writ of Summons, dated March 30, 2016, in summary proceeding brought by
Capricorn against Coop).

of an SPV like Coop turns on the "location of the corporate nerve center and the expectations of

creditors." Hr'g Tr. at 21:10–12, July 21, 2016.  It voiced no disagreement when the Court

stated that "the integrated O[i] group enterprise is managed, directed, and monitored as a

strategic whole in Brazil while major group decisions are affected at the O[i] group headquarters,

[and] the O[i] group headquarters is the corporate nerve center . . . ." *Id*. at 20:24-21:3.  Most

crucially, it offered no objections when the Court opined that "the COMI analysis for the SPV

here [(Coop)] is essentially the same as it was in OAS" and then concluded that Coop's COMI

was in Brazil.  *Id*. at 21:13–15.[32]  Aurelius failed to object notwithstanding its view that COMI

for Coop is and always has been in the Netherlands.  Movants' Proposed CoL ¶ 45; Trial Tr.

637:17–25, Sept. 25, 2017 (Gropper).

Why did Aurelius remain silent at the Prior Recognition Hearing?  As will be explained

more fully below in discussing the second prong of Section 1517(d), the silence was part of a

strategy by Aurelius based on its view that Coop's debt was undervalued.  Under that strategy,

Aurelius significantly increased its holdings of Coop debt after the Prior Recognition Hearing

and took action to overturn this Court's Prior Recognition Order, notwithstanding its lack of

objection at the Prior Recognition Hearing.

### F.  <u>The Court Will Not Exercise its Discretion to Grant Relief Under the Second Prong of Section 1517(d)</u>

The Court now turns to the second prong of Section 1517(d): whether recognition of the

Brazilian RJ Proceeding should be modified or terminated because the grounds for granting

recognition "have ceased to exist."  11 U.S.C. § 1517(d).  To assess this question, the Court must

---

[32]     In fact, there were no objections to the requested relief at the Prior Recognition Hearing.  *See* Hr'g Tr. 9:8–9, July 21, 2016 (counsel noting that they received no objections at the Prior Recognition Hearing to the petition for recognition).

examine what has changed since entry of the Prior Recognition Order.[33]  Almost all of the

central facts regarding Coop have remained unchanged since the Prior Recognition Order.  Coop

remains a special purpose financing vehicle for the Oi Group with a registered office in the

Netherlands.  The only significant change has been the progression of the Dutch insolvency

proceedings and the activities of the Insolvency Trustee arising out of those proceedings.[34]  But

for the reasons explained below, the Court declines on this record to modify or terminate the

Prior Recognition Order—finding a Brazilian COMI—under the second prong of subsection (d)

based on this change.

The Court is mindful that the activities of foreign liquidators and administrators can be

relevant to a COMI analysis.  *See In re Fairfield Sentry,* 714 F.3d at 137 (directing examination

of a debtor's COMI at the time the Chapter 15 petition is filed rather than the earlier date when

the foreign insolvency proceeding was filed, and holding that "any relevant activities, including

liquidation activities and administrative functions, may be considered").  Where a foreign

representative "has engaged in significant pre-U.S. filing work to operate (or even liquidate) the

---

[33]    The Insolvency Trustee and the IBC argue that under *Fairfield Sentry*, the Court must analyze COMI based only on the facts as of July 7, 2017, the date that the Insolvency Trustee filed his petition for recognition.  But as previously noted, the Court is not making a determination of COMI under Section 1517(a), but rather is examining whether recognition should be modified or terminated pursuant to Section 1517(d).  The second prong of subsection (d) explicitly contemplates looking to how facts have changed since the Prior Recognition Order.  *See* 11 U.S.C. 1517(d).  Additionally, allegations of COMI manipulation have been raised in this proceeding.  *See* SC Objection ¶¶ 65–92; Oi Objection ¶¶ 67–74; Trial Tr. 136:5–9, Sept. 18, 2017 (Cunningham).  In such circumstances, courts may examine events prior to a Chapter 15 petition.  *See In re Fairfield Sentry,* 714 F.3d at 137.

[34]    Two minor facts have changed between the date of the Prior Recognition Order on July 22, 2016 and the Insolvency Trustee's request for recognition on July 7, 2017.  First, at the time of the Prior Recognition Order, Coop had two directors, one who resided in Brazil and the other in the Netherlands.  Following the opening of Coop's Dutch Bankruptcy Proceeding, the Coop Board of Directors removed both prior directors, and since April 2017 Coop has one director, Bryoptha, which is a Brazilian entity based in Rio de Janiero.  Trial Tr. 188:20–25, Sept. 18, 2017 (Rabelo); Stip. Facts ¶ 11.  Second, Coop's Netherlands-based director, Mr. Correa, served as Coop's sole employee at the time of the Prior Recognition Order.  Stip. Facts. ¶ 14.  His employment was terminated with his directorship around late April 2017, and Coop currently has no employees.  Berkenbosch Decl. ¶ 10; Trial Tr. 194:9–21, Sept. 18, 2017 (Rabelo).  These changes are not significant enough to provide a basis for relief under Section 1517.

83

foreign debtor in the jurisdiction where the foreign insolvency proceeding was commenced (even if in a letterbox jurisdiction), the COMI can be found to have shifted from the foreign debtor's original principal place of business to the new locale." *In re Creative Fin.*, 543 B.R. at 518.

But the activities of a judicial administrator must be of sufficient significance to produce a shift in COMI. For instance, "when a foreign representative relocates all of the primary business activities of a debtor to his or her location, the COMI may 'become lodged with the foreign representative.'" *In re Creative Fin.*, 543 B.R. at 519 (quoting *In re Fairfield Sentry Ltd.*, 440 B.R. 60, 65 (Bankr. S.D.N.Y. 2010), *aff'd*, 2011 WL 4357241 (S.D.N.Y. Sept. 16, 2011), *aff'd*, 714 F.3d 127 (2d Cir. 2013)). In circumstances involving debtors without significant operations in a jurisdiction, a foreign representative's work to operate or liquidate a foreign debtor provides a basis for U.S. recognition of letterbox jurisdiction insolvency proceedings—*so long as the estate fiduciaries in those jurisdictions do enough work*." *Id*. at 518 (emphasis added). But such a change in COMI can only take place "where *material activities* have been undertaken in the jurisdiction in which the foreign proceeding was filed—thus *providing a meaningful basis for the expectations of third parties*." *Id*. at 501 (emphasis added); *see id.* at 518.

Two cases identify some facts to consider when assessing whether the actions of a foreign trustee are sufficient to change creditor expectations and COMI. In *Creative Finance*, the court held that the conduct of a liquidator appointed in the British Virgin Islands (the "BVI") was not significant enough to shift the foreign debtor's COMI from the U.K, Spain, or Dubai— the locations at which the debtor's principal actually conducted business—to the BVI, the letterbox jurisdiction where the debtor was organized but did not conduct business activities. *See In re Creative Fin.*, 543 B.R. at 511. The principal of that debtor had filed a voluntary

84

proceeding in BVI, but had not provided the liquidator with enough funding to do more than the

bare minimum required by BVI law.  *See id*. at 502.  The tasks undertaken by the liquidator

included administrative tasks like opening bank accounts for the debtors, gathering and preparing

required documents, providing creditor notices, holding creditor meetings, and issuing formal

reports.  *See id*. at 508–09.  But the liquidator did not collect or liquidate any of the debtor's

assets, shut down any of the debtor's businesses, pay any taxes, bring any causes of action, or

conduct any investigations (including into a monetary transfer by the debtor's principal that was

made after a judgment against the debtors).  *See id*. at 509.  Finding that the liquidator had not

managed the debtor's business or taken the necessary steps to liquidate the debtor in any material

way, the Court concluded that COMI had not shifted to the BVI.  *See id*. at 511.

In *In re British Am. Ins. Co. Ltd.*, 425 B.R. 884, the court discussed the activities of a

judicial manager appointed in the Bahamas and his impact on the COMI of the foreign debtor.

In that case, the manager argued that the debtor's COMI was located in the Bahamas in part

because of the broad powers conferred upon him by his order of appointment and his initial

activities as judicial manager, which included the retention of professionals, investigatory work,

and preparation and submission of certain reports to the Bahamian court.  *See id*. at 913.  The

court, however, observed that other than the judicial manager's appointment, the debtor's

contacts with the Bahamas were "limited to those necessary to retain its charter and insurance

license."  *Id*. at 913.  Specifically, the debtor had no directors, managers, or other employees

located in the Bahamas at the time of the judicial manager's appointment and was being

managed by a wholly owned subsidiary located outside of the Bahamas.  *See id*.  Other than the

location of its registered office, limited professional representations, and the manager's

oversight, all of the administrative functions were taking place outside of the Bahamas and none

of its books and records, except for required corporate records, were maintained in the Bahamas.

*See id.*  Prior to the manager's appointment, none of the debtor's liquid assets were located in the

Bahamas, although he established accounts in the Bahamas after his appointment.  *See id.*  No

material creditors were located in the Bahamas.  *See id.*  The court observed:

> [t]here may be instances where a foreign representative remains in place for an
> extended period, and relocates all of the primary business activities of the debtor
> to his location (or brings business to a halt), thereby causing creditors and other
> parties to look to the judicial manager as the location of the debtor's business.
> This would lead to the conclusion that the center of its main interest has become
> lodged with the foreign representative.

*Id*. at 914.  The court further noted the primary components of the debtor's business, which

directly touched its creditors, were still taking place outside of the Bahamas.  *See id*.

These same factors have been discussed in a few other cases.  *See, e.g., In re Suntech*,

520 B.R. at 419–20 (holding that COMI shifted to the Cayman Islands from China based on the

appointment and actions of joint provisional liquidators in the Cayman Islands who operated

with broad authority to, among other things, take control of debtor assets, take legal action on

behalf of the debtor, open bank accounts and borrow money, and exercise rights over the

debtor's operating subsidiaries in accordance with the debtor's equity rights); *In re Soundview

Elite, Ltd.*, 503 B.R. 571, 594 (Bankr. S.D.N.Y. 2014) (noting that COMI was located at debtor's

principal place of business in the U.S., but if the joint official liquidators "were to undertake

active day-to-day management of the Debtors that are the subject of the Cayman proceedings,

and for a sufficient period of time, [the court] might be able to eventually find that the COMI

shifted to the Cayman Islands. . . ."); *In re British Am. Isle of Venice, Ltd.*, 441 B.R. 713, 723

(Bankr. S.D. Fla. 2010) (where liquidator in BVI foreign proceeding took control of a debtor that

had no officers or directors and became the sole person responsible for the management of the

debtor for a period of over 14 months, court found that "in light of the Petitioner's concerted

efforts on behalf of the Debtor, and the extended passage of time since his appointment, third parties must necessarily consider the Petitioner's offices in the British Virgin Islands to be the location of the Debtor's COMI."); *In re Betcorp Ltd.*, 400 B.R. 266, 292 (Bankr. D. Nev. 2009) (in making COMI determination, noting that "[t]he location of those that manage Betcorp—the liquidators (since commencing the winding up divests the directors of their authority)—is Australia.").

In seeking relief here, the Movants highlight steps taken by Mr. Berkenbosch in connection with the Dutch insolvency proceedings. First, they cite to Mr. Berkenbosch's communications with and notices to Coop's creditors and other stakeholders.[35] Second, they note that the Insolvency Trustee performed certain administrative and management duties, such as securing Coop's books and records, paying Coop's debts as they came due, and paying professionals, and obtaining financing. Berkenbosch Decl. ¶¶ 82, 100, 102; TX 57–58; *see also* Stip. Facts ¶ 25(c) (referencing Coop's court-controlled bank account in the Netherlands). Third, they observe that Mr. Berkenbosch has engaged in litigation activities on behalf of the Coop estate, including filing the Pauliana Proceeding in the Netherlands against Oi and Oi Móvel, pursuing a claim against Dutch taxing authorities for a VAT refund of €160,846, and protecting the interest of Coop's Dutch estate in the Brazilian RJ Proceeding.[36] Berkenbosch Decl. ¶¶ 5, 25–26; TX 471, 485; Trial Tr. 753:4–13, 828:23–829:4, Sept. 25, 2017 (Berkenbosch). Movants

---

[35]    These include communications with the Coop Board, PTIF, Aurelius, and the Steering Committee, as well as published notices and public reports required by Dutch law. TX 29–35; TX 38, 40, 47; TX 162, Arts. 73(a) and 227; TX 215–256; TX 309 ¶ 2.10.1; TX 461–467; TX 482, 486; Berkenbosch Decl. ¶¶ 55, 59; Declaration of Dan Gropper ("Gropper Decl.") ¶ 16 [ECF No. 77].

[36]    For example, the Insolvency Trustee obtained orders directing the Brazilian RJ Debtors to provide separate creditor lists and to allow creditors a non-consolidated vote with respect to the proposed consolidation in the Brazilian RJ Proceedings, as well as filing the instant proceeding before this Court and requesting recognition of the Dutch Bankruptcy Proceedings. TX 471; TX 485; Trial Tr. 786:14–17, 828:12–829:4, Sept. 25, 2017 (Berkenbosch).

emphasize that the Insolvency Trustee has control over the assets of Coop's Dutch estate and is

the only party with the power to investigate, pursue, and settle claims and causes of action on

behalf of the Dutch estate.  Berkenbosch Decl. ¶¶ 156–57.

But these facts are not enough to shift Coop's COMI from Brazil to the Netherlands.

While the Insolvency Trustee's activities are more significant than those previously discussed in

the *Creative Finance* case, they nonetheless fall short for two reasons: 1) his actions do little to

change the economic realities associated with Coop's status as a special purpose financing

vehicle and the related expectations of its creditors; and 2) there are significant legal and

pragmatic limitations on the Insolvency Trustee.  There is also an independent reason for the

Court to decline to exercise its authority to grant relief under Section 1517(d): Aurelius' role in

bringing about the very facts that the Movants now rely upon as a basis to modify or terminate

recognition.  The Court will examine each of these three issues separately.

### 1. <u>The SPV Nature of Coop and Creditor Expectations</u>

Coop's status as an SPV was central to the Court's prior recognition of Brazil as the

location of Coop's COMI.  *See* Hr'g Tr. 21:10–15, July 21, 2016 ("Case law including the OAS

case notes that the COMI of an SPV turns at a location of the corporate nerve center and the

expectation of creditors. And here, I find that the COMI analysis for the SPV here is essentially

the same as it was in OAS and I reach the same conclusion that Brazil is the appropriate place.").

It remains the backbone of the Court's determination today that the Insolvency Trustee's

activities do not change Coop's COMI under the second prong of Section 1517(d).

The significance of Coop's SPV status is best explained by comparing the facts here with

those in *In re OAS*, 533 B.R. 83 (Bankr. S.D.N.Y. 2015).  In *OAS*, the court found that the COMI

of a special purpose financing entity was located in Brazil, despite its incorporation in Austria.

In doing so, the court noted that COMI analysis for SPV entities is "less straightforward than the

88

typical case." *In re OAS*, 533 B.R. at 101. The court in *OAS* focused on the economic reality of

the debtor's purpose as an SPV. The court observed that having issued notes, the SPV debtor

"had no other business except to pay them off. This was the very business it and the other

Brazilian Debtors were engaged in through the Brazilian Bankruptcy Proceedings . . . .

Moreover, the Brazilian Bankruptcy Proceedings provide the only realistic chance to repay the

[notes]." *Id.*

The court in *OAS* further reflected on the fact that Brazil was the debtor's nerve center

and headquarters. *See id.* The debtor's parent was a Brazilian entity that was the debtor's sole

shareholder and had the power to elect the debtor's executive officers and "determine the

outcome of any action requiring shareholder approval, including transactions with related parties,

acquisitions and dispositions of assets and the timing and payment of any future dividends,

according to Brazilian Corporation Law." *Id.* at 101–02. The Court also considered creditor

expectations, observing that the offering memoranda for certain notes focused on the corporate

group and its Brazilian contacts, not the individual debtor. *See id.* at 102–03.[37] The Court

concluded that purchasers of the notes "understood that they were investing in Brazilian-based

businesses, and [the debtor's] place of incorporation, or for that matter its very existence, was

immaterial to their decision to purchase their notes." *Id.* at 103. Furthermore, the Court noted

---

[37]       The OAS offering memoranda stated that the guarantors on the notes were all organized under the laws of
Brazil, the debtor was described as a special purpose financing company whose principal purpose was to finance the
operations of the larger corporate group, and extensively discussed the business, financials, and management of that
corporate group, but failed to include similar information regarding the debtor. *See In re OAS*, 533 B.R. at 102.
Importantly, the offering memoranda described the risks associated with the business of the corporate group, not the
debtor individually, and the risks that the investments could be affected by the Brazilian economy and government
actions. *See id.* Purchasers of the notes were warned that if the corporate parent and its subsidiaries could not repay
their indebtedness, including the guaranteed obligations, "they might become subject to bankruptcy proceedings in
Brazil, and Brazilian laws might be less favorable to creditors compared to the laws of the United States or other
jurisdictions." *Id.* at 102–03. The offering memoranda did not discuss the risks of operating in Austria, merely
mentioning that "Austria would not enforce U.S. judgments, the U.S. securities laws or awards of punitive
damages." *Id.* at 103.

that "the purchasers expected to receive repayment from the cash generated by the operations of the [corporate group], and in the event of a default, might ultimately have to enforce their rights in a Brazilian bankruptcy proceeding.  [The debtor] had no separate, ascertainable presence in Austria; it was part of, and inseparable from, the [corporate group] located in Brazil.  Finally, the [noteholders] had no legitimate expectation that the Austrian courts would play any role in the determination or payment of their claims."  *Id*

The situation before this Court is remarkably similar to the *OAS* case.  Coop was formed as a special purpose financing company, and was incorporated in the Netherlands specifically to provide the Oi Group with access to the international capital markets and thereby decrease the cost of capital.  Shah Decl. ¶ 30; Rabelo Decl. ¶ 7.  Coop has no subsidiaries, revenue-generating operations or business of its own.  Trial Tr. 181:11–13, Sept. 18, 2017 (Rabelo); Rabelo Decl. ¶ 8.  It does not and has never held any equity investments.  Trial Tr. 682:2–13, Sept. 25, 2017 (Berkenbosch).  Coop has never had any employees that were responsible for managing its finances, and since May 1, 2017 has had no employees at all.  Trial Tr. 194:9–21, 352:13–15, Sept. 18, 2017 (Rabelo); Berkenbosch Decl. ¶ 10.  Since its formation, Coop has only performed two functions: (i) borrowing, or issuing or assuming notes; and (ii) on-lending to the Oi Group.  Trial Tr. 224:17–23; 351:20–352:4, Sept. 18, 2017 (Rabelo); Rabelo Decl. ¶¶ 8, 13; Shah Decl. ¶¶ 30, 35.  Indeed, under the provisions of one of its note indentures, Coop has no authority to undertake any activities other than these two functions.  TX 15 § 4.17.  Like the debtor in *OAS*, Coop raised money for its parent and now has no real business other than paying off the underlying obligations.  And crucially, the Brazilian RJ Proceeding provides the only realistic chance to repay Coop's debt's.  *See* Trial Tr. 725:18–726:7, Sept. 25, 2017 (Berkenbosch).

Also similar to the debtor in *OAS*, Coop's nerve center and headquarters are clearly

located in Brazil.  Coop has no operations or business independent of the Oi Group and is

operated within the Oi Group as part of a single, integrated economic unit.  Trial Tr. 682:15–18,

Sept. 25, 2017 (Berkenbosch); Rabelo Decl. ¶ 10.  The Oi Group, in turn, is headquartered and

managed from the principal executive office of Oi in Rio de Janeiro, Brazil, with every aspect of

the Oi Group's operations, finances, corporate management, employee management and payroll,

and short- and long-term strategic planning directed from Brazil.  Shah Decl. ¶ 8.  Coop has

never held money for any entity other than a member of the Oi Group.  Trial Tr. 352:10–12,

Sept. 18, 2017 (Rabelo).  As the sole member (shareholder) of Coop, Oi has the exclusive power

to elect Coop's directors and also the power to dictate any corporate action of sufficient

magnitude as to require member approval.[38]  Rabelo Decl. ¶ 7; Trial Tr. 181:3–5, Sept. 18, 2017

(Rabelo).  Significantly, the people that actually manage Coop in the context of the Brazilian RJ

Proceeding are located in Brazil.  Trial Tr. 362:16–363:5, Sept. 18, 2017 (Rabelo); Rabelo Decl.

¶ 10.

In contrast to these weighty connections to Brazil, Coop's corporate contacts in the

Netherlands largely reflect the minimum requirements necessary to remain registered as a Dutch

company.  *See In re Bear Stearns*, 374 B.R. at 130 n.8 (denying recognition of a foreign Cayman

Islands proceeding where "the only business done in the Cayman Islands apparently was limited

to those steps necessary to maintain the [debtors] in good standing as registered Cayman Islands

companies, [causing] the [debtors to] closely approximate the 'letterbox' companies referred to

in the *Eurofood* decision.").  As a Dutch financing company, Coop must comply with certain

---

[38]      Of course, this power is now subject to whatever restrictions exist by virtue of Coop's two foreign
bankruptcy proceedings.

minimum substance requirements in the Netherlands for Dutch and Brazilian tax purposes. Shah Decl. ¶ 31. For instance, Coop maintains a registered office in the Netherlands (*id.*), enters routine filings with the Dutch Chamber of Commerce (*id.*), pays taxes in the Netherlands (Trial Tr. 204:19–22, Sept. 18, 2017 (Rabelo)), files tax returns with the Dutch tax authorities (Shah Decl. ¶ 31), and historically has maintained one director located in the Netherlands (Trial Tr. 183:21–187:8, Sept. 18, 2017 (Rabelo)).

But even these contacts with the Netherlands are less fulsome than they first appear. For example, Coop's office is an office in name only. Coop maintains its registered address in the Netherlands at a "trust office," which serves as the registered seat for a large number of entities. Trial Tr. 678:20–679:4, Sept. 25, 2017 (Berkenbosch). Coop initially used the offices of its Dutch director T.I.M., which is a company whose business it is to serve as a third-party director for and rent out its office space to many companies simultaneously. Trial Tr. 343:23–344:10, Sept. 18, 2017 (Rabelo). Moreover, Mr. Correa, who was both the sole employee and a one-time director of Coop and lived in the Netherlands, appears to have performed his duties only at home or in internet cafés, and not at Coop's registered office. Trial Tr. 345:22–346:7, Sept. 18, 2017 (Rabelo). In fact, Mr. Berkenbosch testified that he had no knowledge of anyone ever having worked at Coop's registered office and that even he had never visited the location. Trial Tr. 678:2–4; 681:20–25, Sept. 25, 2017 (Berkenbosch). Coop's board meetings were conducted by telephone conference. Trial Tr. 189:10–22, Sept. 18, 2017 (Rabelo). While Coop's books and records are in the Netherlands, copies are held in Brazil at Oi headquarters. Trial Tr. 201:20–23, Sept. 18, 2017 (Rabelo). Additionally, Coop's board resolutions were always transcribed in English rather than in Dutch. Trial Tr. 45:2–8, Sept. 18, 2017 (Rabelo).

There are some differences between this case and *OAS*.  But these differences do not change the Court's conclusions.  For instance, the Movants note that Coop held the funds it received from PTIF for a period of time before transferring them to other Oi Group entities, unlike the immediate funds transfer that occurred in the *OAS* case.  But the Court sees no significance to that fact, other than what appears to be an effort to maximize a tax advantage. The Movants also note minor differences relating to the location of employees, directors, and offices.  But these differences don't change the economic reality here, and instead largely reflect the requirements for maintaining Coop's tax status in the Netherlands.  As Coop's SPV nature remains unchanged since the Prior Recognition Hearing, it significantly undermines any claim that COMI has shifted to the Netherlands by virtue of the Insolvency Trustee's activities.

This is equally true for evidence concerning Coop's creditors' expectations.  For the purposes of a COMI analysis, creditor expectations can be evaluated through examination of the public documents and information available to guide creditor understanding of the nature and risks of their investments.  *See In re Fairfield Sentry,* 714 F.3d at 138 (underscoring the importance of regularity and ascertainability in determining COMI) (quoting EU Regulation, Preamble ¶ 13 stating that COMI "should correspond to the place where the debtor conducts the administration of his interest on a regular basis and is therefore ascertainable by third parties."). Coop's creditors fall into three buckets: (1) holders of the Coop Notes; (2) PTIF; and (3) other miscellaneous Dutch creditors.  Stip. Facts ¶ 16; Trial Tr. 312:15–19, Sept. 18, 2017 (Rabelo). Evaluating creditor expectations, like the broader COMI analysis, is not a box-checking exercise, and each category does not warrant equal weight here.[39]  While a detailed analysis of creditor expectations was not conducted at the Prior Recognition Hearing, extensive evidence was

---

[39]    For instance, the third category does not factor into this analysis in any meaningful way given the small value of those claims (approximately €50,000) when considering all Coop creditors.  *See* Stip. Facts ¶ 16.

submitted on this issue during the trial in this case.  A review of that evidence confirms that a

reasonable creditor would have looked to Brazil for their recovery at the time of the Prior

Recognition Hearing and would still do so now.

To assess the expectations of the first bucket of creditors—the noteholders—this Court

primarily looks to the associated indentures and offering materials.  *See In re OAS*, 533 B.R. at

101–03 (reviewing offering memorandum to establish noteholder expectations as part of a COMI

analysis); *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 474 B.R. 88, 93–94

(S.D.N.Y. 2012) (same); *In re Suntech*, 520 B.R. at 418 (considering terms of indenture to

establish creditor expectations regarding likely location of a restructuring as part of a COMI

analysis).  These documents direct investors to look towards Brazil and the Oi Group as a whole

when evaluating the risks associated with the Coop Notes in three ways.

First, both series Coop Notes are fully guaranteed by Oi, underlying the clear truth that

any chance of repayment stems from the revenue-producing operations in Brazil, not an empty

financing vehicle in the Netherlands.  Stip. Facts ¶ 22; TX 15 § 11; TX 18 § 2*; see In re OAS*,

533 B.R. at 103 ("[P]urchasers of the 2019 Notes understood that they were investing in

Brazilian-based businesses, and OAS Investments' place of incorporation, or for that matter its

very existence, was immaterial to their decision to purchase their notes. . . . [T]he purchasers

expected to receive repayment from the cash generated by the operations of the OAS Group, and

in the event of a default, might ultimately have to enforce their rights in a Brazilian bankruptcy

proceeding.").  The 2021 Notes Indenture reinforce Coop's limited role to creditors by explicitly

barring Coop from establishing any operations or taking any actions beyond its role as a

financing SPV for the Oi Group.  TX 15 § 4.17.  The offering memoranda for both series of

94

notes similarly speak of the Oi Group as a single integrated operation,[40] and the 2021 Notes

clearly describe Coop's conduit role and complete dependence on the Brazilian entities.[41]

Second, the indentures for both series of Coop Notes actually allow the issuer itself to be

swapped among Oi Group entities at Oi's sole discretion.  TX 17 § 10.01; TX 15 § 10.01.  The

2022 Notes were not even originally issued by Coop, but rather by Oi's predecessor entity, Brasil

Telecom S.A.  Stip. Facts. ¶ 20.  Movants argue that this clause should be discounted because the

right to swap issuers was lost upon the filing of the Brazilian RJ Proceeding and the associated

default under the terms of the indentures.  Trial. Tr. 975:2–976:15, Sept. 26, 2017 (Brilliant).

But while Movants are correct about the impact of the default, a reasonable investor would

consider such a significant right when assessing the risks of an investment in the Coop Notes up

through the default triggered by the filing of the Brazilian RJ Proceeding, which was only one

day before the Brazilian Petition was filed.  One would assume that creditors would consider this

right even up through the filing of the Dutch Petition given what the right reflects about how the

Oi Group operates.

Third, the risks identified in the materials primarily point creditors toward Brazil even if

they sometimes also mention the Netherlands.  *See In re OAS*, 533 B.R. at 102 (weighing the

"'Risk Factors' that all note purchasers were warned to 'carefully consider'" in the offering

---

[40]    The offering memoranda states that "all references to 'our company,' 'we,' 'our,' 'ours,' 'us,' or similar terms are to Oi S.A. and its consolidated subsidiaries."  TX 16 at i; TX 19 at i.

[41]    For example, the offering memorandum for the 2021 Notes states:

> [Coop], a wholly-owned subsidiary of Oi organized under the laws of the Netherlands, has no operations other than the issuing and making payments on the Notes and other indebtedness ranking equally with the Notes, and using the proceeds therefrom as permitted by the documents governing these issuances, including lending the net proceeds of the Notes and other indebtedness incurred by [Coop] to Oi and subsidiaries of Oi. Accordingly, the ability of [Coop] to pay principal, interest and other amounts due on the Notes and other indebtedness will depend upon the financial condition and results of operations of Oi and its subsidiaries that are creditors of [Coop].

TX 16 at 18.

materials).  The definition of "Events of Default" in the 2021 Notes Indenture includes

restructuring or liquidation ("whether judicial or extrajudicial") or "any event . . . under the laws

of *Brazil*, *the Netherlands* or any political subdivision thereof [that] has substantially the same

effect."  TX 15 § 6.01(9) (emphasis added).  The focus on Brazil is even clearer for the 2022

Notes Indenture, which references Brazil in defining the "Events of Default" but excludes any

reference to the Netherlands.  *See* TX 17 § 6.01(8) ("any event . . . under the laws of Brazil or

any political subdivision thereof [that] has substantially the same effect.").  In discussing default

and insolvency risk, the offering memoranda for both series of notes explicitly advises of the

possibility of a Brazilian bankruptcy:

> [i]f we are unable to pay our indebtedness, including our obligations under the
> notes, then we may become subject to bankruptcy proceedings in Brazil. Brazilian
> bankruptcy laws are significantly different from, and may be less favorable to
> creditors than, those of the United States.

TX 19 at 26; *see also* TX 16 at 21.  The offering memoranda also warn of risks stemming from

Brazilian regulation of Oi's fixed line business,[42] and of currency risk related to Brazil's

exchange rate,[43] potential foreign exchange taxes,[44] and laws governing cross-border currency

---

[42]    The offering memorandum for the 2021 Notes states:

> A substantial portion of our assets, including our fixed-line telecommunications network are
> dedicated to providing an essential public service. These assets would not be available for
> liquidation in the event of our bankruptcy or attachment to secure a judgment, and in the case of our
> bankruptcy would, pursuant to the terms of our concession and Brazilian law, revert to the Brazilian
> government. Although the Brazilian government would be obligated to compensate us for early
> termination of our concessions, we cannot assure you that the amount ultimately paid by the
> Brazilian government would be equal to the market value of the reverted assets. These restrictions
> on liquidation may lower significantly the amounts available to holders of the Notes in the event of
> our liquidation and may adversely affect our ability to obtain adequate financing.

TX 16 at 19.

[43]    The offering memorandum warns that "[t]he foreign exchange policy of Brazil may affect the ability of Oi
to make money remittances outside Brazil in respect of the guarantee."  TX 16 at 20.

[44]    The offering memorandum also warns that "[t]he imposition of [Brazilian] IOF [(foreign exchange)] taxes
may indirectly influence the price and volatility of the Notes."  TX 16 at 21.

flow.[45]  Admittedly, the offering memorandum for the 2021 Notes also raises the risk of a change

in E.U. banking regulations requiring new licensing for Coop's operation,[46] but this does not

come close to balancing the scales.[47]

In the context of creditor expectations, Movants once again cite the board resolutions and

Clifford Chance opinion letter that include statements that Coop's COMI under the EU

Regulation is in the Netherlands.  TX 148 ¶ 6; TX 149 ¶ 6; TX 150 Annex at 4 ¶ 6; TX 304 ¶

3.18.  But as discussed extensively above in the estoppel context, COMI under the EU

Regulation is not the same as COMI under Chapter 15, and Movants offered no evidence at trial

or cogent explanation that establishes that a creditor would expect such statements about EU

COMI would be binding in a U.S. Chapter 15 proceeding.  This is particularly true for creditor

expectations at the time the Dutch Petition was filed, which occurred after this Court had ruled

that Coop's COMI was in Brazil in the Prior Recognition Proceeding.

The Court turns to the second creditor category, which includes only PTIF.  Admittedly,

PTIF is a Dutch entity and Coop's largest creditor.  Dutch Petition ¶ 8.  Movants flag the PTIF

Loan Agreement, which included a Netherlands forum selection clause, as proof that PTIF

expected to be repaid in the Netherlands by a Dutch entity.  Trustee Reply ¶ 24; TX 5 § 8.1.

Movants also rely on the change in maturity date on the PTIF Loan, reasoning:

> [o]n March 17, 2016, the PTIF Loan Agreement was amended, to . . . amend the
> original maturity date of June 2, 2016 to various maturity dates depending on

---

[45]    The offering memorandum states that "[r]estrictions on the movement of currency out of Brazil may impair the ability of holders of the notes to receive interest and other payments on the Notes."  TX 16 at 19.

[46]    The offering memorandum warns that "[i]f regulations in the European Union are changed, and [Coop] is required to obtain a banking license from the European Central Bank as a result of issuing the Notes, it could have a material adverse effect on us and your investment in the Notes."  TX 16 at 21.

[47]    In fact, the documents direct creditors to look beyond the Netherlands to a third location: New York.  Both Coop Note Indentures are governed by New York law, designate New York as the forum for any disputes related to the Coop Notes, and require that Coop maintain an office or agency in New York City for the purpose of service of process.  Stip. Facts ¶ 23–24.  The Bank of New York Mellon is the indenture trustee for both series of Coop Notes.  Stip. Facts ¶ 25.

different tranches of borrowing to closely track the maturity dates of the PTIF
Notes, indicating the intent to use the funds held by Coop to repay amounts due
under the PTIF Notes.

Movants' Proposed FoF ¶ 60.  But while these facts provide some support for their position,

Movants' position once again ignores economic reality.  Like Coop, PTIF is a special purpose

subsidiary created under Dutch law to facilitate financing for a foreign operating parent.  Stip.

Facts ¶ 2; TX 16 at 4; Brazilian Petition n.5, ¶ 43.  As a Dutch SPV for PT, one would

reasonably expect that its economic fate had been tied to its Portuguese parent.  After the Oi

Group sold PT in 2014, PTIF played a similar role for Oi as a sibling entity to Coop.  Stip. Facts

¶ 2; Rabelo Decl. ¶ 19; Berkenbosch Decl. ¶ 17; TX 16 at 4; Trial Tr. 347:11–17, Sept. 18, 2017

(Rabelo); Motion for Provisional Relief [Case No. 16-11791, ECF No. 7, Ex. N ¶¶ 2.1, 2.5, 2.12]

(Statement of Defence [sic] on Appeal, dated June 7, 2016).  Once PTIF became a subsidiary to

Oi, Oi had control over both PTIF and Coop and used these entities consistent with their SPV

Nature: to funnel money to the Oi Group in Brazil.  In fact, PTIF was required under applicable

law and the terms of its own outstanding notes to on-lend any borrowed funds to other Oi Group

entities.  Motion for Provisional Relief [Case No. 16-11791, ECF No. 7, Ex. N ¶¶ 2.1, 2.5, 2.12]

(Statement of Defence [sic] on Appeal, dated June 7, 2016); Rabelo Decl. ¶ 19.

One also can safely assume that PTIF was aware that Coop—as an Oi Group SPV like

itself—was required to on-lend the monies that Coop received from PTIF and, therefore, that the

PTIF funds would end up with the Oi Group in Brazil.  Any representative for PTIF also would

have known that Coop, like PTIF, was a mere financing vehicle for Oi, without any revenue-

generating operations of its own from which it could repay its debt. Once again, therefore, a reasonable creditor would look to Brazil for recovery.[48]

Even if the evidence were more supportive of Movants' position, it would be difficult to credit the "expectations" of a sibling shell financing entity—without operations and wholly owned and governed by the same parent in Brazil—to the same degree as the expectations of the third party investors holding the Coop Notes. Rabelo Decl. ¶ 19; Berkenbosch Decl. ¶ 17; *see In re Bear Stearns*, 374 B.R. at 130 (discounting the significance that two of the three investors in the debtors—Cayman Islands based investment fund entities with no operations of their own— were also located in the Cayman Islands, because they were sibling Bear Stearns vehicles which had "the same minimum Cayman Islands profile."). Of course, PTIF is currently undergoing its own bankruptcy in the Netherlands where it has had its own insolvency trustee appointed. Trial Tr. 781:17–25, Sept. 25, 2017 (Berkenbosch). Neither the PTIF board of directors nor its Dutch insolvency trustee were parties to the current proceeding. Trial Tr. 781:20–782:18, Sept. 25, 2017 (Berkenbosch). If either has an interest in or opinion regarding the outcome of this case, they chose not to share them with this Court. Trial Tr. 781:17–25, Sept. 25, 2017 (Berkenbosch).[49]

---

[48]    Notably, aside from its Netherlands forum selection clause, the PTIF Loan Agreement is "governed by and construed in accordance with the laws of Brazil" (TX 5 § 6.5), and was executed not in Dutch, but "in both [the] English and Portuguese languages," while setting out that "[i]n the event of any dispute or controversy, the Portuguese version [would] prevail" (TX 5 § 6.4).

[49]    Mr. Berkenbosch testified at trial as to hearsay conversations he has had with the PTIF Insolvency Trustee, but this testimony was struck. Trial. Tr. 781:20–782:18, Sept. 25, 2017 (Berkenbosch). Mr. Berkenbosch made similar statements in paragraph 25 of his written direct testimony, but the parties agreed that these statements could not be used "for the truth of the matter asserted therein, but for Mr. Berkenbosch's state of mind." Berkbenbosch Decl. ¶ 25; Trial. Tr. 665:5–15, Sept. 25, 2017 (Berkenbosch). These statements are not, therefore, evidence of PTIF's views.

## 2.  **The Limits on the Insolvency Trustee**

The actions of the Insolvency Trustee—and their effect on COMI—also must be discounted in light of the significant legal and practical limitations on his authority with respect to Coop.  At first blush, the Insolvency Trustee appears to enjoy a fairly broad purview: (i) administering the bankruptcy estate (but not the legal person) of the debtor; (ii) liquidating the assets of the estate; and (iii) distributing the proceeds thereof to the creditors of the debtor in accordance with their ranking.  Veder Decl. ¶ 60.  But Dutch law and the economic realities of the case make his authority broader in theory than practice.  These realities dictate Mr. Berkenbosch's potential courses of action for the Dutch Bankruptcy Proceeding: (i) liquidate Coop with only the assets available in the Netherlands; and/or (ii) participate in the Brazil RJ Proceeding, either by litigating with respect to the intercompany claims or negotiating with the Oi Group in the context of that proceeding.  Consequently, none of Mr. Berkenbosch's actions change the fact that Coop's main proceeding—the only proceeding that can facilitate Coop's restructuring—is the Brazilian RJ Proceeding.

As an initial matter, the Coop Board maintains its separate existence and retains the sole power to propose a composition plan under Dutch law.  Trial Tr. 698:8–22, Sept. 25, 2017 (Berkenbosch).  Mr. Berkenbosch can only render advice to creditors regarding any proposal made by the Coop Board.  *Id.*  In other words, the Insolvency Trustee cannot actually restructure Coop, but rather can only negotiate and, failing consensus, litigate on behalf of the Dutch Coop estate.  Mr. Berkenbosch conceded that he cannot restructure Coop independently of the Brazil RJ Proceeding, and testified that the possibility of a standalone restructuring of Coop independent of the Brazilian RJ Proceeding was so unlikely that he had never even contemplated it prior to his deposition in this case.  Trial Tr. 725:18–726:7, Sept. 25, 2017 (Berkenbosch).  Mr. Berkenbosch further testified that bankruptcy proceedings in the Netherlands almost always end

100

in a liquidation.  Trial Tr. 762:8–12, Sept. 25, 2017 (Berkenbosch).  In fact, he has not personally

been involved in a Dutch bankruptcy proceeding that ended with approval of a composition plan

in his 18-year career.  Trial Tr. 699: 3–12; 730:23–731:5, Sept. 25, 2017 (Berkenbosch).  Mr.

Berkenbosch also conceded that Coop's biggest assets—its intercompany claims against Oi and

Oi Móvel—are located in Brazil.  *See* Trial Tr. 762:15–25, Sept. 25, 2017 (Berkenbosch).  As

was the situation in *OAS*, therefore, the Brazilian RJ Proceeding provides the only realistic

chance that Coop will be able to repay its debts.  Absent some consensual resolution, it appears

that any recovery on these claims would require litigation in Brazil.  Indeed, Aurelius and Mr.

Berkenbosch themselves have repeatedly looked to the Brazilian RJ Proceeding to obtain relief

with respect to Coop and issues relating to the proposed Brazilian RJ Plan.  Two Aurelius-

managed funds, Capricorn and Syzygy, have actively participated in the Brazilian RJ Proceeding

by filing pleadings and asking for relief from the Brazilian courts.  Trial Tr. 592:9–12, Sept. 25,

2017 (Gropper).  Mr. Berkenbosch has also appeared in the Brazilian RJ Proceeding, entering

objections, filing pleadings, and expressing his opinions to the Brazilian courts.  Trial Tr.

785:11–18, Sept. 25, 2017 (Berkenbosch).  Recently, an appeal that Mr. Berkenbosch filed

received a favorable decision from the Brazilian Court of Appeals, requiring the Brazilian RJ

Debtors to provide separate creditor lists and allow creditors to have a non-consolidated vote on

the proposed consolidation in the Brazilian RJ Proceeding.  TX 471, 485; Trial Tr. 786:13–17,

Sept. 25, 2017 (Berkenbosch).

The Brazilian courts have explicitly highlighted the limits of Mr. Berkenbosch's

authority, which only further confirms that Coop's COMI is in Brazil.  Following conversion of

the SoP Proceeding by the Dutch courts, the Insolvency Trustee filed a motion with the Brazilian

RJ Court objecting to the relief sought by the Brazilian RJ Debtors in the Brazilian RJ

Proceeding.  Ferreira Decl. ¶ 6.  In response, the Brazilian RJ Court rejected the Insolvency

Trustee's motion and issued the Brazilian Injunction Order declaring, among other things, that

the Insolvency Trustee did not have the power to represent or act as the managing body of Coop,

that Coop is a financial vehicle of the Oi Group and not operational, and that the Oi Group's

operational activities and main place of business are in Brazil, making all issues related to the

parent company and its subsidiaries subject to Brazilian law.  Ferreira Decl. ¶¶ 6–9.  The order

makes clear that the Insolvency Trustee would be fined if he tried to oppose or inhibit the actions

regularly performed by the Brazilian courts or the Coop Board.  Ferreira Decl. ¶ 9.[50]

        The Movants rely on the Insolvency Trustee's initiation of the Pauliana Proceeding as

evidence that Coop's COMI is now in the Netherlands.  But the Movants once again ignore

economic reality.  The Insolvency Trustee conceded that the Pauliana Proceeding is simply

another way to seek recovery of the money loaned from Coop to Oi and Oi Móvel in Brazil.

Trial Tr. 703:16–704:25, Sept. 25, 2017 (Berkenbosch); Berkenbosch Decl. ¶ 25 (stating that the

goal of this action is the "unwinding [of] the 2016 loans from Coop to Oi Móvel.").  These are

the same loan transactions that are the subject of Coop's intercompany claims against Oi and Oi

Móvel, claims that the Insolvency Trustee concedes are located in Brazil.  Trial Tr. 703:16–

704:25, Sept. 25, 2017 (Berkenbosch) (subject of Pauliana Proceeding are same loans that are

subject to the intercompany claims); *id.* at 762 (Coop's largest assets are intercompany claims

against Oi and Oi Móvel and those assets are located in Brazil).  On this evidentiary record, there

is no reason to expect that the mere initiation of the Pauliana Proceeding would dramatically

---

[50]        On appeal of the Brazilian Injunction Order, the Insolvency Trustee and Capricorn, an Aurelius-managed
fund, obtained an order from the Court of Rio de Janiero, Eighth Civil Chamber stating in part that the Brazilian
Injunction Order has extraterritorial effect except in instances in which foreign jurisdictions have found otherwise
for assets within their jurisdictions.  Ferreira Decl. ¶¶ 14–17.  Thus, the Brazilian Court order still is in place for Oi
Group assets in Brazil, the only assets that provide a chance for recovery for Coop's creditors.

affect where Coop creditors would look for recovery on their claims given that the assets of Oi

and Oi Móvel remained in Brazil even after Mr. Berkenbosch's appointment.[51]  *See In re*

*Creative Fin.*, 543 B.R. at 501 (noting that to change COMI from jurisdiction in which debtor

did business to a letterbox jurisdiction requires material activities that provide "a meaningful

basis for the expectations of third parties.").[52]

Of course, one might imagine a circumstance where the filing of such a Pauliana

Proceeding might be more significant.  For example, it might be different if recovery in such an

action might be possible against assets located outside Brazil.  This could be the case if some of

the cash transfers from Coop to the Oi Group in Brazil had not occurred, and the funds instead

had remained in the Netherlands or some other jurisdiction in which the Insolvency Trustee had

direct access to them.  But these are not the facts here.  Instead, the factual record demonstrates

inherent limitations on the Insolvency Trustee's ability to shift COMI in this case, regardless of

how much work he performs.  *See In re Fairfield Sentry*, 714 F.3d at 138 (noting that "[t]he

absence of a statutory definition for a term [like COMI] that is not self-defining signifies that the

text is open-ended, and invites development by courts, *depending on facts presented*, without

---

[51]    The Movants fail to articulate a theory of creditor recovery against Oi and Oi Móvel other than against the assets in Brazil or the Netherlands.  While the Movants reference Oi Group operations in Europe, they provide no evidence or explanation of how assets located in Europe would lead a creditor to conclude that their recovery would be obtained through the Dutch Bankruptcy Proceeding.  *See* Movants' Proposed FoF ¶ 100 (referencing U.K bank account of Oi Móvel used to process payments relating to roaming agreements) (citing TX 107 ¶ 11; TX 284 ¶¶ 18, 28; Trial Tr. 289:22–25, Sept. 18, 2017 (Rabelo)).  In his testimony, Mr. Berkenbosch also references U.S. assets of Oi and Oi Móvel as one of the reasons for filing these proceedings, but does not clarify what type of assets or quantify their value.  *See* Trial Tr. 789:3-13, Sept. 25, 2017 (Berkenbosch).  In sum, the Movants provide no specific information regarding non-Brazilian assets of Oi or Oi Móvel in the record or explain how such assets impact the dispute before this Court.

[52]    Movants do not appear to place much reliance on the few assets that the Insolvency Trustee does control as a basis for a Dutch COMI.  The Court finds that such funds are insufficient to support a COMI finding in the Netherlands, particularly given that the amount of assets controlled by the Insolvency Trustee is eclipsed by the amount of the loan borrowed by the Insolvency Trustee in the Dutch Proceedings from members of the IBC.  *See* Berkenbosch Decl. ¶ 26 (claim against Dutch authorities for VAT of €160,846); Dutch Certified Petition ¶ 30 (same); Stip. Facts ¶ 26–27 (court-supervised account in the Netherlands with balance of approximately €116,905 and bank account in New York with approximately USD $50,000 held in trust by Jones Day); Berkenbosch Decl. ¶ 100 (discussing USD $5 million credit facility for loan from IBC to Insolvency Trustee); TX 58 (credit facility).

prescription or limitation.") (emphasis added); *cf. In re Creative Fin.*, 543 B.R. at 501, 519

(noting that recognition of letterbox jurisdictions is possible "so long as the estate fiduciaries do

enough work," but the material activities must provide "a meaningful basis for the expectations

of third parties").

Given the totality of the evidence, therefore, the Movants have not satisfied their burden

of showing that the COMI of Coop has shifted from Brazil to the Netherlands based on events

after the Prior Recognition Order.

### 3.   The Plan of Aurelius

While the Court finds that the SPV nature of Coop, creditor expectations, and the limits

on the Insolvency Trustee's powers are a sufficient basis to deny the Movants' request to modify

or terminate the Prior Recognition Order, there is another reason: the actions of the creditor

Aurelius.  The evidence establishes that Aurelius chose to sit on the sidelines during this Court's

Prior Recognition Hearing, while simultaneously planning—and later executing— a strategy to

undo that recognition and block the Brazilian RJ Proceeding.  The Court finds these actions

provide an independent basis to decline to exercise this Court's discretion to modify or terminate

recognition under the second prong of Section 1517(d).  *See In re Loy*, 448 B.R. 420, 438

(Bankr. E.D. Va. 2011) (noting that revisiting a recognition determination under Section 1517(d)

is not mandatory, but within the Court's discretion.).

As a threshold matter, it is important to understand Aurelius' investment strategy here.

Aurelius' investment philosophy involves finding securities that are undervalued based on

"business drivers," and considering where the securities sit in the capital structure, the existence

of a legal dispute, the restructuring process, or a combination of these factors.  Trial Tr. 603:7–

15, Sept. 25, 2017 (Gropper).  Aurelius believed that the PTIF and Coop Notes were undervalued

in initial restructuring negotiations between the Oi Group and certain of its creditors.  OX 73 at

3.  On July 22, 2016, the same day as this Court's Prior Recognition Hearing, Aurelius published

a memo that shared its analysis with the market and invited other creditors with significant

holdings in Coop Notes or PTIF notes to contact Aurelius.  OX 73.  Aurelius' analysis, based on

an internal waterfall model, was premised on holders of Coop and PTIF notes recovering directly

against Coop and PTIF as "issuers" and also recovering against Oi based on its guarantees.  Trial

Tr. 605:14–606:19, Sept. 25, 2017 (Gropper).  This dual recovery strategy is sometimes referred

to as a "double dip."  Trial Tr. 607:19–23, Sept. 25, 2017 (Gropper).  Under this strategy,

Aurelius believed that it was important to take into account the prepetition transfers of money

moving between the Oi financing entities, Coop and PTIF.  Trial Tr. 609:21–25, Sept. 25, 2017

(Gropper).  Thus, by pressing for strict corporate separateness and enforcement of intercompany

claims, Aurelius would have two paths for recovery against Oi Group assets.

This double dip strategy would have been compromised by a plan in the Brazilian RJ

Proceeding that sought substantive consolidation of Oi Group debtors and eliminated

intercompany claims, because such a plan would allow the noteholders only "one dip," that is a

single claim against the consolidated Oi Group assets.  Trial Tr. 610:21–25, 612:12–17, Sept. 25,

2017 (Gropper).  While Aurelius believed that multinational restructurings in Brazil should

respect corporate separateness (Trial Tr. 612:18–24, Sept. 25, 2017 (Gropper)), it also

understood that the issue of whether the Oi Group plan would permit a double dip would

ultimately be decided by the Brazilian courts.  Trial Tr. 613:12–17, Sept. 25, 2017 (Gropper).

Moreover, Aurelius was aware of the recent restructuring of Rede Energia S.A. and its

subsidiaries, in which the Rede corporate group's substantively consolidated plan was approved

in Brazil notwithstanding Aurelius' understanding that "bondholders were denied the right to

vote." Trial Tr. 614:6–615:5, Sept. 25, 2017 (Gropper).[53]  It is logical to conclude that Aurelius

understood that if it were to wait until the conclusion of the Brazilian RJ Proceeding to oppose

substantive consolidation, there was a risk that the Brazilian courts would approve a plan that

eliminated the double dip and that this Court might later recognize such plan in a Chapter 15

proceeding.

As part of its strategy, Aurelius decided not to object to the Court's prior recognition of

Brazil as Coop's COMI, notwithstanding its view that Coop's COMI has always been the

Netherlands.  *See* Movants' Proposed CoL ¶ 45 ("Even if the developments of the last year are

ignored, Coop's COMI is and always has been in the Netherlands."); Trial Tr. 637:17–25, Sept.

25, 2017 (Gropper) (Aurelius' expectation even at the time of the Prior Recognition Hearing that

Coop would be reorganized in the Netherlands).  Aurelius kept silent at the Prior Recognition

Hearing while pursuing bankruptcy proceedings for Coop in the Netherlands with the intent of

overturning this Court's Prior Recognition Order, and undermining the Brazilian RJ Proceeding.

One can safely assume that Aurelius concluded from its involvement in the *OAS* case that relief

requested in a U.S. bankruptcy court by an "independent fiduciary" acting pursuant to its legal

obligations was more likely to be viewed favorably by the court than steps taken by a creditor.[54]

---

[53]     Although Mr. Gropper of Aurelius claimed that he "[didn't] know what the impact [of the *Rede* case] was from a Chapter 15 perspective" (Trial Tr. 615:4–5, Sept. 25, 2017 (Gropper)), it bears noting that the Rede Group's Brazilian plan was subsequently recognized by this Court in a published decision.  *In re Rede Energia*, 515 B.R. 69.

[54]     Aurelius played a markedly similar role in the *OAS* case in 2015, which involved not only an analogous fact pattern, but even most of the same professionals.  At the end of March 2015, OAS Group entities, including OAS Investments and OAS Finance, two finance SPVs incorporated in Austria and the BVI respectively, commenced Brazilian bankruptcy proceedings.  *See In re OAS*, 533 B.R. at 89, 101; OAS Finance Petition ¶ 4 [Case No. 15-11304, ECF No. 2].  In mid-April 2015, the Brazilian foreign representative of four of those entities (including the two SPVs) commenced Chapter 15 cases in this Court.  *See In re OAS*, 533 B.R. at 90.  The next day, Aurelius and another hedge fund, both OAS Group creditors, filed a petition to appoint joint provisional liquidators (the "JPLs") in the BVI for one of the SPV entities, OAS Finance.  *See In re OAS*, 533 B.R. at 91; OAS Finance Petition ¶ 36.  Roughly a month later, the JPLs filed their own petition for recognition under Chapter 15.  *See In re OAS*, 533 B.R. at 91; OAS Finance Petition ¶ 41.  In mid-May 2015, the two funds filed an objection to the Brazilian foreign representative's petition for OAS Investment's recognition, arguing, among other things, that OAS

*See* Trial Tr. 616:19–25, Sept. 25, 2017 (Gropper) (Aurelius wanted a conversion so that

someone with the powers of the Insolvency Trustee would be appointed for Coop).

Aurelius' actions following the issuance of the Prior Recognition Order are consistent

with execution of this strategy. First, Aurelius significantly increased its Coop investment. In

June 2016, two Aurelius-managed entities held investments in the Oi Group—Syzygy in Coop

Notes and Capricorn in PTIF notes. But Syzygy's Coop Notes holdings were relatively small.

OX 118. By the time that Mr. Berkenbosch filed his Chapter 15 proceeding, however, Syzygy's

holdings in Coop Notes had increased by a multiple of over ███, substantially all of which were

purchased after this Court's recognition of the Brazilian RJ Proceeding. OX 118; Trial Tr.

590:18–22, Sept. 25, 2017 (Gropper). Capricorn already held a substantial position in PTIF

notes at the time the Recognition Order was entered, and maintained that position thereafter. *See*

---

Investments' COMI was in Austria. *See In re OAS*, 533 B.R. at 91. In the recognition hearing held later that month, representatives of the Brazilian debtors acknowledged that they would not be proceeding with the OAS Finance recognition petition at that time given the status of the competing BVI proceedings. *See OAS* Hr'g. Tr. 4:9–10:10, May 23, 2015 [Case No. 15-10937, ECF No. 71]. In July 2015, the Court denied the objection as to OAS Investments and recognized the Brazilian restructuring as its foreign main proceeding. *See In re OAS S.A.*, 533 B.R. at 103.

    Over the remainder of the summer, the parties engaged in a discovery dispute and geared up for a recognition fight for OAS Finance. *See e.g.* Letter Filed by John Cunningham at 1 [Case No. 15-11304, ECF No. 22]. A recognition hearing was held in August, in which the Court questioned the petitioners and objectors on how it ought to account in its COMI analysis for the filing of the BVI proceeding by Aurelius and the second fund, and whether those actions could qualify as COMI manipulation. *See OAS* Hr'g. Tr. 22:3–26:22, 63:2–68:19, Aug. 18, 2015 [Case No. 15-11304, ECF No. 68]. The Court expressed the sentiment that the actions of the JPLs themselves, including pursuit of the Chapter 15 recognition, were generally in line with their legal responsibilities, considered separately from the actions that lead to their appointment. *See OAS* Hr'g. Tr. 25:6–12, Aug. 18, 2015 [Case No. 15-11304, ECF No. 68] ("THE COURT: No. No. I don't -- I'm not impugning anything with the JPL's. They did what they were supposed to do . . . . I'm focusing on the commencement of the proceeding, which was really before they undertook their duties"); *id.* 66:9–68:13 ("MR. CUNNINGHAM: . . . . [Aurelius] submitted to the jurisdiction in Brazil by objecting and participating, got an adverse result, and then, in essence, launched this proceeding in our view clearly as a strategic tactic to . . . create a poisoned pill. . . . [T]his was an attempt to control OAS Finance to try to disrupt -- you saw that the very first moves that were made by the JPL's were to try to withdraw OAS Finance from the Brazilian proceedings, the attempt to strip us of authority from taking any actions here. THE COURT: But that's -- it strikes me that that's a proper thing for the JPL's to do once they're appointed."). On December 30, 2015, before the Court issued a decision on the matter, the parties reported a settlement, "contingent on . . . the closing of a plan of reorganization in Brazil for the OAS Group that is consistent with the terms of the settlement agreement." Letter Filed by Andrew Rosenblatt at 1 [Case No. 15-11304, ECF No. 70].

Trial Tr. 582:5–8, Sept. 25, 2017 (Gropper); OX 29.  This position provided additional exposure

to the outcome of Aurelius' strategy given that one of PTIF's principal assets is its intercompany

claim against Coop for approximately USD $4 billion (Trial Tr. 595:4–7, Sept. 25, 2017

(Gropper)).

Second, Aurelius took actions to bring about the Dutch Bankruptcy Proceeding for Coop.

In late June 2016, approximately a month before entry of this Court's Prior Recognition Order,

the Aurelius-managed Syzygy and certain other bondholders initiated involuntary bankruptcy

proceedings against Coop in the Netherlands.  Trial Tr. 589:11–15, Sept. 25, 2017 (Gropper).

The SoP Petition subsequently filed by Coop on August 9, 2016 is a common defensive response

taken by debtors in the Netherlands to the filing of an involuntary bankruptcy petition and

appears to be defensive in this case.  Trial Tr. 734:24–735:6, Sept. 25, 2017 (Berkenbosch).[55]

Upon his appointment as SoP administrator, Aurelius almost immediately began applying

pressure on Mr. Berkenbosch both directly and through counsel to have the SoP withdrawn and a

bankruptcy declared, repeatedly reminding him of his fiduciary duties.  Trial Tr. 617:10–18,

618:13–619:6, Sept. 25, 2017 (Gropper); OX 4, 7.  Aurelius continued its barrage of letters

through the fall of 2016.  Trial Tr. 617:14–18, 619:11–23, 620:14–621:11, Sept. 25, 2017

(Gropper); OX 9, 16, 27 (counsel letter on behalf of the IBC); SCX 6.  Aurelius also pressed

other bondholders to contact Mr. Berkenbosch to urge him to have the SoP withdrawn and a

bankruptcy declared, all to force Oi to negotiate with the Coop and PTIF bondholders.  OX 36 at

---

[55]    While the Insolvency Trustee asserts that the request for a SoP was part of a comprehensive strategy by Oi
to pursue plan recognition in the European Union, the evidence does not support that assertion.  *See* Berkenbosch
Decl. ¶ 50.  The document relied upon for this allegation explicitly states that the filing of a SoP would be used only
as a defensive measure.  TX 152 at 41 ("RJ will not be recognized in the Netherlands therefore if creditors take
action in the Netherlands, the Fincos will have to file for an additional insolvency proceeding, Suspension of
Payments, to ensure they are protected in the Netherlands.  Please note the current intention is that this will be used
as a defensive measure only.  And illustrative timeline is on the next slide."); *see also* Trial Tr. 733:6–13, Sept. 25,
2017 (Berkenbosch).

Bates Aurelius–000899.  The record is devoid of similar demands, threats, or protests by other

creditors.

Aurelius also met with Mr. Berkenbosch and provided him with a roadmap to pursue its

double dip strategy, which included the only third party recovery analysis that Mr. Berkenbosch

ever received.  SCX 6; Trial Tr. 818:17–822:9, Sept. 25, 2017 (Berkenbosch).  Aurelius intended

that, after a bankruptcy was declared and a trustee with the power to act on behalf of the Coop

estate was installed, a proceeding would be commenced in the United States on behalf of Coop

under either Chapter 15 or Chapter 11.  Trial Tr. 616:19–617:9, Sept. 25, 2017 (Gropper)).  In

December 2016, Mr. Berkenbosch ultimately applied for withdrawal of the SoP and petitioned

for bankruptcy, with a supporting petition filed by members of the IBC, which had been formed

in November 2016.  Trial Tr. 647:22–2, 648:6–8, Sept. 25, 2017 (Gropper); Trial Tr. 770:2–6,

Sept. 25, 2017 (Berkenbosch).  As a part of extensive litigation in the Dutch District Court, the

Dutch Court of Appeals, and the Dutch Supreme Court, Mr. Berkenbosch was appointed the

Insolvency Trustee for Coop's Dutch Bankruptcy Proceeding.

The credible evidence establishes that, consistent with Aurelius' investment strategy, one

of the goals of the Dutch Bankruptcy Proceeding was to block this Court's recognition of the Oi

Group's Brazilian plan.  In early January 2017—well before the Dutch Court of Appeals granted

the request to convert the SoP to a bankruptcy proceeding—Mr. Berkenbosch's counsel prepared

a memo for him (the "Jones Day Memo") analyzing the effects of U.S. recognition of a Dutch

bankruptcy proceeding as Coop's foreign main proceeding.  OX 55.  The Jones Day Memo laid

out a strategy for "Blocking Recognition of a Brazilian Plan for Coop" were such a plan to be

approved by creditors in Brazil.  OX 55 ¶ 2.2.  The Jones Day Memo noted that Mr.

Berkenbosch could "block the implementation of any RJ Plan and the discharge of Coop's notes

by objecting to the recognition of any RJ Plan for Coop in the United States." OX 55 ¶ 2.2.3.

This would "effectively prevent the Oi Group from raising any new capital in the international

debt or equity markets . . . ." OX 55 ¶ 2.2.4. Recognition of the Dutch Bankruptcy Proceeding

as the foreign main proceeding by this Court was critical to Mr. Berkenbosch's ability to carry

out this strategy. OX 55 ¶¶ 2.2.5, 2.2.8.[56]

When questioned regarding the Jones Day Memo, Mr. Berkenbosch testified that

"blocking" the Brazilian RJ Plan was not his goal. Trial Tr. 714:25–715:4, Sept. 25, 2017

(Berkenbosch). But such demur is not credible as it is inconsistent with other statements of Mr.

Berkenbosch.[57] For example, Mr. Berkenbosch prepared a letter for the Dutch Supervisory

Judge stating that recognition of the Dutch Bankruptcy Proceeding as a foreign main proceeding

under Chapter 15 would "provide the bankruptcy trustee with the authority to block the Brazilian

RJ plan if it does not comply with Dutch laws and regulations." OX 80 at 3; Trial Tr. 722:12–

723:13, Sept. 25, 2017 (Berkenbosch).[58] It is also inconsistent with ███████████████

---

[56]    To fund this litigation strategy, the IBC (including Aurelius) provided a USD $5 million loan to Mr. Berkenbosch. Trial Tr. 771:13–17, Sept. 25, 2017 (Berkenbosch); TX 58. Mr. Berkenbosch testified that this loan was necessary for him to bring certain litigation in the U.S. and Brazil, including the Dutch Petition. Trial Tr. 839:18–22, Sept. 25, 2017 (Berkenbosch); Trial Tr. 700:17–702:9, Sept. 25, 2017 (Berkenbosch). As a condition of receiving the loan, Mr. Berkenbosch agreed to concede that the PTIF claim asserted against Coop (which is a key component of value for holders of PTIF notes) is valid and not subject to subordination. Trial Tr. 772:18–773:21, Sept. 25, 2017 (Berkenbosch).

[57]    Mr. Berkenbosch equivocated on this subject throughout his trial testimony. He testified first that preventing a plan inconsistent with Dutch law was an objective. Trial Tr. 719:19–25, Sept. 25, 2017 (Berkenbosch). But he then walked his answer back: "Q. Right. Sir, your testimony – I'm not trying to put words in your mouth, I just want to understand it. If this paragraph 2.2.8 accurately reflects one of the objectives. Please tell me if it does or it doesn't. A. Okay. I'm going to read it again then. Q. Sure (Document Review.). A. It is – it is difficult for me to say and to confirm that this is an objective. I would like to have to look very close at the wording. Q. I'll tell you what, sir, let's turn to Tab –. A. Because this says, "No reorganization plan approved in Brazil if conflicted with Dutch bankruptcy proceedings," and yes, Dutch bankruptcy proceedings are very, very important, but I can imagine that there is some discretion before – also before the U.S. court would not – or would prevent the implementation of the reorganization plan. This is just very black and white. I'm not sure if I'm entirely clear." Trial Tr. 720:16–721:17, Sept. 25, 2017 (Berkenbosch).

[58]    Mr. Berkenbosch testified that he wasn't sure if the draft version of this letter was ever sent (Trial Tr. 724:17–725:14, Sept. 25, 2017 (Berkenbosch)), and that the letter is "an earlier draft, so it's very difficult for me to say that—doing it again, I would have used a few other words. Some words are a bit strong, so it's difficult for me to say." Trial Tr. 724:8–12, Sept. 25, 2017 (Berkenbosch). But there was no dispute that he drafted the letter.



Having found as a factual matter that Aurelius engaged in such a strategy, the question

then becomes the legal significance of these actions. The parties offer very different

conclusions. The Objectors characterize the efforts of Aurelius as a bad faith effort at COMI

manipulation. They note that U.S. courts have tried to prevent COMI manipulation by

scrutinizing the motives and actions of parties in interest prior to the commencement of a

Chapter 15 case and indeed even before the filing of a foreign proceeding. *See* Objectors'

Proposed FoF and CoL ¶¶ 103–04 (citing *In re Fairfield Sentry*, 714 F.3d at 137; *In re Suntech*,

520 B.R. at 416; *In re Millennium Global Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 75

(Bankr. S.D.N.Y. 2011) ("Use of the [C]hapter 15 petition date as the date for determining

recognition also leads to the possibility of forum shopping, as it gives prima facie recognition to

a change of residence between the date of opening proceedings in the foreign nation and the

[C]hapter 15 petition date.")). While Objectors take no issue with the appointment of Mr.

Berkenbosch, they complain of efforts by Aurelius and the Aurelius-led IBC to manipulate
COMI as part of an orchestrated strategy to block the Brazilian RJ Proceeding and preserve their
hopes for a double dip strategy. *See* Objectors' Proposed FoF and CoL ¶ 105.

Movants strongly disagree. They maintain that Aurelius could not manipulate COMI
because it is a creditor and thus without the ability to move assets, change headquarters or take
other actions that could impact the COMI analysis. *See* Movants' Proposed CoL ¶ 41. They
further argue that COMI manipulation cannot be found based on the Dutch proceedings given
that Mr. Berkenbosch acted as a Court appointed fiduciary for the benefit of Coop and its
creditors. *See* Movants' Proposed CoL ¶ 40; Trustee Reply 70–73; Trial Tr. 936:14–25 Sept. 26,
2017 (Ball).

Mr. Berkenbosch's actions within the scope of his authority as a fiduciary appointed by
the Dutch Court, in and of themselves, do not trigger any concerns about COMI manipulation or
improper conduct. *See, e.g., OAS* H'rg. Tr. 25:6–12 [Case No. 15-11304, ECF No. 68] ("THE
COURT: No. No. I don't -- I'm not impugning anything with the JPL's. They did what they
were supposed to do. . . . I'm focusing on the commencement of the proceeding, which was
really before they undertook their duties"); *see also id.* 66:9–68:13; *In re Suntech*, 520 B.R. at
419–20 (holding that joint provisional liquidators did not manipulate COMI in bad faith when
they acted consistent with their duties under their order of appointment and took actions that they
would have taken even if they did not intend to file for Chapter 15).

The Court instead must focus on the actions of Aurelius. The Court recognizes that a
creditor like Aurelius does not have the same fiduciary obligations to the creditor body as a
debtor. It is expected to act on behalf of its own interests. Not surprisingly then, the few cases
on COMI manipulation address the efforts of a debtor—not a creditor—to influence COMI

leading up to the filing of a Chapter 15 recognition proceeding. *See, e.g., In re Fairfield Sentry*,

714 F.3d at 133 (identifying concern regarding "a debtor's ability to manipulate its COMI"); *In*

*re Creative Fin.*, 543 B.R. at 523 (finding debtors' principals—and thereby the debtors

themselves—guilty of bad faith and noting that under *Fairfield Sentry*, such activities could

constitute bad faith invocation of the Bankruptcy Code that could "trump any apparent COMI

premised on the locale of a foreign representative's activities.").   The Court also agrees with the

Movants that a creditor does not have the same control as a debtor over certain facts relevant to

COMI, such as the location of a debtor's registered office.

But the evidence here presents a disturbing picture: a creditor unhappy with Brazilian

insolvency proceedings decided to strategically remain silent through a Chapter 15 recognition of

those proceedings by this Court while planning—and eventually executing—a strategy designed

to reverse that recognition and block any restructuring in the Brazilian proceeding.   As the

evidentiary record reflects that this strategy existed at the time of the Prior Recognition Hearing,

Aurelius' actions also reflect a lack of candor before the Court.   Such actions are clearly within

the realm of concerns identified in the COMI manipulation cases. *See In re Fairfield Sentry*, 440

B.R. at 66 (identifying activities that may constitute an "opportunistic shift to establish COMI,"

including "insider exploitation, untoward manipulation, [and] overt thwarting of third party

expectations."); *In re Creative Fin.*, 534 B.R. at 513, 523 (finding debtors' principals—and

thereby the debtors themselves—guilty of bad faith for, among other things, attempting to

control a BVI liquidator by the purse strings); *cf. In re Compañía de Alimentos Fargo, S.A.,* 376

B.R. 427 (Bankr. S.D.N.Y. 2007) (dismissing under Section 305 an involuntary Chapter 11 filed

by creditors amidst concerns that case was filed to "hijack" a foreign insolvency proceeding in

Argentina or, at a minimum increase the creditors' leverage in any negotiations).

Bankruptcy courts often are required to consider issues of bad faith.  For example, bankruptcy courts are called upon to determine whether to subordinate creditor claims.  *See In re LightSquared Inc.*, 511 B.R. 253, 333, 340–41, 345–46 (Bankr. S.D.N.Y. 2014) (equitably subordinating the claims held by an SPV created by a competing company to pursue an end-run around the eligible assignee provisions of the credit agreement in violation of the implied covenant of good faith and fair dealing); *In re Adler, Coleman Clearing Corp.*, 277 B.R. 520, 566 (Bankr. S.D.N.Y. 2002) (equitably subordinating the "customer claim" filed pursuant to SIPA against a securities clearing firm because the customer was the "knowing" beneficiary of fraud and other illegal conduct that led to the firm's failure).  Similarly, bankruptcy courts sometimes address whether to limit a creditor's ability to credit bid.  *See In re The Free Lance-Star Publ'g Co. of Fredericksburg, VA*, 512 B.R. 798, 804–08 (Bankr. E.D. Va. 2014) (restricting a creditor's right to credit bid based on an "overly zealous loan-to-own strategy" and the negative impact its misconduct had on the auction process); *In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 60–61 (Bankr. D. Del. 2014) (restricting credit bidding because it might freeze out other "suitors" and "the proposed sale purchaser had insisted on an unfair process, i.e., a hurried process").  Bankruptcy courts also place restrictions on parties' ability to inappropriately collude when submitting bids for an auction sale.  *See In re Stroud Ford Inc.*, 163 B.R. 730, 733–34 (Bankr. M.D. Pa. 1993) (denying motion to sell estate property because a payment made between bidders to withdraw an objection "smack[ed] of inappropriateness and could have only stifled the bankruptcy mechanism designed to ensure that the estate is fairly compensated for its assets."); *In re Edwards*, 228 B.R. 552, 565–66 (Bankr. E.D. Pa. 1998) (denying objection to Section 363 sale after finding no evidence that an agreement between joint bidders was aimed at controlling and depressing the sale price)).

114

Movants contend that they cannot be penalized for Aurelius' actions, noting that the

Objectors "have not claimed that . . . the Insolvency Trustee [is] estopped from bringing or

supporting the petition."  Movants' Proposed FoF ¶ 41 n.13.  Movants note that the Insolvency

Trustee had not yet been appointed at the time of the Prior Recognition Hearing, that the IBC

was not yet in existence at that time, that Aurelius only accounts for ███ of the IBC holdings,

and that there is no evidence Aurelius controls the IBC.  *Id.*  Movants' argument is misdirected,

however, as this Court is not relying on estoppel to make this ruling, and therefore need not

establish privity between Aurelius and any other party.  *In re Avaya Inc.*, 2017 WL 4119034, at

*7 (Bankr. S.D.N.Y. Sept. 18, 2017) (judicial estoppel requires privity or identity).

Rather, as has been explained above, this Court is assessing the facts in this case and the

forward-looking policy implications generally of Aurelius' strategy and tactics as factors in its

exercise of discretion under Section 1517(d).  The Court finds it appropriate to consider

Aurelius' actions in the Section 1517(d) analysis given its unique and central role in creating the

factual record now before the Court.  It was Aurelius that initiated litigation in the Netherlands in

the spring of 2016 to enjoin the fund transfers being made pursuant to Coop's loans to Oi and Oi

Móvel.  Shah Decl. ¶¶ 56–57.  Aurelius bargained to remain silent at the Prior Recognition

Hearing in return for stipulations which protected its authority to take further actions overseas

and in the Netherlands.  Hr'g Tr. 7:24–8:15 June 22, 2017; Hr'g Tr. 9:23–10:15 July 21, 2017.[59]

It was also Aurelius that filed a Dutch involuntary insolvency petition against Coop just

six days after Mr. Shah filed the Brazilian Petition.  While three other involuntary petitions were

subsequently filed, Aurelius was first off the line, and it also sought to rally like-minded

---

[59]    The significance of these stipulations was not clear to the Court at the time as they largely mirrored the
relevant statutory language.  *See* Hr. Tr. 10:15–22, July 21, 2016.  In hindsight, the requests make clear Aurelius'
intent even then was the use of a Dutch proceeding to compete with and potentially derail the Brazilian RJ
Proceeding.

creditors to its cause by circulating its investment memo. OX 73 at 4. Once Mr. Berkenbosch

received his appointment as SoP Adminstrator, it was Aurelius that once again sprang into

action, immediately applying frequent and aggressive pressure to Mr. Berkenbosch to press

Aurelius' agenda. Trial Tr. 617:10–18, 618:13–20, 619:3–23, 620:14–621:11, Sept. 25, 2017

(Gropper); OX 4, 7, 9, 16, 27 (counsel letter on behalf of the IBC); Trial Tr. 816:11–19, Sept. 25,

2017 (Berkenbosch); SCX 6. So immediate and forceful was its campaign to convince Mr.

Berkenbosch that Aurelius representatives felt obligated to later apologize once he eventually

joined in the conversion efforts. Berkenbosch Decl. ¶ 55 n.87; Trial Tr. 621:22–24, 640:13–

641:20, 659:11–660:22, Sept 25, 2017 (Gropper); *id.* 767:15–769:4 (Berkenbosch).

Critically, after the Dutch District Court denied the Conversion Requests, it was

Aurelius' affiliate Syzygy and three other funds (two of whom are reported members of the

IBC), which appealed that decision, not Mr. Berkenbosch. Stip. Facts ¶ 62–3; IBCX 45 n.2.

And finally, it was again Aurelius and the IBC which provided the actual funding for Mr.

Berkenbosch to file this case. Rabelo Decl.¶ 9; TX 58.

The actions of Aurelius are at odds with many of the goals of Chapter 15 set out in

Section 1501. These include: promoting cooperation between U.S. and foreign courts, greater

legal certainty for trade and investment, fair and efficient administration of cross-border

insolvencies that protects the interests of all creditors and other interested entities, including the

debtor, protection and maximization of a debtor's assets, and the rescue of financially troubled

businesses. 11 U.S.C. § 1501. Rather than promote cooperation between U.S. and foreign

courts, Aurelius seeks leverage over the Chapter 15 Debtors by attempting to block the Brazilian

RJ Proceeding. Thus, Aurelius has weaponized Chapter 15 to collaterally attack both the

Brazilian RJ Proceeding and the Oi Group's proposed Brazilian RJ Plan. The result undermines

the goals of maximizing the Chapter 15 Debtors' assets and assisting in the rescue of their

financially troubled business.

Indeed, the actions of Aurelius are inconsistent with the trend in international insolvency

law. For example, UNCITRAL has a working group studying cross border insolvencies of

multinational enterprise groups of the kind at issue in this case. The working group has

published draft legislative provisions on the issue. Those drafts define an "Enterprise" as "any

entity, regardless of its legal form, that is engaged in economic activities and may be governed

by insolvency law, and an "Enterprise Group" as "two or more enterprises that are

interconnected by control or significant ownership." *Facilitating the Cross-Border Insolvency of*

*Multinational Enterprise Groups: Draft Legislative Provisions*, Article 2. Definitions, United

Nations Commission of International Trade Law, Working Group V (Insolvency Law), Fifty-

First Session, New York, 10-19 May 2017 (dated 2 March 2017),

http://www.uncitral.org/uncitral/en/commission/working_groups/5Insolvency.html (last accessed

on Nov. 12, 2017). Among the objectives of the draft law is the promotion of cooperation

between courts and other competent authorities among States involved in cases of cross-border

insolvency affecting members of an enterprise group. *Id.* at Chapter 1. General Provisions,

Preamble.

Of particular relevance to this case, the draft legislation seeks to promote:

- Fair and efficient administration of cross-border insolvencies concerning enterprise
  group members that protects the interests of all creditors and other interested persons,
  including the debtors;

- Protection and maximization of the overall combined value of the operations and
  assets of enterprise group members affected by insolvency and of the enterprise group
  as a whole; and

- Facilitation of the rescue of financially troubled enterprise groups, thereby protecting
  investment and preserving employment.

117

*Id.*, Preamble, Sections (d), (e), and (f).  The draft legislation provides for cooperation in a variety of ways, including:

-    Authority to enter into agreements concerning the coordination of insolvency proceedings of group members in different foreign jurisdictions;

-    The appointment of a single insolvency representative to administer and coordinate insolvency proceedings concerning members of the same enterprise group in different foreign jurisdictions; and

-    Use of a "planning proceeding" open to members of the enterprise group who have a COMI in the foreign jurisdiction where the proceeding is being held but also to members of the enterprise group whose COMI is in another foreign jurisdiction.

*See id.*, Articles 9, 10, 11, 12.  Aurelius' actions here are at odds with the focus of this draft legislation on cooperation, value maximization and enterprise preservation.[60]

In sum, the strategy pursued by Aurelius in these cases is a troubling one that the Court refuses to countenance.  The Court recognizes that the facts here are novel, unlike any reported decision that the Court or the parties have been able to locate.  The result here is certainly not a traditional application of COMI manipulation principles, normally applied to a debtor with only one foreign proceeding.  But the Court reaches this result based on the discretion granted it under Section 1517(d), the Court's authority to address issues of bad faith and other inequitable conduct, and the Court's evidentiary findings above.  In reaching this conclusion, moreover, the Court takes to heart the Second Circuit's guidance that the factors relevant for COMI are open-ended and must be developed by courts on a case-by-case basis.  S*ee In re Fairfield Sentry*, 714 F.3d at 138 (noting that "[t]he absence of a statutory definition for a term [like COMI] that is not self-defining signifies that the text is open-ended, and invites development by courts, depending on facts presented, without prescription or limitation."); *c.f.* U.S.C. § 105(a).

---

[60]     The Court notes that neither Brazil nor the Netherlands has enacted the UNCITRAL Model Law that is reflected in Chapter 15 of the United States Bankruptcy Code.

The Court is also mindful that the Movants always have the ability to come back to this Court and challenge the recognition of any plan approved in the Brazilian RJ Proceeding. *See In re OAS*, 533 B.R. at 104.  As *OAS* noted in overruling an objection to recognition:

> [o]bjections based on the speculation that the Brazilian Court will approve a plan or plans that permit substantive consolidation, unfair distributions or the elimination of creditor fraudulent transfer claims are premature. They depend on the contents and effect of one or more plans that the Brazilian Court has not yet approved and may never approve. . . . In addition, Aurelius and Alden will have the chance to object to any plans in Brazil and challenge any motion in this Court seeking recognition and enforcement of any plans approved by the Brazilian Court.

*In re OAS*, 533 B.R. at 104.

## <u>CONCLUSION</u>

For all the reasons set forth above, the Court denies the Dutch Petition and request for related relief.[61]  The Objectors are directed to settle a proposed order on seven days' notice.  The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice.  A copy of the notice and proposed order shall also be served upon Movants' counsel.

Dated: New York, New York
        December 4, 2017

        */s/ Sean H. Lane*_____
        UNITED STATES BANKRUPTCY JUDGE

---

[61]    The Movants raised an argument regarding Mr. Shah's replacement as foreign representative by Mr. Rabelo.  *See* Trustee's Supp. to the Dutch Petition at ¶ 2 [ECF No. 23].  The parties should consider their position on this issue in light of the Court's ruling today and contact the Court within 14 days of this decision regarding how they would like to proceed on this issue.